I5PAAAMTC                    Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -------------------------------x

3   AMTRUST NORTH AMERICA, INC. ET
    AL.,
4
                    Plaintiffs,
5
                v.                        17 CV 5340 (JPO)
6
    KF&B, INC.,
7
                    Defendant.
8
    -------------------------------x
9                                        New York, N.Y.
                                         May 25, 2018
10                                       11:00 a.m.

11  Before:

12                     HON. J. PAUL OETKEN,

13                                       District Judge

14                          APPEARANCES

15  KASOWITZ BENSON TORRES LLP
         Attorneys for Plaintiffs AmTrust
16  BY:  ALEXANDER SIMKIN MATTHEW J. WEISER

17  LEWIS BRISBOIS BISGAARD & SMITH LLP
         Attorneys for Defendant KF&B
18  BY:  SERENA A. SKALA JOCOB ZISSU

19

20

21

22

23

24

25

I5PAAAMTC                        Conference

1          (Case called)

2                MR. SIMKIN:  Alexander Simkin, for the plaintiff.

3                MR. WEISER:  Matthew Weiser, for the plaintiff.

4                THE COURT:  Good morning.

5                MS. SKALA:  Good morning, your Honor.

6                Serena Skala, for the defendant.

7                THE COURT:  Good morning.

8                MR. ZISSU:  Jacob Zissu, supporting Ms. Skala this

9    morning.

10                THE COURT:  Good morning.

11                Welcome everybody.

12                We're here to address the letters that the parties

13   have submitted regarding the current disputes on discovery.

14   Before we get to that, let me talk a little bit about the

15   pending motion to dismiss the counterclaims.  KF&B has a

16   counterclaim against AmTrust.  I've read the briefs and I want

17   to ask a couple of questions about that.  Y'all can remain

18   seated for this.  You don't need to stand.  Just speak into the

19   microphones because we do have a court reporter here.

20                As usual in these contract cases, you wish the

21   contracts had been drafted a lot more clearly, and the question

22   is whether there is an exclusive arrangement whether

23   essentially KF&B was made the exclusive broker of AmTrust in

24   the 2013 endorsement, endorsement number two by the language.

25   Producer is appointed as the dedicated program manager.  I

1    think plaintiffs have a pretty good argument that it's kind of

2    an odd way when you've already said that this arrangement is on

3    a nonexclusive basis to then use completely different language

4    that doesn't seem to be a term of art in the industry suddenly

5    you're calling it dedicated.  So it seems to me just a better

6    reading contractually probably is that that doesn't trump the

7    nonexclusive language in the main managing producer agreement.

8            However, the question is whether it's unambiguous and

9    I don't know that it's unambiguous.  What else does that

10   language mean, "the dedicated program manager" if not it's

11   dedicate in the way that a bike lane is dedicated?  It's the

12   sole, it's exclusive.  That's one meaning of dedicated.

13           So how would you respond to that?

14           MR. SIMKIN:  First, I would say I appreciate what your

15   Honor says about a lot of contract cases having language that

16   you wish was drafted more clearly.  I think this contract

17   language is actually drafted as clearly as you could possibly

18   have.  When they allege an exclusivity right in the contract,

19   not only is there not an exclusively right, there is actually

20   an expressed provision saying they are appointed on a

21   nonexclusive basis.  They then point to a single phrase in an

22   amendment years later that amends a different part of the

23   contract and it is says it's not amending any part of the

24   contract unless it expressly does --

25           THE COURT:  What do you mean it "amends a different

 1   part of the contract"?

 2              MR. SIMKIN:  So, the exclusivity language.

 3              THE COURT:  It's for AmTrust specialty program

 4   section.  Isn't that the subject matter of this contract?

 5              MR. SIMKIN:  The non-exclusivity language is in

 6   section, I believe it's 2.1 of the contract.

 7              THE COURT:  I see what you are saying.  This is

 8   amending -- it's like an endorsement that amends an amendment

 9   to an exhibit.

10              MR. SIMKIN:  None of it refers back to that section of

11   the contract.

12              THE COURT:  But it's clear in the original contracts

13   that all the endorsements and exhibits become part of the

14   contract.  That how these contracts work.  There are all these

15   attachments that are just part of the contract.

16              MR. SIMKIN:  Sure.  But I would say that if the

17   intention is to amend the non-exclusivity language they would

18   say, we're amending that language, but they don't.

19              THE COURT:  These things are cobbled together.  This

20   is how these contracts work.  They say like all the dates are

21   attached to Exhibit A and that's key to the contract.  That is

22   the amendment to Exhibit A.  These are cobbled together.  This

23   is not drafted by casual expenses.

24              MR. SIMKIN:  That's true.

25              THE COURT:  I assume it was.

1          MR. SIMKIN:  It was not.  But I think you had a more

2    specific question which is what does it mean?  And the answer

3    is in the next sentence of the contract which is that they are

4    dedicated to bringing all of the taxi business to us and that

5    we have a right of first refusal.  And if we don't they go to

6    someone else.  That is in the next sentence contract which is

7    the common language meaning of the word dedicated.  If I say

8    Mr. Weiser is dedicated to my firm's insurance practice that

9    means he spends all of his time working on the insurance

10   practice.  It does mean that he is the only associate who works

11   in the insurance practice.  The fact they are the dedicated

12   program manager, I mean they are dedicated to us, not the

13   converse.  And there is no language in the contract that says

14   the converse.

15          THE COURT:  That's a fair point.

16          Ms. Skala or Ms. Zissu, what's your response to the

17   argument that the little two after little one in the language

18   we're talking about of endorsement two seems to cut in their

19   favor?  In other words, it seems to if you read it in context

20   right after saying the "dedicated program manager" it goes on

21   to say it will submit all of the subject business to AmTrust

22   meaning this is like Mr. Weiser being the dedicated associate

23   to Mr. Simkin meaning, all his work is for Mr. Simkin and not

24   to one else at the firm.

25          MS. SKALA:  Well, I think the fact that they're

1    separated into discrete paragraphs and that the second one,

2    Roman numeral two, doesn't come as an index to the fist one.

3    There are two discrete ideas.  They're reciprocal promises to

4    one another, not that the second one modifies or in any way

5    enhances the first.

6         THE COURT:  Well, that's a fair point, Mr. Simkin,

7    which is that their reciprocal promises.  One is saying the

8    dedicated program managers, this is our dedicated program

9    manager emphasis on the exclusivity to KF&B being the only

10   broker of AmTrust business.  Two goes the other way.  Two would

11   be and on the other hand, all subject business of KF&B will be

12   dedicated to AmTrust.  It's two sides of the same coin.  It

13   seems I'm leaning toward the view that it's ambiguous even

14   though I think you have probably a better reading of the

15   argument.  I don't know that it's so clear that it's

16   unambiguous.

17        MR. SIMKIN:  So what I was saying is I don't know how

18   my client could have drafted clearer contract saying that they

19   are not the exclusive agent.  They could express

20   non-exclusivity language.  I think what they're saying is there

21   is an isolated word in an amendment to an amendment years later

22   that is not defined.  There is not a term of art in the

23   industry.  That's not a defined term with capital letters.

24   There is no obligation that flows from that term.  Everything

25   that they are say about that exclusivity right are invented

1    based on those three words and none of them are in there.

2            So even if it's not defined by itself and even if

3    they're separate concepts, which is what I think you are saying

4    that all of the rights they give themselves, it's actually

5    pretty extraordinary because when you look at the briefing and

6    talk about what exclusivity rights they think they have, all

7    things they've listed, they are not the exclusive person or

8    they now say they are the exclusive person for it.  They say

9    this flipped that.

10           THE COURT:  But isn't there a course of conduct

11   evidence one way or another?  One of the things that this makes

12   me want to know is how did the parties act?  Did in July 1,

13   2013, when this language went in, did they change how they are

14   doing business?  Because if they weren't then they're argument

15   is even stronger.  In the way they were drafting the language

16   did one say now you're going to be dedicated to this and here

17   is what we mean by that in an e-mail or something?

18           MR. SIMKIN:  Well, you have to look at the allegations

19   that are in the counterclaim.  There are no allegations that

20   that happened.  So even if they prove every allegation in the

21   their counterclaim --

22           THE COURT:  They don't have to prove the alleged

23   drafting history.  There is an alleged draft history to assert

24   a contract.

25           MR. SIMKIN:  Well, if they are going to allege the

1    contract is ambiguous and it has a certain meaning, they would

2    need to allege facts that supported that.  And the

3    allegations -- and this is an amended contract.  We moved to

4    dismiss the original one and they amended in response to the

5    motion to dismiss.  So they have had notice of all our

6    arguments and the opportunity to add in all the facts that they

7    think they have.

8         And what they don't allege is that anyone ever told

9    them that this was an exclusivity provision.  They don't attach

10   any correspondence and saying this is what was in someone's

11   mind.  They rely exclusively on these isolated words in an

12   amendment to an amendment to a contract that has clear

13   expressed non-exclusivity language and then even the amendment

14   says it's not amending anything implicitly.  It says "unless

15   expressly modified and herein".

16        THE COURT:  Your argument is they could have been

17   clearer ignores the fact that suddenly this language "dedicated

18   program manager" pops into this endorsement and no one's

19   defined it.  It's never been used before.  And it says it is

20   appointed as the dedicated program.  That's new.  That wasn't

21   in the party's prior reading.  Why wouldn't you add that?  It's

22   not to change the status of the parties.

23        MR. SIMKIN:  Throughout the entire contract they are

24   referred to by many terms.  There is not a single defining

25   term.  There are different references to their role and it's

not like there were later amendments and this term doesn't pull

through later.  It's not like all of a sudden in 2013 you start

referring to them exclusively as dedicated program manager

going forward.  That is an isolated term or phrase in a single

amendment that has many different descriptive terms non of

which provide exclusivity right.  This is just a plain English

term they were using to describe an arrangement that was not

intended to modify the expressed non-exclusivity language in

the contract.  If that was what they intended, they would have

said that.

THE COURT:  Why do you need paragraph two if you have

paragraph one?

MR. SIMKIN:  Little "I"?

THE COURT:  Romanette ii.

MR. SIMKIN:  In my interpretation romanette ii

explains whats meant by romanette i.

THE COURT:  But one has an exception for ii states and

ii doesn't.  If ii says all subject business will go to AmTrust

including -- Washington, what does it mean to say that KF&B is

the dedicated program manager for 48 of the 50 states in one?

MR. SIMKIN:  I think the answer to that is my client

wasn't doing business in the other states.  They were appointed

to work in 48 states and in those 48 states they needed to

bring us business.

THE COURT:  OK.  Anything you want to add on this,

1    Ms. Skala?

2              MS. SKALA:  With respect to the exception of the

3    Oregon and Washington or just in general?

4              THE COURT:  Just in general.

5              MS. SKALA:  What Alex was saying earlier is that KF&B

6    was referred to as -- throughout the MPA and that's a phrase

7    was just another way of referring to KF&B is entirely in my

8    pleading.  It's an isolated phrase because it's adding a new

9    relationship between the parties.  It's not a synonym for

10   program manager adding an additional requirement that wasn't

11   there before.  And I think that your Honor said it earlier that

12   clearly we need discovery to determine what the intent of the

13   parties were here and that a motion to dismiss is premature.

14             THE COURT:  OK.

15             MR. SIMKIN:  With respect to discovery, it's the same

16   contract that we're fighting over.  So we're producing all the

17   drafting history for the contract.  That's not the fight that

18   we're having in the discovery world.  What we're having is so

19   they allege that there's an exclusivity provision in the

20   contract that we think doesn't exist.  And they say all this

21   other business that's done by hiring separate people and hiring

22   separate affiliates violates that exclusivity provision.  And

23   these were people who are otherwise not involved in the dispute

24   we have and are doing things that are otherwise not involved.

25             So with respect to documents that relate to the claims

that are in the contract claims like the trafficking history

for the contract, they have that.  What we've -- and this

really opens up a huge amount of discovery and we think is

totally improper is a number of reasons including because

having terminated the relationship with KF&B, KF&B now works

for one of plaintiff's competitors and they're using this as a

fishing expedition to try to get information that they can use

for business purposes and they have this -- in my view of

imagining exclusivity provision but I wanted to make sure that

with respect to the drafting history of the contract, all of

that's been produced.

THE COURT:  Let me understand one other thing which is

in terms of how the parties' relationship actually worked

from -- the first contract was 2011.  So from the first period

of 2011 to 2013, was KF&B the only broker selling insurance

within the taxi world for AmTrust or were there others?

MR. SIMKIN:  So we've used AmTrust as a defined term

to refer to the plaintiffs in this case.  There's also a larger

parent company, AmTrust Financial Services Incorporated.  So

with respect to the three plaintiffs they've never been in the

taxi business other than with KF&B during the filing period.

KF&B wrote all their taxi business.  The fact that I say they

had a right to do other business didn't mean they did or they

didn't.

THE COURT:  Even after the 2013 claim they didn't?

1          MR. SIMKIN:  No.  The amended -- the contract was

2    updated every year.  None of them changed the relationship or

3    the practices.

4          THE COURT:  So you're saying they didn't -- until the

5    termination of the contract, they didn't sell insurance through

6    any other broker?

7          MR. SIMKIN:  That's my understanding with respect to

8    the three plaintiffs.  There may have been -- the insurance

9    companies that are affiliated with parent, they may have done a

10   small amount of the taxi work.  They allege in their complaint

11   the parent company of -- a new insurance company, Power

12   Insurance Company towards the end of the relationship between

13   the plaintiffs and KF&B and they allege that Power wrote some

14   taxi business and I suspect that's true although, I don't know

15   that for a fact.

16         THE COURT:  OK.  And did KF&B on the other hand, were

17   they exclusive in the sense that they did this in the taxi

18   world only for AmTrust or did they also do it for others?

19         MR. SIMKIN:  I can tell you what the contract says

20   which is they were supposed to bring all business to us whether

21   they --

22         THE COURT:  For the whole period?

23         MR. SIMKIN:  For the whole period.  Well, whether I

24   think under the contract they had a right to bring it to

25   someone else if we turned it down, whether this scenario

1   happened on their end, they would have to answer.

2          THE COURT:  Do you want to answer?

3          MS. SKALA:  My understanding is Mr. Simkin is right

4   with respect to KF&B that they worked in the taxi and limousine

5   industry exclusively with AmTrust and that AmTrust declined

6   particular business that they could bring it to someone else.

7          THE COURT:  That was the situation for the whole

8   period?

9          MS. SKALA:  Yes.

10         THE COURT:  And that language in that romanette ii in

11  the second endorsement was also in the earlier agreements?

12         MS. SKALA:  I'd have to go back and check but my

13  understanding is that there was -- I can't say for sure.  I'd

14  have to go back and look to be honest.

15         THE COURT:  Do you all know of anything in the

16  drafting history that sheds light on this question?  I assume

17  you would have put in your briefs.

18         MS. SKALA:  Only with respect to what my clients told

19  me, I haven't seen any documents yet that I could provide --

20         THE COURT:  You haven't either?

21         MR. SIMKIN:  I believe there was an e-mail exchange

22  early on at the beginning of the first contract where they

23  asked for an exclusivity right?

24         THE COURT:  Who did?

25         MR. SIMKIN:  KF&B.

1          THE COURT:  Meaning they wanted to be the exclusive

2    AmTrust broker?

3          MR. SIMKIN:  Correct.

4          THE COURT:  Was there 2013 correspondence saying now

5    we're giving you this?

6          MR. SIMKIN:  Nothing.  Nothing that I've soon.

7          THE COURT:  Do you know if there was anything like

8    that?

9          MS. SKALA:  I believe we submitted them with our

10   opposition to our motion where three discussed this but it

11   wasn't entirely clear.  But based on my conversations with my

12   client and his conversations with several AmTrust employees

13   contemporaneous with it, this amendment, that was their

14   understanding.

15         THE COURT:  That was their understanding?

16         MS. SKALA:  Yes.

17         THE COURT:  OK.  All right.  Well, I didn't mean to

18   get you into a -- or detour.  The purpose of this was not to

19   have oral argument on the motion but since I had read it

20   recently I just wanted to air all my questions and I will be

21   ruling on that shortly, not today, unless I change my mind but

22   I think not today.  But the purpose of today is really to go

23   over the parties' discovery disputes and I'll start with KF&B's

24   letter of may 9.

25         First dispute, is KF&B is complaining that plaintiffs

1    haven't stated the basis of the stated objection, is that

2    right?

3              MS. SKALA:  You are looking at our letter from May 9.

4              THE COURT:  Well, the document production in general

5    sounds like there was this issue of the 240 count files account

6    files and then whatever the random sample of 300 or whatever

7    then by the last letter of my understanding is that defendant

8    has agreed to produce all of the files; is that right?

9              MS. SKALA:  To produce all of files.

10             THE COURT:  Yes.

11             MS. SKALA:  We had discussed that, yes, but in light

12   of the upcoming deadline with Court if we don't get an

13   extension or some sort of narrowing down of what the plaintiff

14   is looking for it's going to take us a substantial amount of

15   time to produce all of the files because of the number of

16   documents that are generated by the search and just what we're

17   required to review before producing it to them.

18             THE COURT:  You talked about word search and then

19   account files.  Are account files everything irrespective of --

20   or are those different things?

21             MS. SKALA:  So, the way that KF&B's underwriting

22   writing are maintained currently is this there is the agency

23   manages images which are -- file and then there are e-mails,

24   both of which compiles those underwriting files which contain

25   the information used by KF&B to quote the policy.

I5PAAAMTC                    Conference

1              THE COURT:  So the e-mails, how would you know e-mail

2       "X" is in file number 122?  Does it say that on the e-mail or

3       is it actually in a computer folder or something?

4              MS. SKALA:  No.  They were archived because KF&B --

5              THE COURT:  They changed archived --

6              MS. SKALA:  They weren't organized by the account C,

7       account D.

8              THE COURT:  They're all --

9              MS. SKALA:  So we have to perform a word search to

10      cull documents, put them in these folders to produce them to

11      the plaintiff.

12             THE COURT:  Word search to cull the document, so you

13      were basically recreating the files?

14             MS. SKALA:  Yeah.  I mean for a lack of a better word,

15      yeah.  They may exist.  It's not as though they don't exist.

16             THE COURT:  But they are not in the file?

17             MS. SKALA:  No, not a hard file, no.

18             THE COURT:  Or a soft file.  They're not in a computer

19      folder under the name whatever, correct?

20             MS. SKALA:  Correct.

21             THE COURT:  But you are able to say these are all the

22      e-mails by custodian, I assume?

23             MS. SKALA:  By performing a search for the custodian,

24      yeah, which we've agreed to do.  I don't think there's a

25      dispute there.

1          THE COURT:  OK.  So you don't have all the -- there

2   are no paper files?

3          MS. SKALA:  Correct.

4          THE COURT:  So you do have -- is there like a computer

5   file -- putting aside the e-mails like all the policy documents

6   and correspondence with someone, is there a copy of all that

7   stored differently by the policy or by the contract?

8          MR. ZISSU:  So it's two parts, your Honor.  The agency

9   management tips which are a limited snapshot of the account.

10  It's a full account.  Those are labeled electronically and

11  their file name is filed -- for the e-mails and other things

12  that are physically sorted but in no particular order because

13  we literally pulled all the e-mails, agreed upon custodians,

14  those e-mails are being searched by 21 selected terms that we

15  did agree on with counsel.

16          And also with we're using the policy number and the

17  account submission which is like when ever a request for

18  insurance would come in whether it was actually written into a

19  policy or not, that would get a unique identifier too.  So for

20  each account there's an associated number of KF&B A numbers.

21  Some of the accounts had more than one policy issued.  Some of

22  them had renewals.  For each year the policy was written there

23  is a going to be a distinct submission as it was submitted --

24          THE COURT:  I see.  So what's the status of the

25  parties' understanding or agreement on what universe of the

1   policy documents -- I don't know if that is the right phrase --

2   will be produced?

3            MR. ZISSU:  We intended to produce all the policy

4   documents.  I think what we're doing now is because we had to

5   cull everything on this archive that it didn't unpack neatly.

6            THE COURT:  You've hired a team of contract attorneys

7   to pull together the relevant documents?

8            MR. ZISSU:  Yes.

9            MS. SKALA:  Yes, your Honor.

10           THE COURT:  Mr. Simkin, is there anything else we need

11   to talk about with respect to that?  We'll get to the deadline

12   in a minute.

13           MR. SIMKIN:  I still think we have a lack clarity on

14   our side.  In our original letter we didn't talk about

15   underwriting files which we had understood they had agreed to

16   produce all of them.  And only if their last letter it looked

17   like --

18           THE COURT:  It sounds like they are planning to

19   produce them.  They're just concerned about the deadline.

20           MR. SIMKIN:  So if that's still the case, then I think

21   that's fine with the caveat that we do have the concern that we

22   need the information to be able to tell which documents belong

23   to which underwriting file and what they've done -- originally,

24   they produced a small number of underwriting files in the

25   dozens that looked very complete and then they made two

1   productions.  That was the first and it was 700 documents or

2   so.  Then they made a second production of a few thousand

3   documents that are a jumble of loose e-mails.  And I can look

4   at an e-mail or look at a document and see which name is on the

5   document in many instances and then try to reverse engineer

6   which file it gets into.  But one of the issues in this case

7   is, did they do their job when underwriting this policy?  And

8   the way you'd normally see this in the industry is you have an

9   underwriting file for each account that you are underwriting

10  where there is an application.  And then there's a record of

11  diligence.  And in this case there are certain requirements

12  that are supposed to be in there that everybody were supposed

13  to have been gotten.

14          For example, a motor vehicle record for each of the

15  drivers.  So our question is where are all these motor vehicle

16  records?  And you would expect to see them in an underwriting

17  file on an account-by-account basis.  Instead, what it looks

18  that they are now trying to do is just sort of produce a

19  mismatch of all of the files which if they give us the key to

20  what's what -- Bates number C to D is for this account, that's

21  fine.  But I do have a concern we are going to hire an expert

22  who is going to want to look at these underwriting files and be

23  able to say, this new thing should be in here and it's not.  So

24  I am going to need from them certainty on what they're claiming

25  the underwriting file is for each of these accounts.

I5PAAAMTC                        Conference

1          THE COURT:  OK.  Do you all want to respond to that?

2          MR. ZISSU:  Well, your Honor, I'm a little confused by

3    counsel's position or concern given what they've given us is

4    essentially a large mishmash in no particular order.  So we're

5    applying the same search tools.  And we've given them the

6    meta-data and all the other things so they can run the same

7    searches as us.  They have the same policy numbers and

8    submission numbers that we have.  It's really a function of

9    them doing the same thing we're doing.  And these documents are

10   already dated.  They have a unique identifier.  So producing

11   them by account with, by name if that's the way we want to

12   proceed, we can do that.  We got 20 people that are working on

13   this and what gets done first gets produced on a rolling basis.

14   It's not an intention to shuffle the deck.

15         THE COURT:  Is there some sort of key you can give

16   them to allow them to, as he said, reverse engineer and create

17   what the file was for a given policy?

18         MR. ZISSU:  It's the same key that we're using to pull

19   the data together which is the KF&B A numbers and policy

20   numbers.  We're dealing with a shuffled deck to begin with, so

21   they have the same hurdles that we do.  We can produce that.

22   It'll take a lot more time than what they're doing right now.

23   This goes back to what Ms. Skala was going to get to currently

24   listing 310 random accounts.  We're about a third of the way

25   through that and that's why we are looking for either an

1    extension or some sort of limitation on the scope of what we

2    are doing.  There is 2,433 accounts.  Of those accounts, not

3    all of them are causing any damages to the plaintiff.  This is

4    really broad --

5            THE COURT:  It's not clear this dispute is ripe

6    because by the end of the letters I thought you would have

7    agreed --

8            Let me ask Mr. Simkin, do you agree there is 2,433 of

9    these --

10           MR. SIMKIN:  There are 2,433 policies.  There are 1500

11   or so policyholders, so I would view that as the account.

12           THE COURT:  Is there any way to limit that so that we

13   could get this done sooner?

14           MR. SIMKIN:  Well, we offered a long time ago to say

15   we will agree to do a sample, if you agree that the

16   non-produced documents are similar to the produced documents.

17   What I can't actually say is I am going to look at 150 of these

18   accounts and my expert is going to say there are problems with

19   these and they'll say the other 90 percent are perfect.  That's

20   what I'm worried about.  So I made that offer to them.  They

21   didn't want to do that.  They said instead we'd rather produce

22   all the files.

23           And frankly, if you go back and look at the contract

24   the underwriting files are my client's files.  My client owns

25   them.  They're in their possession.  My client has a right to

1   show up with no notice and review them.  So the fact that it

2   takes them a year and a half to find those files, to give them

3   to us is in my mind indicative of a breach in and of itself.

4   It just shouldn't be this problematic to produced the

5   underwriting files.

6          THE COURT:  But it's terabytes of data.  That's the

7   problem.

8          MR. SIMKIN:  Well, I don't know whether it is or is it

9   isn't but in any event --

10         THE COURT:  Well, there's a chicken and egg problem in

11  that there's these master files.  They're unfortunately stored

12  on tape because of the change in electronic storage and you

13  have, your clients have come forward and said there are all

14  these breaches but you are refusing to say it's these

15  policyholders that are the problem.  So either it's going to be

16  a longer discovery period for you saying, look, why don't

17  you -- you've made these allegations, why don't you have

18  insight to where the problems are?

19         MR. SIMKIN:  So we know which account was causing

20  losses.  They had an obligation to get motor vehicle records

21  for each of those policy models.  They didn't do that.  They

22  underwrote that account in breach of the policy.

23         THE COURT:  For all of them?

24         MR. SIMKIN:  Yes.  That was one of the --

25         THE COURT:  They failed to do it for all of them?

1          MR. SIMKIN:  I don't know.  Maybe they failed to do it

2     for one and maybe that company didn't happen to have an

3     accident.  That doesn't mean that they weren't doing their job

4     in that the aggregate.  The way insurance works is you try to

5     price it so the aggregate, you try to make a profit.

6          The other piece is if you look back at the contract

7     their obligation five years after termination is to give all

8     these files to us at their expense.  So they sort of put them

9     in some format that they can't get back is a problem.  But I

10    hear what you're saying about we've asked for a lot of stuff

11    and maybe it's organized in a way that maybe properly or not

12    it's going to take some time and we're willing to give some

13    time.  I'm trying to be flexible.  In my view 18 months is too

14    much time for document discovery but I appreciate what your

15    Honor is saying but there's some work to this.

16          THE COURT:  But how did your clients realize there was

17    a problem?  Was it with particular accounts or we didn't make

18    nearly as much money as we should?

19          MR. SIMKIN:  I think there's a combination.  I think

20    there were particular accounts that looked problematic.  There

21    were the fact that the numbers weren't panning out the way they

22    thought they were going to and there were huge losses to the

23    program.  And we allege in our complaint some of the examples

24    of the things we believed they did wrong but they're asking for

25    a list of every account that was breached.  I can't do that

before discovery is done.

THE COURT:  If Mr. Simkin right that there is a right of their clients to get access, I don't see how I could limit them unless the parties agree to look at random samples.  He is right.

MS. SKALA:  I don't know if that's in the context of litigation it does say that within five years it hasn't been five years.  But in the context of this litigation they're claiming $20.4 million in damages which clearly had to come from accounts that were not profitable and AmTrust knows which accounts it's alleging were not profitable and we can start there.  AmTrust has contention that just because an account was profitable doesn't mean that we didn't breach the agreement ignores an essential element of its claims which is damages.

THE COURT:  Right.  But the damages we would have profited a lot more.

MS. SKALA:  The damages could mean we would have profited a lot more.  There are only $20.4 million in the red.

THE COURT:  You are not claiming any contracts where you profited?

MR. SIMKIN:  The 20.4 million number which has increased since our complaint filing is the net number.  So the way it works is if there's an insurance policy that should have been sold for $100 but they sold it for $50 and you do that over many times, you are going to lose money on the program.

1    Now you don't know which accounts necessarily are going to be

2    the ones that have the accidents that you pay out of but it's a

3    systemic issue.

4              THE COURT:  But are you, is your universe of damages

5    limited to the accounts that lost money as opposed to those

6    that were profitable?

7              MR. SIMKIN:  No.  We were taking them all into

8    account.

9              THE COURT:  OK.  Well, this is going to be a little

10   unwieldy but I don't see a dispute that's teed up for me to

11   resolve on the issue of searches other than the specific search

12   item which is teed up which we will get to a minute.

13             Now, back to where I was.  Item in dispute number one,

14   withheld documents, what's your complaint here?

15             MS. SKALA:  They objected to producing documents.

16   This is more specific to the counterclaim requests from us and

17   the document pertaining to prior insurance program where

18   AmTrust refused to produce documents.  They don't indicate

19   whether or not they are in possession of the documents or

20   they're just not producing them.  They just object to it.

21             THE COURT:  You don't say whether you have them or

22   not; is that the problem?

23             MS. SKALA:  Yes.

24             THE COURT:  Is this an issue only because of the

25   counterclaim that you are not producing on the counterclaim?

1          MR. SIMKIN:  To be honest, I have no idea.  This is

2     not an issue we discussed.  I'm really confounded with what it

3     is.  We've spent months doing meet and confers.  We're written

4     extensive correspondence trying to answer every question they

5     had.  I'm not trying to hide any balls.  I'm not sure which

6     request they think we're not being specific enough on.  I'm

7     happy to try to clarify.

8          MS. SKALA:  Specifically, the counterclaim request.

9     Mr. Simkin and I, with Mr. Zissu on the phone, have discussed

10    this before.  It's specifically to counterclaim discovery that

11    I'm talking about.  The objection from Mr. Simkin was that he

12    was not under an obligation to produce documents related to our

13    counterclaim because there was a motion to dismiss pending.

14    That was as far as the conversation got.

15         THE COURT:  OK.  You are going to have to produce

16    counterclaim discovery because I'm likely to deny the motion to

17    dismiss.  So, I don't know what the issue is here.  You are

18    going to have to respond here.

19         Search terms.  Am I correct that the only dispute on

20    search terms is the one long search term that's in Kasowitz's

21    May 16 letter?

22         MR. ZISSU:  Yes.

23         THE COURT:  The one that is Black Car or Limousine or

24    taxi cab hand; that's the only dispute?

25         MS. SKALA:  Yes.

I5PAAAMTC                    Conference

1          MR. ZISSU:  With the generic term.

2          THE COURT:  Right.  With the asterisk.  I think it's a

3     fair term and I'm going to require that a search term be

4     included with respect to the other 21.

5          You've agreed, right?

6          MR. ZISSU:  Yes.

7          MS. SKALA:  Yes, your Honor.

8          THE COURT:  Document pertaining to prior insurance

9     program, this is document requests, several document requests

10    and interrogatory 20 from KF&B second demands pertaining to

11    AmTrust marketing solicitation, et cetera.  The document

12    requests will not necessarily be produced but interrogatory 20

13    will be responded to.

14         Identification problematic accounts, we've talked

15    about this a little.  There's a chicken and egg problem.  I am

16    not going to require it at this time until perhaps the point of

17    contention interrogatories toward the end of discovery for them

18    to give you a list of problematic accounts.

19         With respect to request number 40 of the first

20    demands, KF&B sought documents related to the AmTrust internal

21    evaluation given risks prior for approving and or rejecting

22    proposal.  And KF&B says AmTrust should be ordered to identify

23    which documents AmTrust used to approve or request to approve

24    or reject a proposed account.

25         Could you explain a little more what this is about?

1              MS. SKALA:  Sure.  A lot of the accounts that were

2     written by KF&B were subject to AmTrust ultimate approval

3     before a quote could be issued before a policy could be issued.

4     So we're looking for documents that AmTrust used, generated,

5     relied upon in determining whether or not to approve or reject

6     a given risk under that authority.

7              THE COURT:  What's the objection?

8              MR. SIMKIN:  That's fine, your Honor.  Request 40 we

9     wrote to them in November 2017 saying we're not sure what

10    you're asking for as written, seems to be asking that every

11    document and every claim file.  If you tell us what you want

12    that's not covered by your other requests, we're happy to give

13    it to you.  And they wrote back and the first we heard of it

14    was in that May letter.  This was the November 17 letter.

15             THE COURT:  Insofar as documents indicating basis for

16    approving or rejecting a proposed account, you can produce it

17    based on that understanding?

18             MR. SIMKIN:  Yes.  The back and forth between them

19    where they may -- underwriting guidelines for an account and we

20    evaluate it and give them an account.  We're happy to produce

21    that.

22             THE COURT:  OK.  With respect to -- I think we'll do

23    the deadline last because that's the trickiest.  With respect

24    to the documents concerning KF&B' -- no.  I'm on Kasowitz

25    letter from May 9 which identifies separate disputes, first is

1    KF&B's November 2014 sale to Acrisure.

2         MS. SKALA:  Yes.

3         THE COURT:  This is denied.  The idea, the motive on a

4    breach of contract case is relevant is a real stretch.

5         MR. SIMKIN:  What about with respect to damages, your

6    Honor?

7         THE COURT:  How do you get damages from the document

8    relating to a transaction in which their assets were sold?

9         MR. SIMKIN:  Sure.  I am happy to.  What we believe

10   happened, so we paid during the four years of the program, we

11   paid KF&B approximately a million dollars.  Now, if they sold

12   themselves on a basis that was tied to the amount of sales,

13   their commissions and they say they sold them -- or ten times

14   sales and they earned, that turned 18 million into $180

15   million, then that is a potential avenue for damages which they

16   don't dispute.  All they say is that we would have to wait

17   until we've proved liability in order to get damages and

18   discovery.  But they've never made a request to bifurcate

19   liable and damages.  This wouldn't be an appropriate one to

20   prove our damages at trial and the amount that they may have

21   profited from their misconduct I think is relevant.

22         THE COURT:  What exactly is this category of documents

23   you are seeking.

24         MR. SIMKIN:  The contract document and document

25   sufficient to show the economic terms of the deal which I think

1  are just the contract documents the agreements.  There's a side

2  agreement.

3            THE COURT:  So you want the agreement?

4            MR. SIMKIN:  Yeah.  And if it's multiple agreements,

5  then the integrated family of agreements.

6            THE COURT:  I know you were seeking a bunch of stuff

7  about the representation and the warranty and I guess that's in

8  the agreement.

9            MR. SIMKIN:  I would have liked some of the

10 communication back and forth about our program.  But I agree,

11 that's not relevant to damages.  That would be relevant to

12 liability but with respect to the damages, I think that all we

13 would need is the agreement.

14           THE COURT:  What do you say to that, Ms. Skala?

15           MS. SKALA:  The agreement itself, I don't believe,

16 contains the economic terms that he is seeking.  And he is not

17 entitled to discouragement of profits to the extent that that

18 is what this is because he hasn't proved his case as breach of

19 fiduciary duty and I don't know if it qualifies as

20 discouragement.

21           THE COURT:  We haven't bifurcated discovery.  We're

22 doing damages and liability discovery all together.  You've

23 signed a protective order I assume.  So this could be

24 confidential.  Could be "attorneys' eyes only".

25           MS. SKALA:  I don't think that he's established

 1  relevance or entitled to.  It's a fishing expeditious.

 2           THE COURT:  He's laid out a theory that this would be

 3  damages for breach of fiduciary duty to the extent that they

 4  profited off the breaches of their duty in connection with

 5  the --

 6           MS. SKALA:   -- theory can be somehow offered for the

 7  premium which it didn't have authority to increase its

 8  commissions because it needed -- bias.  So balanced the theory

 9  of AmTrust to sort of put forthwith absolutely no support.

10  They somehow -- for us to think that there a shred of

11  credibility to that theory.

12           THE COURT:  I agree.  I am going to deny the request.

13           Second is KF&B's communications with Old Republic

14  concerning the program.  So Old Republic was the entity that

15  KF&B worked with following the termination.

16           Is that right?

17           MS. SKALA:  Their current business partner, yes.

18           THE COURT:  And what's the theory or relevance of

19  those documents?

20           MR. SIMKIN:  So two theories, your Honor.  First, I

21  mean, so we've sent the subpoena to Old Republic and they've

22  produced a small number of documents back.  Among the documents

23  we've gotten we've seen e-mails where these people have told

24  Old Republic this account should be priced at double.  They

25  should charge premiums which total and consistent with our

1   theory with what KF&B was doing and Ms. Skala said KF&B didn't

2   have authority to set premium rates.

3            The second point is KF&B has told the store in this

4   case that the losses on the program are due to systemic issues

5   in the industry that were beyond their control and not due to

6   any sort of incompetents or malfeasance on their end.  And when

7   they take this program and shop it at Old Republic I think it's

8   plausible they are going to be saying a different story because

9   they're not going to go to Old Republic and say they're all

10  systemic issues -- and so we think that what they said about us

11  and what they said about our program when they went to Old

12  Republic to shop this program around we think that's --

13            THE COURT:  Ms. Skala.

14            MS. SKALA:  So with respect to the charging of double

15  premiums I'm going to best to do -- the account I believe that

16  he's referring to, I know which account it is.  It's ASC and he

17  takes out of context the e-mail is that he is talking about, I

18  saw the e-mail.  KF&B did not have the authority to arbitrarily

19  charge premiums.  Premium number was generated using

20  development factors that AmTrust actuaries created and used

21  with ISO rates to determine what the premium could be.  There

22  was a limited discretion that KF&B had but attached five

23  percent of what the premium that was generated by AmTrust

24  actuaries using AmTrust's own -- in each state that it filed

25  insurance policies with.  And that was where KF&B got the

premium.

           Now each insurance company in the industry has its own

lost cause multiplier that it develops with actuaries that it

files within each state.  Each state that uses ISO factors

apply to those.  It changes them on a yearly basis.  California

where this account is, where this e-mail is that Mr. Simkin is

referring to from Old Republic is one where you if you want to

adopt the new factors that are developed by ISO in that state,

your have to apply for it and AmTrust didn't and Old Republic

did.  So they could charge a higher premium and AmTrust

couldn't.

           THE COURT:  OK.  Do you have a different theory of

that?

           MR. SIMKIN:  Look, they may have defenses or

explanations for a lot of these inconsistencies but that's not

a question of whether we're entitled to get the documents and

then explore our theories.  What I can tell you about KF&B's

involvement in rate setting seems to have become relevant.  So,

yes, there's been an algorithm that KF&B controlled a number of

the inputs that go into the algorithms and some of those inputs

are supposed to be objective and some of them are subjective.

           For example, if you put into the account owns one

thousand vehicles, you'll get a cheaper price than if the

account owns two thousand.  There are also subjective factors

that you could put in.  Do they have a secure garage?  So KF&B

1    had the ability to effectively manipulate the price of the

2    insurance that was sold.  And so I don't think you can say

3    categorically it's irrelevant when they took the program to

4    someone else and the rate we were charging with AmTrust were

5    way too low.

6         MS. SKALA:  Mr. Simkin is seeking documents from his

7    direct competitors, AmTrust's direct competitors by seeking

8    these documents with Old Republic and has to provide an

9    adequate representation other than a conspiracy theory as to

10   why he is entitled to them.

11        THE COURT:  What about the idea that there might have

12   been representations by KF&B and Old Republican about the

13   performance of the program that do undermine what KF&B is

14   arguing in this case?

15        MS. SKALA:  I think that Mr. Simkin overgeneralized

16   and misrepresented what KF&B's entire defense is in this case

17   that is solely the market factors.  It's also the fact that

18   AmTrust had a lot of control over this program is lot of what

19   KF&B did was -- a lot of numbers that KF&B used were developed

20   by AmTrust's actuaries.  And so by just the blanket statement

21   that was market factors is not a whole picture.  I also don't

22   see what KF&B told Old Republican assuming Mr. Simkin is right

23   and KF&B told Old Republican that the program was not profiting

24   because of market factors, I don't see how that changes how the

25   program was actually profiting.  It's not relevant.

1        THE COURT:  I ultimately agree.  I think it's not

2   really tangential to the breach of contract claims in this case

3   and I am not going to require them to produce it.

4        Documents concerning prior insurers is the third

5   category.  And this I assume is prior relationships that KF&B

6   had.  And for the same reasons I think that that's tangential

7   and I'm not going to require that to be produced.

8        MR. SIMKIN:  Your Honor, could I explain one reason

9   why it's different?

10        THE COURT:  Yes.

11        MR. SIMKIN:  So as I was explaining to your Honor, one

12   of KF&B's ability to control premium prices was with these

13   inputs they would put into the algorithm.  One of the largest

14   inputs is the taxi company's prior loss experience.  So if KF&B

15   put into the algorithm the taxi company "X" had very few losses

16   over the past four years, then if you put in KF&B's, the taxi

17   company "X" has lost experience as high and we believe that if

18   you get the actual loss experience or some of these taxi

19   programs, that may show that what was input was not accurate.

20   That is why we're trying to get some information about these

21   prior insurers that I think was categorically different to the

22   theory of relevance than and with respect to the subsequent

23   insures because obviously nothing that happened after our

24   program directly impacted what happened in our program.  But

25   the information that happened before our program, KF&B was

I5PAAAMTC                    Conference

1    supposed to use that as part of our program.  And so I think

2    that the theory of relevance is a little different and a little

3    bit more direct and concrete.

4              THE COURT:  Ms. Skala, would you like to respond?

5              MS. SKALA:  Yes.  I was having trouble following what

6    he was saying.

7              Are you --

8              THE COURT:  Please address the Court.

9              MS. SKALA:  OK.  The claim for a breach of contract

10   and what Mr. Simkin seems to be indicating is that he was

11   claiming that KF&B intentionally misfed information into the

12   programs to change what the lost funds would be.  And he has

13   not plead that anywhere.  So I don't see how that could be

14   relevant to the dispute.  The loss funds were something that

15   were generated by those areas.  They were input into KF&B's

16   spreadsheet and the number was put out.  I don't see how what

17   those numbers were are relevant to AmTrust's now claimed

18   damages.

19             THE COURT:  Do you want to clarify?

20             MR. SIMKIN:  So part of our theory is KF&B is

21   essentially a broker.  Then it gets paid a commission.  So it

22   has an incentive to sell, sell, sell.  So it's easier to sell

23   insurance at a cheaper price.  KF&B has this incentive to try

24   to lower the price of insurance to increase the number sales

25   and increase its commission as profits.  We allege they did

1    that improperly to our detriment in a breach of our fiduciary

2    duties.

3          One of the ways we believe that they were able to

4    artificially inflate the price of insurance was through fudging

5    the inputs that go into algorithms.  One of biggest drivers of

6    those inputs is the actual lost experience of the taxi company

7    that you are plugging into the algorithm.  What we're trying to

8    do is get the information to compare what was the actual loss

9    experience with the information they plugged into the system.

10          THE COURT:  Do you understand?

11          MS. SKALA:  Yeah, I do.  Part of the underwriting

12    guidelines, one of the requirements that when we underwrote a

13    company for AmTrust we were supposed to supply loss for the

14    prior three to five years.  So AmTrust will have that

15    information and that's what we're looking for.  They're looking

16    for a prior insured lost runs that were generated from prior

17    insurance companies.

18          THE COURT:  So that's your --

19          MS. SKALA:  They don't need our communication in a way

20    that the program was operated with the prior insureds.  They

21    will have it.

22          THE COURT:  OK.  With respect to the communications

23    with the prior insurance, I don't see how that's relevant.

24          MR. SIMKIN:  We are getting loss runs with respect to

25    the prior carriers.

1          MS. SKALA:  To the extent that the lost runs, exist

2     and are in the files --

3          MR. ZISSU:  If I might?  It's not the lost runs that

4     are submitted to the prior insurance carriers that KF&B worked

5     with.  What would be provided to AmTrust as part of its

6     underwriting file are the three year lost runs or whatever the

7     case may be for that individual taxi account which might come

8     from KF&B's prior business partners or other insurers that KF&B

9     does do business with but are considered the lost runs as lost

10    history to then judge whether this would be a good risk.  And

11    those are going to be provided to AmTrust for the accounts

12    written with AmTrust.

13         MR. SIMKIN:  I think that's the problem.  What we're

14    trying to do is compare what they told us with what the reality

15    was before.  So, if they're saying all I'm giving you is what I

16    told you, that didn't allow us to do the comparison to figure

17    out whether if what they told us is true or not.

18         MS. SKALA:  I don't understand what Mr. Simkin is

19    asking for.  The lost runs that are generated are -- let's say

20    it's Serena's taxi.  And now Serena's taxi is now applying to

21    AmTrust and has a lost run whether can be the MGA or not, it

22    doesn't matter going to be lost runs or prior carriers and they

23    are going to get them.

24         THE COURT:  Do you have some reason to believe that

25    the lost runs with respect to prior carriers are different?

1    Some of the prior carriers are different information?

2              MR. SIMKIN:  Yes.

3              THE COURT:  Why don't you subpoena the prior carriers?

4              MR. SIMKIN:  We have.

5              MS. SKALA:  No.

6              THE COURT:  So you'll get them now?

7              MR. SIMKIN:  They've made burden objection and this

8    was a long time ago.  So a lot of areas -- well, I don't

9    have -- I don't still have a lot of this stuff.  So I'd like to

10   be able to fill in the gaps.  If they don't have it, they don't

11   have it.  But if they do, I think it's relevant.

12             THE COURT:  So are you basically looking for not some

13   targeted piece of information.  You are looking for a claims

14   file for prior carriers.

15             MR. SIMKIN:  No, not claims file.  The claims files

16   would be each piece of paper on an individual claim.  A lost

17   run -- that this carrier or taxi company had or during that

18   year period or whatever it is.  It would be a summary

19   spreadsheet.

20             THE COURT:  Are you folks you really on the lost runs?

21             MR. SIMKIN:  Yes.

22             THE COURT:  So you are looking for communications with

23   prior carriers relating to lost runs?

24             MR. SIMKIN:  Correct.

25             THE COURT:  Do you know if you have that?

1          MS. SKALA:  I think it's overbroad because I don't

2     think the insurance in prior carriers overlap and were actually

3     insured that were for AmTrust's program.  May have been a

4     company that's left the program and were not relevant to this

5     case.

6          And secondly, if there are overlaps from insureds from

7     recent prior areas, the lost runs would be in the underwriting

8     files whether or not KF&B was the manager or not.

9          MR. SIMKIN:  We would be happy to limit it to insureds

10    that overlap the prior program.

11         THE COURT:  I'm going to ask you to reconfer about

12    this particular issue and if there is a narrowing that you can

13    focus on communications generally or about termination of

14    relationship solely on the lost run information, lost run

15    experience in the overlapping prior program.  See if you can

16    reach an agreement on that.

17         And then the last issue I think is the date for

18    production.  Plaintiffs respectfully propose June as a

19    reasonable deadline for document production.  Defendants

20    respectfully proposed end of 2018 for document production.

21         MS. SKALA:  Yes.

22         THE COURT:  What I think what I am going to do is

23    extend document production to the end of August.  That gives

24    you two months with 20 diligent contract attorneys.  Hopefully,

25    you can get through it.  I think that means I'm going to have

1  to extend the fact deadline.  You want to do depositions after

2  the production, I assume?

3          MR. SIMKIN:  Yes.

4          THE COURT:  What's the current fact discovery

5  deadline?

6          MR. WEISER:  August 31, 2018.

7          THE COURT:  So, I'm going to make August 31 the

8  deadline for a document production.

9          And then how many depositions are y'all planning to

10  take?

11          Why do you laugh?

12          MS. SKALA:  A lot.

13          MR. SIMKIN:  I think there could be quite a few.

14  There are a number of names that are identified as having --

15          THE COURT:  Could you do it in a month or two months?

16          MR. SIMKIN:  What I'm happy to do is -- having your

17  Honor's guidance for fact discovery -- meet with my colleagues

18  and submit a joint letter.

19          THE COURT:  You're getting along OK, right?

20          MS. SKALA:  For the most part, yes.

21          THE COURT:  You are not hitting on each other?

22          MR. SIMKIN:  I don't think so.

23          THE COURT:  Given that I'm moving the document

24  production deadline to August 31, if you'd confer and scheduled

25  a couple months for deposition therein pushing out the expert

1  period after that.

2              MR. SIMKIN:  Does the August 31 deadline include the

3  deadline for privilege logs?

4              THE COURT:  Can you do that?

5              MS. SKALA:  More time would definitely be helpful in

6  that regard.

7              THE COURT:  Can you guys do that?

8              MR. SIMKIN:  I would like it to be done then because

9  if we're going to have a dispute on privilege logs, then we

10  need to resolve that before depositions.

11              THE COURT:  Privilege logs on August 31, as well.

12              MR. ZISSU:  Your Honor, the 20 attorneys are both a

13  mixture of permanent staff and temporary.  So there is not an

14  army of attorneys solely dedicated to this.

15              THE COURT:  Nice use of "dedicated".

16              MR. ZISSU:  Thank you, your Honor.

17              THE COURT:  All right.  I may quote that.  So if you

18  would submit a proposed schedule within a week or two, this

19  would be great and then I'll sign that.  I don't think I am

20  going to set a date for now on the next conference.  I think

21  I'll wait or do you want me to do it now?  Do you have your

22  phones?

23              MS. SKALA:  No.

24              THE COURT:  I'll send it after I get your proposed

25  schedule.

I5PAAAMTC                    Conference

1          Last thing I want to talk about is settlement.  I

2    remember in this case things were kind of on hold for a little

3    while through December of last year I think when there were

4    settlement discussions.  Am I right about that?

5          You've a got to say yes or no for the court reporter.

6          MS. SKALA:  Yes.

7          THE COURT:  Can we go off the record to talk about

8    settlement?

9          (Discussion held)

10         THE COURT:  For purposes of the record, counsel, we

11   are adjourned.

12         (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25