# KASOWITZ BENSON TORRES LLP

1633 BROADWAY

NEW YORK, NEW YORK 10019

(212) 506-1700

FAX: (212) 506-1800

LAUREN TABAKSBLAT
DIRECT DIAL: (212) 506-1982
DIRECT FAX: (212) 835-5008
LTABAKSBLAT@KASOWITZ.COM

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

September 6, 2019

**Via Electronic Mail**

Hon. J. Paul Oetken
New York District Court, Southern District
United States Courthouse, Court Room 706
40 Foley Square
New York, New York 10007

Re:   *AmTrust North America, Inc. et al. v. KF&B, Inc.*, Index No. 17-cv-05340 (JPO)

Dear Judge Oetken:

Plaintiffs write pursuant to Your Honor's Individual Practice Rule 4(b), to seek a conference to address KF&B's ongoing identification and production of tens of thousands of documents which KF&B implausibly represented comprised the account-specific underwriting files that KF&B was required to maintain under the Managing Producer Agreement between Plaintiffs and KF&B (the "MPA"). As set forth below, in a meet and confer on September 5, 2019, KF&B's counsel admitted for the first time that, despite the discussion at the July 23 conference and this Court's order, KF&B is not identifying and producing "underwriting files," but is instead merely identifying documents that pertain to the accounts in question. The documents identified and produced recently by KF&B, including documents that had apparently been deleted, are the result of a post hoc process of searching KF&B's document production and identifying potentially relevant documents. This does not comport with the MPA's requirements concerning underwriting files, KF&B's corporate representative's testimony, or this Court's order. Moreover, KF&B's conduct has severely prejudiced Plaintiffs who, along with their experts, have spent almost two years trying to recreate underwriting files, only to be advised by KF&B, after the initial close of fact discovery, that KF&B is not identifying underwriting files at all, in direct violation of the Court's order. The prejudice to Plaintiffs is further compounded because, with less than 20 days left prior to the expiration of the extended fact discovery period, KF&B is continuously amending and supplementing the documents which pertain to the enumerated accounts, including the ongoing production of thousands of documents which had not previously been produced during fact discovery.. Accordingly, Plaintiffs seek an order from this Court limiting KF&B's underwriting files to the documents maintained in Agent Aid, and request a conference to address the timeline for completion of fact and expert discovery in light of the recent and ongoing productions by KF&B.

Pursuant to Your Honor's Individual Practice Rule 4(b), the parties met and conferred in good faith via telephone on September 5, 2019, but were unable to reach a resolution. Contrary to KF&B's repeated representations in their production emails that the Excel files and documents

# Kasowitz Benson Torres llp

Hon. J. Paul Oetken
September 6, 2019

produced "comprise the Underwriting Files" for specific accounts, KF&B's counsel disclosed for the first time that documents being produced, or identified in Excel files, are merely documents that *pertain* to the accounts, and do not reflect the specific documents that constituted the underwriting files during the pendency of the program.

## I.    KF&B Failed To Produce Account-Specific Underwriting Files During Fact Discovery.

Pursuant to the MPA, KF&B contracted to underwrite and manage the KF&B Taxi and Limousine Program written through AmTrust (the "Program").   Central to the appropriate underwriting of any insurance program is the maintenance of account-by-account underwriting files.   Accordingly, the MPA required KF&B to "maintain…*an* underwriting file *for each risk written*" in a "complete, accurate and up-to-date" form.  *See* Ex. 1, Complaint, Exhibit 1 at §§ X.B, IX (emphasis added).   Pursuant to the MPA, each underwriting file must contain, *inter alia*, the policy, correspondence and worksheet of account activity, underwriting and pricing information, and a rating worksheet.  *Id.* at §§ X.B.  The MPA further required that KF&B maintain account-specific underwriting files for five years after the termination of the last obligations under the Program and further mandated that upon expiration of the MPA, or sooner upon Plaintiffs' request, KF&B send Plaintiffs the original underwriting files.  *See id.* at § IX.

For more than 19 months, Plaintiffs have diligently pursued discovery of the account-specific underwriting files KF&B was required to maintain.  *See* Ex. 2 (July 8, 2019 Letter to Court).   Throughout that time, KF&B consistently represented that the underwriting files did not exist as they were required to be maintained under the MPA.  *See id.*   Nevertheless, three days prior to the fact discovery deadline in this action, KF&B's corporate representative, Michael Howery, testified that the account-specific underwriting files were accessible on KF&B's Agent Aid system.  *See* Ex. 3 (June 25, 2019 Transcript of Michael Howery at 142-45, 157, 160-61).  Mr. Howery further testified that certain excess taxi account files were "maintained separately in a folder on [KF&B's] system server" until the account was bound, after which subsequent files for the account were uploaded to Agent Aid.  *See id.* at 161-63.[1]

Plaintiffs immediately raised the significant inconsistency in the record with the Court.  *See* Ex. 2.   In response, the Court directed counsel for KF&B to identify what constituted the account-specific underwriting files for a discrete set of accounts Plaintiffs identified, and extended the fact discovery deadline 60 days.  Ex. 4 (July 23, 2019 Conference Tr. at 9-14); Dkt. No. 73.[2]

## II.    KF&B Has Failed To Produce Account-Specific Underwriting Files Consistent With Its Contractual Obligation And Its Corporate Representatives' Testimony.

KF&B's ongoing production of spreadsheets and documents confirms KF&B failed to

---

[1]    Mr. Howery stated that that "the only items that are outside of the agency management system *could be* e-mails and those are stored on our e-mail server."  *See* Ex. 3 (June 25, 2019 Tr. at 158-59).

[2]    Plaintiffs reserved their right to re-open the deposition of KF&B's corporate representative after reviewing the documents produced by KF&B after the close of the initial fact discovery period.  Plaintiffs have not had the opportunity to question any company witness about the process KF&B used to identify underwriting files.

# KASOWITZ BENSON TORRES LLP

Hon. J. Paul Oetken
September 6, 2019

maintain "complete, accurate, and up-to-date" underwriting files "for each risk written" as required.

Rather, beginning on August 5, 2019, KF&B apparently attempted to create, post hoc, a catalog of documents comprising account-specific underwriting files. KF&B has provided Plaintiffs with Excel spreadsheets for 26 of the 36 accounts that allegedly identify previously produced documents which were part of account-specific underwriting files. See Ex. 5 (August 5, 7, 8, and September 2, 2019 Emails). KF&B identified hundreds or, in the majority of cases, thousands of documents allegedly contained in each of those underwriting files. Thus far, KF&B has identified over 55,000 documents across the accounts, with seven accounts remaining.

Moreover, KF&B has also produced, on a rolling basis, documents not previously produced that it represented were also part of the underwriting files. Thus far, KF&B has made six separate supplemental productions for twelve accounts totaling 1,817 documents. See Ex. 6 (August 19, 21, 26, 28, and September 2, 4, 2019 Emails).[3] At the current rate of production, it will be well into September before KF&B completes its supplemental document production for the remaining 24 accounts. In addition, each time KF&B has made a rolling production, it has provided a revised and supplemented Excel spreadsheet for the relevant accounts, which in addition to adding the newly produced documents, also makes modifications with respect to those previously produced, including in some cases removing certain documents which had previously been identified. Id.[4] This is doubly wasteful of AmTrust's resources, further illustrates KF&B's breach of the MPA, and fails to comply with the Court's order. As described above, representations made during a September 5 meet and confer indicate that the foregoing documents merely "pertain" to the accounts in question, and did not comprise the contemporaneous underwriting file.

In addition to KF&B's admission that it was not compiling underwriting files, Plaintiffs have identified, at a minimum, four major problems with KF&B's eleventh-hour identification of documents. First, only a very small percentage of the documents identified by KF&B were housed in Agent Aid, the program where the majority of the underwriting files were maintained according to Mr. Howery's testimony. For example, merely 1.9% of the 4,457 documents listed in the Excel file for the taxi company "5 Star Flash, Inc." are apparently housed in Agent Aid. For 19 of the 26 Excel spreadsheets, each representing another taxi or limousine accounts, 5% or less of the documents listed are from Agent Aid. For the remaining 7 spreadsheets, the percentage of Agent Aid documents range from 6.3% (Derick Payne) to a maximum of 9.4% (Exclusive One LLC).

Second, according to file path information for each document, a large percentage of documents come from sources identified as "Deleted Items" or "Deletions" folders, which necessarily were never maintained as part of underwriting files, and were not available to other

---

[3]     Attached to the August 26, 2019 Email is an excerpt from the updated Beverly Hills Transit Coop Inc. Excel spreadsheet. Inexplicably, hundreds of documents recently produced by KF&B are not listed in corresponding Excel files (e.g. 142 documents produced on August 26, 2019 for Beverly Hills Transit Coop Inc. are absent from the corresponding Excel file).

[4]     For example, the original Excel file for Pleasantville Village Inc. listed 441 documents, while the "updated" version, provided eleven days later, listed 217 documents. KF&B has provided "updated" Excel files for 12 of the 36 accounts, including as recently as this past Wednesday.

# KASOWITZ BENSON TORRES LLP

Hon. J. Paul Oetken
September 6, 2019

personnel at KF&B or AmTrust when reviewing any particular account.  For 18 of the Excel spreadsheets, more than 15% of the documents identified come from deleted file folders.

Third, Mr. Howery indicated that, for certain *excess taxi files*, the only other place underwriting files would have been kept other than Agent Aid and some emails were on KF&B's server.  However, all 12 of the Excel spreadsheets produced thus far for *limousine* accounts list significant percentages of documents identified as coming from the C: Drive.  This is directly contrary to Mr. Howery's testimony and to KF&B's contractual obligation that all the documents be maintained in a "complete, accurate, and up to date" file.[5]

Finally, a significant proportion of documents included in the spreadsheets are emails which were never added to Agent Aid or maintained on an email server on an account-by-account basis.  Rather, these emails were clearly identified by litigation counsel through after-the-fact word searches as evidenced by the fact that some were previously produced, some were not, some were deleted, and some have been designated and then de-designated in supplemental Excel files.  Indeed, for 16 of the Excel spreadsheets, over 25% of the documents identified are emails with a .msg file extension.[6]  By contrast, only a limited subset of emails were contemporaneously added to Agent Aid.

Plaintiffs do not dispute that all of the documents identified by KF&B for each account should have been maintained in an account specific underwriting file pursuant to the MPA and industry standards.  However, there is no dispute these documents were not maintained in such a manner during the pendency of the Program.  Rather, only those documents and correspondence maintained in Agent Aid comprised the contemporaneous account-specific underwriting files.  This conclusion is further reinforced by contemporaneous reports from underwriting audits conducted by Plaintiffs that reflect that the only documents Plaintiffs could review in connection with those audits were housed in Agent Aid.  *See, e.g.*, Ex. 7 (March 19, 2013 Audit Report, ANA00006387 at ANA00006388 ("KF&B uses the 3i-Infotech (Corban) / Agent-Aid system.  Agent-Aid is KF&B's paperless underwriting system.  The audit team made request for remote access to the paperless system that will allow AmTrust the ability to review the underwriting files on future underwriting audits in order to review files either remotely or on-site.")).  The delineation of the account-specific underwriting files is central to the parties' claims and defenses in this action, and KF&B's unilateral post hoc expansion of those files should be rejected.

## III.    Plaintiffs Will Be Severely Prejudiced If The Court Accepts KF&B's Post Hoc Delineation Of Account-Specific Underwriting Files.

The delineation of what constituted account-specific underwriting files is critical to determine whether KF&B properly underwrote each account, and Plaintiffs have been severely prejudiced by KF&B's gamesmanship.  Plaintiffs and their experts spent hundreds of hours

---

[5]    For example, for the limousine account "Juan Tarantula," 48.1% of documents have their source listed as the C: Drive.

[6]    For example, for 5 Star Flash, Inc., AAA Cab Service, Inc., and Gulf Coast Transportation, Inc., 45.3%, 37.5%, and 52.3% of documents identified, respectively, were emails from sources other than Agent Aid.

4

# Kasowitz Benson Torres llp

Hon. J. Paul Oetken
September 6, 2019

identifying and reviewing documents they believed to be part of the account-specific underwriting files.  Of course, in the absence of any designation of underwriting files by KF&B, the documents identified by Plaintiffs are not the same as the documents KF&B has recently identified.  Even if the Court grants the relief requested herein and confines the "underwriting files" to those documents maintained in Agent Aid, this work will have to be redone.[7]

If the Court were to accept KF&B's <u>post hoc</u> creation and supplementation of underwriting files maintained in Agent Aid with tens of thousands of new documents, including thousands of deleted or previously unproduced documents, Plaintiffs and their experts would be further and more severely prejudiced by having to spend hundreds of additional hours and hundreds of thousands of dollars redoing the analysis on a vastly larger scale.  Moreover, the parties will need a significant extension of the fact and expert discovery deadlines from the date that KF&B completes its rolling production of supplemental documents and final Excel files to provide Plaintiffs with sufficient time to review the thousands of documents for each account in context and to determine whether they need to re-depose KF&B's corporate representative.

Accordingly, the Court should limit the underwriting files to those documents maintained in Agent Aid, which is consistent with the terms of the MPA (requiring that the documents for each account be maintained in a complete, accurate and up-to-date file) with Mr. Howery's testimony (that the underwriting files were in Agent Aid), and the parties' course of conduct limiting AmTrust's underwriting audit review to Agent Aid.  There are only a discrete number of documents maintained in Agent Aid and it appears the vast majority had already been produced for each account.  Thus, a ruling limiting the underwriting files to those documents in Agent Aid would obviate the time and resources associated with a re-review of thousands of disparate documents which were not kept in one place during the pendency of the Program and the attendant delays that would result from that re-review.  However, Plaintiffs respectfully request a brief thirty day adjournment of the fact discovery deadline from the completion of KF&B's final production of the spreadsheets identifying which documents were maintained in Agent Aid to collate those documents and determine whether Plaintiffs need to re-open the deposition of KF&B's corporate representative, since KF&B had not previously identified the source of those documents in the metadata and, thus, Plaintiffs were unable to segregate that subset of documents.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs respectfully request a discovery conference to seek the Court's guidance on the delineation of the account-specific underwriting files and to address the deadlines for completion of fact and expert discovery.

---

[7]     As Plaintiffs indicated at the July 23, 2019 conference, Plaintiffs intend to file a motion for sanctions to recover the costs associated with this unnecessary review.

Kasowitz Benson Torres llp

Hon. J. Paul Oetken
September 6, 2019

Respectfully submitted,

*/s/ Lauren Tabaksblat*

Lauren Tabaksblat

cc:  All Counsel of Record (via e-mail)

# Exhibit 1



MANAGING PRODUCER AGREEMENT

**Producer:**    KF&B, Inc. dba KF&B Program Managers Insurance Services

**Insurer:**    AmTrust North America, Inc. on behalf of:

Wesco Insurance Company, a Delaware domiciled, licensed insurer

(collectively, AmTrust)

**Effective Date:**    July 1, 2011

## I. Program Description

A. The business covered by this Agreement shall consist of one or more insurance programs, each described in an Addendum prepared by AmTrust. Upon acceptance and signature by both parties, each Addendum shall be incorporated into this Agreement, and shall, together with the terms of this Agreement, constitute an insurance program (Program refers to one or more programs covered by this Agreement).

B. Each Program shall contain appropriate underwriting guidelines which shall include at a minimum: premium volume requirements (maximum and minimum), basis of rates, and maximum limits of liability; types of risks, exclusions, territorial limitations, effective dates, policy cancellation provisions, and maximum policy periods; and which may be changed by AmTrust at its discretion from time to time (Underwriting Guidelines).

C. Each Program shall also address commission, expenses, and financial and accounting reporting.

## II. Producer's Authority

A. AmTrust appoints Producer, on a non-exclusive basis, for the purpose of marketing, soliciting, underwriting, binding, executing, and servicing on behalf of AmTrust the types and classes of business in the states authorized in a Program. Producer shall issue policies of insurance only in relation to a Program. An insurance policy shall include the policy, binders, certificates of insurance, endorsements and contracts of insurance issued by or on behalf of AmTrust (Policy(ies)). In conjunction therewith, Producer shall have authority to solicit, underwrite, rate, negotiate, prepare, bind, sign, distribute, and cancel Policies; to collect Premiums and pay return Premiums; to prepare and distribute all policyholder notices including endorsements, renewal and non-renewal notices, additional insured and policy certificates; to retain, oversee, and pay a loss control vendor; to cooperate with AmTrust in the selection of a claim administrator; if applicable, to respond to all Bureau Criticisms within ten (10) days of receipt of notice from AmTrust; to follow AmTrust Policy Deductible Guidelines, which are incorporated into and made part of this Agreement; to perform such additional duties as are set forth in a Program; and to serve as program manager with respect to the business described in a Program.

B. Producer agrees to perform the functions specified in a Program in accordance with the highest standards of the industry and pursuant to the standards and procedures set forth in a Program, including compliance with all Underwriting Guidelines and directives issued by AmTrust from time to time. Producer understands and agrees to produce Policies in accordance with applicable AmTrust filings and to abide by the requirements of the insurance laws and regulations of the states in which it will operate on behalf of AmTrust, and shall maintain all licenses necessary to transact the business described in a Program. In addition, Producer shall in all other respects act in full compliance with applicable legal requirements, including but not limited to laws governing consumer disclosures and privacy, remuneration disclosures, and other laws and regulations. Producer agrees to maintain a sufficient staff of competent and trained personnel to perform its duties.



AmTrust Underwriters
An AmTrust Financial Company

C. Producer shall have no authority to act on behalf of or bind AmTrust in any way except as expressly stated in a Program, and shall not without prior written consent of AmTrust:
1. Commence legal proceedings in the name of AmTrust;
2. Incur indebtedness or other liability except as provided for in a Program on behalf of AmTrust;
3. Negotiate, enter into, bind, modify, or cancel reinsurance on behalf of AmTrust or collect any payment from a reinsurer or commit AmTrust to any settlement with a reinsurer;
4. Commit AmTrust to participate in insurance or reinsurance syndicates or pools;
5. Investigate, settle, adjust, or defend claims on behalf of AmTrust;
6. Jointly employ any employee of AmTrust;
7. Effect a flat cancellation of a Policy more than fifteen (15) days after the Policy effective date, or bind any coverage subsequent to the Policy effective date;
8. Extend time for payment of Premiums or other monies due to AmTrust, waive Premium payments, withhold any monies or property of AmTrust, or offer or pay any rebate of Premium;
9. Charge or collect any other fees in respect of any business arising under this Agreement except those fees and Premium payments identified in AmTrust Underwriting Guidelines or elsewhere in a Program;
10. Permit any sub-agent to serve on Producer's Board of Directors;
11. Reinstate any Policy cancelled by AmTrust or bind coverage on any risk if Producer is aware that it was previously declined or cancelled by AmTrust. In the event that AmTrust shall give Producer permission to reinstate a Policy that has been cancelled for non-payment of premium, Producer shall not reinstate such Policy until all past due Premium has been received; or
12. Assign or delegate any interest or obligation arising out of this Agreement to any third party or successor in interest.
D. Producer shall supervise sub-agents, producers, and brokers who place business through the Producer, and Producer shall be responsible to AmTrust for all Premiums, whether or not collected, for business solicited by sub-agents, producers, and brokers. Producer shall maintain a listing and current copy of insurance licenses of any such sub-agent, producer or broker. At AmTrust's request, Producer shall allow AmTrust to review or will provide AmTrust with copies of the listing of its sub-agents, producers and brokers, and any agreements it has with such sub-agents, producers or brokers.

## III. Fiduciary Obligations

Producer shall perform its obligations as a fiduciary of AmTrust, and shall use its best efforts to perform all acts necessary for the proper conduct of business on behalf of AmTrust. Producer shall advise AmTrust if it, or any officer or employee is convicted of a felony crime involving dishonesty or breach of trust, and shall in addition notify AmTrust of any suspected fraudulent acts in connection with this Agreement.

## IV. Independent Contractor

Producer is and shall at all times remain an independent contractor. Nothing contained in this Agreement shall be construed to create an employer/employee relationship between AmTrust and the Producer, or between AmTrust and any of Producer's employees, officers, representatives, sub-agents or the like.

Annually, within one hundred-eighty (180) days following the close of Producer's fiscal year, and at other times upon AmTrust's request, Producer shall provide AmTrust with financial statements and information acceptable to AmTrust.



AmTrust Underwriters
An AmTrust Financial Company

### V. Compensation and Expenses

Producer shall be entitled to receive compensation for the business produced on behalf of AmTrust solely at such rates and on such other terms as are set forth in a Program (Commission).

Producer shall be responsible for all expenses incurred in connection with this Agreement, including but not limited to:

A. Office expenses:  Producer shall be responsible for all its office expenses, overhead charges, remuneration of officers and staff, advertising and promotional expenses.
B. Program administration costs: Producer shall be responsible for all Program administration costs, including but not limited to policy administration expenses, bank charges, agent commissions, fees to sub-agents or brokers, fees to loss control vendors, investigations, licensing fees, costs of policyholder premium audits and actuarial reviews that have been requested by Producer.
C. Extensions of credit: Producer shall be obligated for any extension of credit to any insured and shall be responsible for the full amount of Premiums due to AmTrust on any Policy, whether or not Producer has collected said Premium. It is agreed that Producer shall not cause AmTrust to be responsible to a premium finance company for Premiums, return Premiums, or loss of payments. When a financed Premium is cancelled, AmTrust shall credit the Producer's account in the normal manner and the Producer shall be responsible for return payments.

Producer's right to receive Commission or any other amount due shall at all times be subordinate to AmTrust's right to offset or apply such Commission or other amount due against any indebtedness of Producer to AmTrust. AmTrust shall have the right to offset in its payment of Commission or other amount due to the Producer any return Commission or any other obligations of the Producer, its parent, affiliates, or subsidiaries to AmTrust arising under this Agreement. If any policy fees, late fees, reinstatement fees or other sums related to Policies are determined to be premiums under any state insurance law for the purposes of calculating taxes on insurance premiums, AmTrust shall offset in its Commission payments to Producer the amount needed to satisfy the premium tax obligation due thereon.

### VI. Receipt and Payment of Premiums

Producer shall administer the collection, receipt, and return of Premiums. Premiums shall mean, in addition to all policy related payments identified as Premiums, policy related fees, late payment fees, reinstatement fees, and any other sums due in respect to any Policy (Premiums).

Producer will pay in full the balance indicated on the Monthly Account Current, as provided in Article X, within forty five (45) days from the end of the month covered by the report.  All amounts delinquent for ninety (90) days or more shall bear compound interest at the prime rate as published in the Wall Street Journal on the 90th day of delinquency or, if the 90th day does not fall on a business day, the first business day following the 90th day, plus two percent (2%), regardless of whether AmTrust exercises its right to terminate the Agreement.

### VII. Premium Audit

When applicable, premium audit will be handled according to AmTrust's Premium Audit Guidelines, which may be changed from time to time by AmTrust. AmTrust's Premium Audit Guidelines are incorporated into and made part of this Agreement.

With respect to collection of audit premiums, audit premium due will be billed within five (5) business days of receipt of final premium audit from AmTrust. Producer may, in its own name and on its own behalf, take all reasonable actions it deems appropriate to collect audit premium. If Producer is unable to collect the audit premium within sixty (60) days of initial billing, AmTrust requires Producer



AmTrust Underwriters
An AmTrust Financial Company

to use any or all of the following procedures to collect the audit premium: past due notices, last notice before account is referred to a collection service, and direct telephone calls. In the event the process is unsuccessful and Producer cannot collect the audit premium within ninety (90) days of the initial invoice due date, Producer may, no later than the one-hundredth (100th) day following receipt of final premium audit from AmTrust, either remit full payment to AmTrust, or refer the account to AmTrust for direct collection. Failure to collect audit premium shall not operate as a defense against full payment by Producer to AmTrust for all amounts due or owing to AmTrust, including amounts referred to AmTrust for direct collection. Only AmTrust, at its sole discretion, can relieve Producer of this responsibility. All referrals by Producer to AmTrust for direct collection will result in forfeiture of commission.

## VIII. Premium Fiduciary Account

Producer shall hold all funds collected and paid on behalf of AmTrust in connection with this Agreement as a fiduciary of AmTrust. Producer shall establish and maintain one or more Premium Fiduciary Accounts in the name of Producer for the benefit of AmTrust at a bank approved by AmTrust, which account shall be exclusively dedicated to funds received or held for business placed by Producer with AmTrust (Premium Fiduciary Account). Producer shall not change the bank where the Premium Fiduciary Account is maintained without the prior written approval of AmTrust. The Premium Fiduciary Account shall specifically indicate that the account is "for the benefit of AmTrust North America, Inc." and AmTrust will be given signature authority on the account. All Premium payments with respect to any Policy issued in connection with this Agreement shall be remitted immediately into the Premium Fiduciary Account, and Producer shall under no circumstance make any unauthorized use of such funds. The Premium Fiduciary Account must be used for all payments to and/or on behalf of AmTrust. Producer shall administer and maintain the Premium Fiduciary Account(s) in a manner consistent with its fiduciary responsibilities to AmTrust. Except as otherwise provided in writing by AmTrust, Producer may withdraw funds from Premium Fiduciary Accounts only for the purposes of payment of valid return Premiums, payment of Commission when due, and payment to AmTrust of Premiums. Interest earned on all Premium Fiduciary Accounts shall inure to the benefit of Producer net of bank charges.

AmTrust may at any time during the term of this Agreement at its sole discretion, modify, amend, or change the provisions of this Agreement concerning the maintenance of the Premium Fiduciary Account, including, without limitation, requiring that a Premium Fiduciary Account be established under the ownership and in the name of AmTrust; a lock box account arrangement be instituted; requiring Premiums to be deposited directly into such other account as directed by AmTrust; and/or determining that Producer shall have no further rights of withdrawal as respects the Premium Fiduciary Account.

The establishment of one or more Premium Fiduciary Accounts under this Agreement shall not relieve Producer of its obligation to be and remain responsible in a fiduciary capacity in accordance with the insurance laws of all jurisdictions under which this Agreement operates, for all funds collected and paid on behalf of AmTrust. Producer shall maintain such funds separate and apart from any operating or other funds of Producer, and separate and apart from any other funds maintained by Producer on behalf of any other entity. Neither the keeping of such account, nor any action or statement by AmTrust shall be held to waive assertion by AmTrust of the fiduciary relationship of Producer to AmTrust.

## IX. Maintenance of Books and Records

Producer shall maintain true and correct financial and insurance records for all business produced under this Agreement. Such information shall include all books, records, reports, electronic files, and documents with respect to a Program, including policyholder information, Premium records, policy



registers, all policies, underwriting files, accounting records, agency records, licensing files, records of notices and complaints, policy documents, accounting records, complaint logs, and all reports and records required to be retained in connection with a Program, or required under applicable law (Records). All Records other than policy expirations are the property of AmTrust, and upon its request, AmTrust shall be entitled to receive copies of any and all Records. Producer is obligated to provide copies of any and all such records.

All Records shall be maintained in accordance with generally accepted accounting principles and with regulatory requirements, and shall be complete, accurate and up-to-date for each Program, and shall be kept in a manner and form required by AmTrust to be compatible with AmTrust's internal systems. AmTrust and its duly authorized representatives shall have authority at any time to conduct an on-site review of Producer's operations, including the inspection, duplication and audit of all Records. This right shall survive the termination of this Agreement. The Records shall be maintained for each Program for a period of five (5) years after termination of the last obligations under a Program. At the end of five (5) years, or sooner upon AmTrust's request, Producer shall send to AmTrust, at Producer's expense, the originals of all such Records.

With respect to all information maintained in electronic form, Producer is responsible for maintaining the security and integrity of such Records, and of AmTrust's systems. Producer shall have in place prior to the commencement of any activity under this Agreement a disaster recovery plan, designed to protect all Records required to be maintained under this Agreement from any catastrophe, disaster, or unforeseen occurrence that could damage such Records, and Producer shall adopt procedures reasonably designed to protect the privacy of policyholder information, in compliance with all applicable laws and regulations, and in conformance with all reasonable standards. Producer shall implement a comprehensive written information security program including administrative, technical, and physical safeguards for protection of customer information and insurance and financial data, and including provision of adequate security in the interface between AmTrust and Producer.

## X. Reporting Requirements
  A. Producer shall prepare and submit to AmTrust the following reports:
    1. Monthly Account Current: a separate detailed and itemized monthly account, by insurance carrier, for each Program, in the format prescribed by AmTrust, no later than fifteen (15) days from the end of the month covered by the report. Such report shall include:
      a. policy number,
      b. insured name,
      c. effective date,
      d. expiration date,
      e. line of business,
      f. transaction type,
      g. gross Premium,
      h. surcharges and taxes,
      i. commission percent,
      j. commission amount,
      k. net Premiums and surcharges, and
      l. indication of premium financing.
    2. Underwriting Reports: a monthly report of underwriting activity for each Program. Such report shall include:
      a. Number of accounts submitted, declined, quoted and not written, and written;
      b. Total Premium quoted and not written, and written including Premium endorsements and adjustments, and additional and return Premiums;
      c. Policies issued by named insured, including manual Premium, experience modifications, schedule modifications, and final policy Premium exclusive of surcharges;



AmTrust Underwriters
An AmTrust Financial Company

     d. Cumulative ratio of written business as it applies to the total cap, pricing report split by new and renewal business, including all pricing information indicated in a Program;

     e. Program expenses; and

     f. All other information specified in a Program.

   3. Premium Fiduciary Account Report: upon request by AmTrust, copies of bank statements and reconciliations for the Premium Fiduciary Account(s) will be provided to AmTrust.

B. Producer will maintain in its office an underwriting file for each risk written containing the following information as applicable under a Program:

   Section I   Policy: copy of policy endorsements, cancellations, forms, notices, and renewals;

   Section II  Correspondence and worksheet of account activity;

   Section III Account underwriting and pricing documentation worksheet, ACORD application, binder, financial information, loss control reports, schedule rating worksheets, experience mod sheets, all other documentation demonstrating compliance with eligibility requirements and Underwriting Guidelines of AmTrust;

   Section IV Rating worksheet;

   Section V  Loss data reports; and

   Section VI Miscellaneous, including certificates of insurance, audits, copy of account invoice, premium finance notices, facultative reinsurance certificates, and any other documents as may be required by a Program.

C. Producer shall provide for any other report as directed by AmTrust, and shall cooperate with AmTrust with respect to all reporting requirements of applicable insurance laws relative to a Program.

D. Producer shall comply with and satisfy all applicable Federal Form 1099 reporting requirements, and all applicable escheat regulations, including the preparation of all filings associated therewith.

## XI. Policy Issuance and Processing Standards

No Policy shall be issued except pursuant to the terms and conditions of a Program.

Producer shall utilize the policy issuance systems described in a Program, and shall be responsible for all costs associated with its implementation. New business Policies will be issued within fifteen (15) days of the effective date, and renewal Policies will be issued by the renewal effective date. All subsequent change endorsement transactions will be issued within thirty (30) days from the close of the month in which the endorsement is effective. In addition, all mid-term cancellation notices, and non-renewal notices shall be completed in a timely basis in compliance with statutory advance notice requirements to the named insured, loss payee, mortgagee, certificate holder and such other persons as may be required by law or the terms of the policy to receive such notice.

AmTrust has the right to cancel or non-renew any Policies in accordance with applicable laws and regulations. In addition, AmTrust reserves the right, in accordance with applicable law, to write any particular line of insurance and to decline to accept any particular line of insurance and to accept or decline to accept any particular risk or class of risks. In the event AmTrust exits a line of business or a jurisdiction it will do so in accordance with applicable laws and regulations, including applicable notice requirements.

## XII. Policy Expirations

Producer shall maintain accurate policy expiration lists. Except as provided for in the Termination Provision below, policy expirations are the property of Producer, and Producer shall retain ownership, use, and control of expirations during and after the term of this Agreement. Nothing contained in this section shall interfere with AmTrust's obligation to reinstate or renew policies pursuant to state law or regulation.



AmTrust Underwriters
An AmTrust Financial Company

### XIII. Marketing and Advertising

Producer shall market the Program and shall perform such related marketing, sales and production activities, and in so doing, shall comply with applicable laws and regulations concerning the marketing and advertising of insurance and insurance related products.

Producer shall not use any forms or advertising materials describing any AmTrust product, or otherwise use AmTrust's name or service marks without the prior written consent of AmTrust.

### XIV. Cooperation

Producer shall give immediate notice to AmTrust and to the claim administrator upon receipt of any inquiries or complaints from policyholders, claimants, insurance departments, or other persons relative to any claim arising under this Agreement. Producer is responsible for providing policy and coverage verification to the claim administrator.

Producer shall give immediate notice to AmTrust of any non-claim inquiries or complaints from policyholders, claimants, insurance departments, regulators, or other persons relative to any matter arising under this Agreement, and shall promptly forward the original documents to AmTrust.

Producer shall at its sole cost cooperate with and assist AmTrust in investigating and defending policy claims, in responding to policyholder or regulatory inquiries, in defending non-policy complaints or legal actions, and in all other respects as necessary to effect the smooth commencement, operation and, as applicable, termination of a Program, whether policies will be serviced by Producer or AmTrust. This obligation shall survive termination of this Agreement.

### XV. Confidentiality of Information

In connection with the performance of this Agreement, receiving party may have access to and receive disclosure of confidential or proprietary information owned by disclosing party and its affiliates including, but not limited to, information related to planned or existing business initiatives, organizational structure, actual and projected sales, profits, technology, computer systems, including computer hardware, software, source code, object code, documentation, methods of processing, methods of operation, the other party's products, product administration and management, and employees ("Confidential Information"). Confidential Information shall not include information that (i) is or becomes generally known to the public not as a result of an improper disclosure hereunder; (ii) is rightfully in the possession of the receiving party prior to its disclosure in connection with this Agreement, (iii) is received in good faith and without restriction from a third party having a right to disclose it; or (iv) is independently developed without use or reference to Confidential Information.

Receiving party covenants and agrees that it will maintain disclosing party's Confidential Information in confidence, using such degree of care as is appropriate to avoid unauthorized disclosure. Except as otherwise permitted herein, receiving party covenants and agrees that it will not, directly or indirectly, disclose any Confidential Information to any third party, except with disclosing party's prior written consent, and shall not make use of Confidential Information for its own purposes or the benefit of any person or entity other than disclosing party.

Producer agrees not to use any Confidential Information to purchase, sell, make any short sale of, loan, grant any option for the purchase of, or otherwise transfer or dispose of any shares of AmTrust Financial Services, Inc. ("AFSI") common stock (or other securities, warrants or other forms of convertible securities outstanding or other rights to acquire such securities). Producer acknowledges that (i) a purpose of this provision is so that that Producer and AmTrust will be in compliance with Regulation FD promulgated by the Securities and Exchange Commission ("SEC") and other applicable securities laws, and (ii) if Producer does not comply with the provisions of this Article XV,



AmTrust Underwriters
An AmTrust Financial Company

AFSI may be deemed by such action to be in violation of such laws and regulations, which could have a material negative impact on the business of AmTrust and AFSI.

The provisions of this Article XV shall survive the termination of this Agreement.

## XVI. Intellectual Property

AmTrust will provide Producer access to certain proprietary systems developed by AmTrust, including without limitation, the ANA system, PremProg and NOAH Claims system (collectively, the "AmTrust IP"). Producer acknowledges and agrees that the AmTrust IP, including without limitation program code, specifications, logic, design, ideas, techniques, know-how and procedures contained therein and all related documentation are confidential intellectual property exclusively owned by AmTrust. This Agreement does not grant and shall not be construed to grant any license or right to use the AmTrust IP except as expressly authorized in writing by AmTrust. Producer and its employees shall not disclose AmTrust IP or any part thereof to any third party, including affiliates, except as expressly authorized by AmTrust. Producer shall not (a) use or access the AmTrust IP for any purpose other than performing its duties under this Agreement; or (b) modify, enhance, reverse engineer, delink, disassemble or decompile any of the AmTrust IP or part thereof. This section shall perpetually survive termination of this Agreement.

## XVII. Insurance

Producer shall at all times while this Agreement is in effect and thereafter while there are any obligations remaining under this Agreement maintain the following insurance policies at its sole cost and expense:

A. Fidelity coverage with minimum liability limits of two hundred-fifty thousand dollars ($250,000)
B. Errors and omissions insurance with minimum limits of one million dollars ($1,000,000) with a deductible not to exceed fifty thousand dollars ($50,000).
C. Commercial general liability insurance (including personal injury) covering Producer and its employees in the minimum amount of one million dollars ($1,000,000) single limit per occurrence.
D. Non-owned automobile liability insurance covering your employees in the minimum amount of one million dollars ($1,000,000) single limit per occurrence; and
E. Workers Compensation insurance in at least the minimum amounts required to be maintained by any applicable statute or regulation.

Such policies shall be with insurers rated no less than "A-" by A.M. Best Company and acceptable to AmTrust. Producer shall provide AmTrust with evidence of such insurance on an annual basis, and will immediately notify AmTrust in writing of any material change in terms or conditions, including any lapse, increased deductibles, decrease in coverage or receipt of notice terminating coverage and of any claim brought under the policy for business arising out of this Agreement.

## XVIII. Collateral

If a Program so specifies, Producer shall post collateral in a form and amount satisfactory to AmTrust covering Producer's obligations. Such collateral shall be maintained in full force at all times and may not be altered or amended without AmTrust's prior written approval.

## XIX. Indemnification

AmTrust will indemnify, defend and hold Producer, its directors, officers, employees and representatives harmless against all civil and administrative liability, including reasonable attorney's fees and costs of investigation and defense, arising out of the relationship of the parties under this Agreement caused by AmTrust's act, error, or omission, except to the extent Producer has caused, contributed to, or compounded such act, error, or omission. AmTrust will accept and pay all fines, penalties, fees, administrative payments, and costs levied against AmTrust or Producer individually



AmTrust Underwriters
An AmTrust Financial Company

or jointly by any regulatory agency, governmental unit, or court for any violation of law or regulation to the extent attributable to the error, omission, or act of AmTrust.

Producer will, as a condition precedent to AmTrust's indemnification obligations, give AmTrust written notice upon receipt of any claim or legal action, complaints from policyholders, claimants, insurance departments, or regulators relative to any matter covered by this Agreement. AmTrust will be entitled but not required, to participate in or assume the defense of the Producer in any such action. Producer agrees to cooperate fully in the handling of any such action.

Producer will indemnify, defend and hold AmTrust, its affiliates, and its and their directors, officers, employees and representatives harmless against all civil and administrative liability, including reasonable attorney's fees and costs of investigation and defense, arising out of the relationship of the parties under this Agreement caused by Producer's act, error, or omission, or the act, error, or omission of any person acting under the direction of Producer, including sub-agents, producers, and brokers who place business through the Producer, except to the extent AmTrust has caused, contributed to or compounded such act, error, or omission. Producer will accept and pay all fines, penalties, fees, administrative payments, and costs levied against AmTrust or Producer individually or jointly, by any regulatory agency, governmental unit, or court for any violation of law or regulation attributable to the act, error, or omission of Producer. Producer shall be responsible to AmTrust for all acts, errors, or omissions of sub-agents, producers, and brokers. In the event Producer fails to adhere to the provisions of this Agreement or the Underwriting Guidelines when quoting, binding, underwriting or rating a Policy, whether intentional or not, Producer will immediately take lawful actions necessary to remove or to reduce AmTrust's exposure on such unacceptable risks or limits, and shall indemnify AmTrust for any damages related thereto.

In the event of a finding of comparative negligence, financial responsibility will be allocated pro rata.

The indemnities provided hereunder shall survive the termination of this Agreement.

## XX. Termination

This Agreement shall remain in effect until terminated in accordance with the following provisions:

A. This Agreement or any Program covered under this Agreement may be terminated by either party for any reason upon one hundred twenty (120) days written notice.

B. AmTrust may upon written notice to Producer, immediately modify Producer's authority or terminate this Agreement or any Program covered under this Agreement in the event:
   1. Reinsurance, or a portion thereof, applicable to the business covered by this Agreement is cancelled or reduced by an AmTrust reinsurer, or
   2. A reinsurer, captive or otherwise, providing reinsurance applicable to the business covered by this Agreement, fails to timely provide collateral or other security required under the applicable reinsurance agreement, or if such reinsurance agreement is suspended or terminated.

C. The following shall constitute acts of material breach of this Agreement, which shall result in termination, at AmTrust's option, of this Agreement or any Program covered under this Agreement, immediately upon Producer's receipt of written notice of termination:
   1. Abandonment, fraud, gross, or willful misconduct of Producer with respect to any obligations under this Agreement.
   2. Breach of Producer's fiduciary obligations to AmTrust.
   3. Failure of Producer to account for, effect collection of, or remit Premium when due, failure to pay monies due to AmTrust, or failure to pay any sums for which it is responsible under the terms of a Program.



AmTrust Underwriters
An AmTrust Financial Company

4. Misapplication or misappropriation of funds of AmTrust or funds received by Producer for AmTrust policyholders, or fails to pay any sums for which it is responsible under the terms of a Program.
5. Continued or repeated material breach as outlined in paragraph D. of this Section XX.
6. The commencement of any regulatory or judicial proceeding for the administrative oversight of Producer.
7. Breach of underwriting authority.
8. Producer or any of its directors, officers, or principals, commits an act of fraud, abandonment, misappropriation of funds, material misrepresentation, willful misconduct or gross negligence, or is the subject of an indictment or criminal investigation or conviction that AmTrust, in its sole discretion, determines to adversely reflect on the integrity or trustworthiness of Producer.
9. Producer undergoes a material change in ownership, or any key person identified in a Program is no longer actively involved in business under this Agreement, whether due to departure from Producer or other cause.
10. Producer becomes insolvent.

D. The following shall constitute acts of material breach of this Agreement. If such breach is not cured or substantially corrected within five (5) days from receipt by Producer of written notice of such breach, at AmTrust's option, AmTrust may terminate this Agreement, or may terminate a Program affected by the material breach.
1. The loss, suspension, or revocation of any license or certificate of authority of Producer that is material to the performance of its duties under this Agreement.
2. Producer receives less than a satisfactory rating on any audit or onsite review.
3. Failure by Producer to maintain required collateral.
4. Producer failure to administer a Program in accordance with its terms, including maintenance of required collateral, whether or not the posting of the collateral is the responsibility of the Producer or of some third party.

E. With respect to material breach of this Agreement as outlined herein, and during the pendency of any dispute with the Producer arising out of this Agreement, AmTrust may at its sole option and in its sole discretion and without waiving any of its rights under this Agreement, elect to suspend Producer's underwriting authority under a Program in lieu of terminating the Agreement, establish new provisions concerning receipt of funds to require a lock-box or other account as designated by AmTrust, and take other interim measures as it sees fit if it elects to extend to Producer additional time to cure the breach.

F. In the event this Agreement is terminated by AmTrust for any breach of this Agreement, the use and control of expirations shall be vested in AmTrust. Any monies received by AmTrust through the use and control of these expirations and records shall be applied, less reasonable expenses, to the Producer's indebtedness. The Producer shall remain liable for any unpaid balances. Once all material obligations have been satisfied in full, the rights to the use and control of such expirations and related material information shall revert back to Producer to the extent they remain in the control of AmTrust.

G. In the event of termination for any reason, Producer shall be obligated to perform the duties necessary to service all policies in force until all liability of AmTrust under such policies shall have expired or terminated, or to take all reasonable steps necessary to effect a transfer of its responsibilities to AmTrust, at AmTrust's discretion.

H. At AmTrust's election, AmTrust may carry out the duties of Producer. Producer shall reimburse AmTrust for reasonable expenses, including salaries, incurred in performing such duties.

I. In the event of termination for any reason or in the event of suspension of underwriting authority in lieu of termination as provided for in this Agreement, AmTrust may arrange for a lock-box account for all funds collected subsequent to the date of termination

J. Following termination, AmTrust may collect any outstanding indebtedness due AmTrust, at Producer's expense, which should have been collected under this Agreement by Producer. No



AmTrust Underwriters
An AmTrust Financial Company

> commission shall be due Producer for any such sums collected, nor for any uncollected Premiums.
>
> K. Upon termination for any reason, Producer shall at its sole expense promptly return to AmTrust all property of AmTrust, including but not limited to policies, manuals, forms, and data processing software and hardware.

## XXI. Termination Rights and Injunctive Relief

Both Producer and AmTrust understand that this Agreement places responsibilities, duties, and obligations upon Producer different from those of a normal insurance producer or agency contract. Because this Agreement has been mutually entered into for a special purpose, Producer acknowledges that this necessitates a different relationship. Producer therefore specifically agrees not to pursue any regulatory review of the termination of this Agreement or require AmTrust to comply with any statutory or regulatory provisions relating to notice, "run-off" or continuation of business written that may now or hereafter be provided by statute or regulation in recognition of a normal insurance producer or agency relationship. Furthermore, Producer shall not require compliance by AmTrust of any obligations relating to termination of this Agreement other than those provided for specifically herein.

Producer acknowledges that in the event of any threatened or actual breach of this Agreement by Producer, AmTrust will suffer immediate and irreparable injury not compensable by monetary damages and for which AmTrust will not have an adequate remedy available at law. Therefore, if AmTrust institutes an action or proceeding to enforce the provisions of this Agreement, it shall be entitled to obtain from a court of competent jurisdiction, without the posting of any bond or security, such injunctive relief, restraining orders, specific performance, or other equitable relief as may be necessary or appropriate to prevent or curtail any such threatened or actual breach. The foregoing shall be in addition to any other rights or remedies AmTrust has at law or in equity.

## XXII. Entire Agreement

Each party acknowledges and agrees that this Agreement has been negotiated and entered into in good faith and at arms length. This Agreement supersedes all previous verbal or written agreements between Producer and AmTrust, and constitutes the full Agreement between the parties. Each Program executed by the parties under this Agreement is a part of this Agreement and is subject to all terms and conditions of this Agreement. To the extent that any Program or amendment thereto, signed by both parties, changes the terms of this Agreement, the provisions of such Program or Amendment shall control in respect to all business written under such Amendment or Program.

If any provision of this Agreement should be declared invalid or in conflict with the laws of any state, such provision shall be interpreted to conform to such legal authority, and in all other respects the Agreement shall remain in full force and effect.

The failure of AmTrust or Producer to enforce any obligation under this Agreement shall not constitute a waiver of any right under the Agreement, nor shall past waiver of any provision constitute a course of conduct or a waiver in the future of the same provision.

## XXIII. Representations

Producer represents and warrants that it has full power and authority to enter into this Agreement and to perform the services provided for herein; its participation in this Agreement and performance of its obligations contemplated herein does not and will not violate any law, rule, regulation, judgment, or order of any court binding on it, or in any way violate or conflict with any agreement to which it is a party or by which it may be bound; and that this Agreement is valid and binding on Producer and enforceable against it in accordance with its terms.



AmTrust Underwriters
An AmTrust Financial Company

## XXIV. Applicable Law

This Agreement shall be interpreted and governed by the laws of the State of New York without regard to its rules regarding conflict of laws.

Producer consents to the jurisdiction of any federal or state court sitting in New York, New York with respect to any action relating to this Agreement. **TO THE FULLEST EXTENT PERMITTED BY LAW, PRODUCER AND AMTRUST WAIVE THE RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION ARISING UNDER OR RELATING TO THIS AGREEMENT.**

## XXV. Notices

All notices required under this Agreement shall be made in writing and shall be deemed given upon the delivery of notice personally, by overnight mail delivered by a nationally known courier service or by e-mail, to the following addresses:

AmTrust North America, Inc.
C/O AmTrust Underwriters, Inc.
500 Enterprise Drive, Suite 3C
Rocky Hill, CT 06067
Attention: Regulatory Manager

or to Regulatory Manager at:
AUIRegulatory@AmTrustGroup.com

KF&B, Inc. dba
KF&B Program Managers Insurance Services
425 West Broadway, Suite 408
Glendale, CA 91204
Attention: Michael Howery

The parties by their duly authorized representatives execute this Agreement to be effective on the date first written above:

AmTrust North America, Inc. on behalf of
Wesco Insurance Company

_____
(Signature)

Name: Christopher J. Bellis

Date: 6/21/2011

KF&B, Inc. dba
KF&B Program Managers Insurance Services

_____ EVP
(Signature)

Name: Michael C Howery

Date: 6/17/2011



**AmTrust Underwriters**
An AmTrust Financial Company

ADDENDUM
To Managing Producer Agreement

NUMBER 1
EFFECTIVE DATE July 1, 2011

This Addendum, effective July 1, 2011, is made to the Managing Producer Agreement dated July 1, 2011.

Producer:   KF&B, Inc. dba KF&B Program Managers Insurance Services
Insurer:    AmTrust North America, Inc. on behalf of:
            Wesco Insurance Company
            (AmTrust)

1. Program Name/Subject Business
   a. This alternative risk program is known as **KF&B Limousine and Taxi Program**, only for the line(s) of business and only in the state(s) set forth in Exhibit A, as may be amended from time to time, which is attached to and made part of this Agreement.

2. Program Term
   a. All policies with effective dates on and between July 1, 2011 and June 30, 2012 (Program Year 1).

3. Premium Cap
   a. Your premium cap for Program Year 1 will be $20,000,000.

4. Program Commission
   a. Provisional Commission
      i. Your provisional commission for Program Year 1 shall be as follows:
         A. Your compensation in total shall be 20.5% of gross written premium and shall be reduced by returns and cancellations. Your right to receive compensation shall at all times be subordinate to our right to offset or apply such compensation against any indebtedness of you to us.
         B. Your compensation applies as follows:
            (1)  Retail Commission:        13.5%
            (2)  Program Administration     7.0%
                                           20.5%
            Claim Administration Fees will be paid by AmTrust.
         C. Provisional Commission Adjustment:
            As payment in full for the performance of its obligations under this Agreement, Producer shall be entitled to the following compensation:
            (1)  As respects Program Year 1, Producer shall be entitled to a provisional commission ("Provisional Commission") of 20.5% of Gross Earned Premium assuming a provisional expected Loss Ratio of 60.0%. AmTrust shall be entitled to, and Producer shall be obligated to pay to AmTrust, a return commission on return premiums at the same rate as such commission is paid to Producer.



AmTrust Underwriters
An AmTrust Financial Company

(2)   The Provisional Commission paid to Producer shall be subject to recalculation and adjustment by AmTrust to arrive at the actual commission payable to Producer ("Actual Commission") depending on the actual Loss Ratio as follows:

(a)   if the actual Loss Ratio is less than 60.0%, the Provisional Commission shall be adjusted upward at a rate of 1/3 to 1, increasing the commission by 1/3 of 1.0% for each 1% decrease in the actual Loss Ratio, until a maximum commission rate of 22.5% of Gross Earned Premium at an actual Loss Ratio of 54.0%;

(b)   in the event that the actual Loss Ratio for Program Year 1 shall exceed 60.0%, the difference between the actual Loss Ratio and 60.0% shall be multiplied by the Gross Earned Premium for Program Year 1 and the result shall be carried forward and added to Losses Incurred in the subsequent Program Years for the purpose of Loss Ratio calculation.

The following chart illustrates the commission parameters:

|  | Commission % on GEP | Loss Ratio |
|---|---|---|
| Minimum & Provisional | 20.5% | 60.0% |
| Maximum | 22.5% | 54.0% |

b.   Sliding Scale Adjustment
   i.   Within ninety (90) days following the thirty-sixth (36th) month subsequent to the end of each Program Year, AmTrust will adjust the Provisional Commission in respect of each Program Year on the basis of the actual Program Year results as reflected in AmTrust's statutory books and records, in accordance with formula set forth above.  At the end of each subsequent twelve (12) month period, the Provisional Commission in respect of each Program Year shall be adjusted by AmTrust on the basis of actual Program Year results as reflected in AmTrust's books and records, until all losses have been fully and finally settled in respect of business produced under this Agreement.  The parties may by mutual agreement agree to close out any Program Year calculation and arrive at a final commission in respect of such Program Year, prior to the full and final settlement of such Program Year.
   ii.   If as a result of any adjustment to the Provisional Commission, a recalculation is made of the Actual Commission payable to the Producer, and as a result, the Actual Commission due to the Producer is less than the adjusted Provisional Commission previously allowed, the Producer shall be obligated to remit to AmTrust the difference no later than the due date of the next Monthly Underwriting Report immediately following the date of such calculation, and if the Actual Commission due to the Producer is greater than the adjusted Provisional Commission previously allowed, then AmTrust shall remit to Producer the difference arising out of such adjustment, concurrent with the delivery of the next Monthly Underwriting Report immediately following the date any such adjustment.
   iii.   All commission payments to the Producer are payment for performance of its obligations under this Agreement and are made as long as the Producer is not in material breach of this Agreement.
   iv.   Definitions
        Gross Earned Premium (GEP) shall mean the earned portion of the direct written premium collected under AmTrust policies attaching during the applicable Program Year, including premium audits and all other premium adjustments, but excluding any Policy



AmTrust Underwriters
An AmTrust Financial Company

related fees, any applicable late payment fees or other sums chargeable and/or due from insureds in respect of such Policies.

Losses Incurred shall mean the sum of reported losses and loss adjustment expense paid as of the valuation date of calculation, the reported case loss and loss adjustment expense reserves for outstanding loss and loss adjustment expense with respect to losses incurred under Policies written during the term of each Program Year less realized reinsurance recoveries. Reinsurance recoveries are to be taken into account only if the GEP calculation includes a corresponding charge for such reinsurance purchased. If AmTrust pays for any reinsurance and does not charge Producer for such purchase, the Loss Ratio calculation will not consider any reinsurance.

Loss Ratio shall mean the fraction having a numerator equal Losses Incurred and a denominator equal to the Gross Earned Premium.

5. Claim Administrator: North American Risk Services (NARS)

6. Policy Issuance System:
   a. AmTrust Policy Issuance System installed in Producer's office (AmTrust System):
      i. Producer is required to use the AmTrust System without modification or deviation for the issuance of policies for the **KF&B Limousine and Taxi Program** as follows:
         A. All of the Limousine business; and
         B. For the portion of the Taxi business which will not be reported on a Monthly Reporting Form.
      ii. Producer's failure to comply with paragraph i., above will be considered a negligent act and Producer's failure to comply with the terms and conditions of this Agreement and may result in our enforcement of all remedies available under this Agreement.
      iii. Producer will be responsible for all costs associated with the implementation of the AmTrust System in Producer's office.

   b. Producer Policy Issuance System (Producer System):
   For the Taxi business which will be reported on a Monthly Reporting Form, Producer shall issue such Policies in its own policy issuance system:
      i. Producer will comply with AmTrust's Producer Policy Interface and Policy Documentation Requirements and Timeline procedures which are attached to and made part of this Agreement. Within forty-five (45) days of the effective date of the Program, in accordance with this provision the Producer Policy Interface will be functioning and Policies will be provided to AmTrust. If the Interface is not functioning within such forty-five (45) days, Producer's authority under the Agreement may be suspended at AmTrust's option until such time the Interface is properly functioning and Policies are being provided to AmTrust as required by this provision. In addition, Producer will provide AmTrust with access to its policy issuance system to allow AmTrust to obtain Policy and underwriting information necessary to carry on its business.
      ii. Producer will be required to update Producer's system in accordance with those loss cost/rate, rule or form filings submitted on behalf of AmTrust either by national advisory organizations (Insurance Services Office/National Council On Compensation Insurance) or independent bureaus and to support the effective dates of these filings, without deviation, unless otherwise instructed in writing by AmTrust.
      iii. Producer will be required to update Producer's System in accordance with all AmTrust independent filings including but not limited to loss cost multiplier revisions, rating plans and rating factors and to support the effective dates of these filings, without deviation.



AmTrust Underwriters
An AmTrust Financial Company

iv.  Producer will provide all required statistical data for AmTrust to comply with data reporting requirements to its statistical agent and to its internal accounting system via the agency interface files with the AmTrust System and within the timeframes required both by the AmTrust System and our statistical agents, without exception.

v.  Producer will prepare and submit on a weekly basis a policy log that will capture all information we require in lieu of a physical policy. This information will include Program Name, Agent, LOB, Policy Number, New/ Renewal, Insured's Name, Effective Date, Expiration Date, Issue Date, Cancellation Date, Reinstatement Date, Address, Fed ID number, Location/ State.

vi.  Producer will provide AmTrust with electronic copies of all policies for each risk written in a manner as agreed to by AmTrust.  Such electronic copies will include: declaration page(s), schedules, coverage parts, rating worksheets, and all forms and endorsements.

vii.  Producer will provide for any other data or reports as directed by AmTrust.

viii.  Producer's failure to comply with paragraphs i. through vii., above will be considered a negligent act and Producer's failure to comply with the terms and conditions of this Agreement and may result in our enforcement of all remedies available under this Agreement. In addition, if the Agreement or program is terminated or if Producer does not comply with paragraph i. above, in addition to providing AmTrust access to its policy issuance system as required above, Producer will upon request, provide AmTrust with access to any other supplemental databases and systems to allow AmTrust to secure data necessary to carry on its business.

7.  Other Information:
    For all policies issued through AmTrust's System, AmTrust will, upon Producer's request, provide to Producer the information set forth in Section A.1. of Article X. of this Agreement.

This Addendum is an amendment to the Managing Producer Agreement. All references to the Managing Producer Agreement shall be deemed to refer to the Managing Producer Agreement, as amended hereby.

To the extent any provision of this Addendum shall be inconsistent with any provision of the Managing Producer Agreement, then the provision of this Addendum shall control and such inconsistent provisions shall be deemed amended, so that, as amended, such provisions shall be consistent with the provisions of this addendum.

The parties by their duly authorized representatives execute this Addendum to be effective on the date first written above:

AmTrust North America, Inc. on behalf of          KF&B, Inc.
Technology Insurance Company, Inc.               dba KF&B Program Managers Insurance
Rockdale Insurance Company                        Services
Wesco Insurance Company

(signature)                                       (signature)                    EVP

Name: Christopher J Bellis                        Name: Michael C Howery

Date: 0/21/2011                                   Date: 6/17/2011



AmTrust Underwriters
An AmTrust Financial Company

EXHIBIT A
To Managing Producer Agreement

EFFECTIVE DATE July 1, 2011

This Exhibit A, effective the 1st day of July, 2011, is attached and made part of the Managing Producer Agreement dated July 1, 2011.

| Producer: | KF&B, Inc. dba KF&B Program Managers Insurance Services |
| Insurer: | AmTrust North America, Inc. on behalf of: |
| | Wesco Insurance Company |
| | (collectively, AmTrust) |

| Program: | KF&B Limousine and Taxi Program |

Producer is authorized pursuant to the terms and conditions of the Agreement to produce Subject Business on behalf of each insurer listed above, only in the states indicated below, for the lines of business where the insurer is authorized and has approved filings.

| States | CA | GL |
|---|---|---|
| Alabama | ✓ | ✓ |
| Alaska | ✓ | ✓ |
| Arizona | ✓ | ✓ |
| Arkansas | ✓ | ✓ |
| California | ✓ | ✓ |
| Colorado | ✓ | ✓ |
| Connecticut | ✓ | ✓ |
| Delaware | ✓ | ✓ |
| DC | ✓ | ✓ |
| Florida | ✓ | ✓ |
| Georgia | ✓ | ✓ |
| Hawaii | | |
| Idaho | ✓ | ✓ |
| Illinois | ✓ | ✓ |
| Indiana | ✓ | ✓ |
| Iowa | ✓ | ✓ |
| Kansas | ✓ | ✓ |
| Kentucky | ✓ | ✓ |
| Louisiana | ✓ | ✓ |
| Maine | ✓ | ✓ |
| Maryland | ✓ | ✓ |
| Massachusetts | | |
| Michigan | ✓ | ✓ |
| Minnesota | ✓ | ✓ |
| Mississippi | ✓ | ✓ |



AmTrust Underwriters
An AmTrust Financial Company

| States | CA | GL |
|---|---|---|
| Missouri | ✓ | ✓ |
| Montana | ✓ | ✓ |
| Nebraska | ✓ | ✓ |
| Nevada | ✓ | ✓ |
| New Hampshire | ✓ | ✓ |
| New Jersey | ✓ | ✓ |
| New Mexico | ✓ | ✓ |
| New York | ✓ | ✓ |
| North Carolina | ✓ | ✓ |
| North Dakota | ✓ | ✓ |
| Ohio | ✓ | ✓ |
| Oklahoma | ✓ | ✓ |
| Oregon | ✓ | ✓ |
| Pennsylvania | ✓ | ✓ |
| Rhode Island | | |
| South Carolina | ✓ | ✓ |
| South Dakota | ✓ | ✓ |
| Tennessee | ✓ | ✓ |
| Texas | ✓ | ✓ |
| Utah | ✓ | ✓ |
| Vermont | ✓ | ✓ |
| Virginia | ✓ | ✓ |
| Washington | ✓ | ✓ |
| West Virginia | ✓ | ✓ |
| Wisconsin | ✓ | ✓ |
| Wyoming | ✓ | ✓ |

| Key: | |
|---|---|
| CA | Commercial Automobile Liability |
| GL | General Liability |
| ✓ | Available |
| | Not Available |



AmTrust Underwriters
An AmTrust Financial Company

### AMENDMENT 1
### to MANAGING PRODUCER AGREEMENT

This Amendment, effective the 1st day of July, 2012 (Effective Date) is made to the Managing Producer Agreement (MPA) entered into July 1, 2011 by and between AmTrust North America, Inc. on behalf of Wesco Insurance Company (collectively, AmTrust); and KF&B, Inc. dba KF&B Program Managers Insurance Services (Producer).

WITNESSETH:

Intending to be legally bound, in consideration of the mutual covenants of the parties set forth in the MPA and for other good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, it is hereby agreed by and between AmTrust and Producer:

1. Article II. Producer's Authority, Section B. is deleted in its entirety and replaced with the following:

   **II. Producer's Authority**
   B. Producer agrees to perform the functions specified in a Program in accordance with the highest standards of the industry and pursuant to the standards and procedures set forth in a Program, including compliance with all Underwriting Guidelines and directives issued by AmTrust from time to time. Producer understands and agrees to produce Policies in accordance with applicable AmTrust filings. Producer agrees to maintain a sufficient staff of competent and trained personnel to perform its duties.

2. The last paragraph in Article IX. Maintenance of Books and Records, is deleted in its entirety and replaced with the following:

   **IX. Maintenance of Books and Records**
   With respect to all information maintained in electronic form, Producer is responsible for maintaining the security and integrity of such Records, and of AmTrust's systems in accordance with the terms set forth in Article XV. below.

3. Article XV. Confidentiality of Information, is deleted in its entirety and replaced with the following:

   **XV. Protection of Information**
   A. Confidential Information:
      1. In connection with the performance of this Agreement, receiving party may have access to and receive disclosure of confidential or proprietary information owned by disclosing party and its affiliates including, but not limited to, information related to planned or existing business initiatives, Records (as defined in Article IX. Above) organizational structure, actual and projected sales, profits, technology, computer systems, including computer hardware, software, source code, object code, documentation, methods of processing, methods of operation, the other party's products, product administration and management, and employees ("Confidential Information"). Confidential Information shall not include information that (i) is or becomes generally known to the public not as a result of an improper disclosure hereunder; (ii) is rightfully in the possession of the receiving party prior to its disclosure in connection with this Agreement, (iii) is received in good faith and without restriction from a third party having a right to disclose it; or (iv) is independently developed without use or reference to Confidential Information.
      2. Receiving party covenants and agrees that it will maintain disclosing party's Confidential Information in confidence, using such degree of care as is appropriate to avoid unauthorized disclosure. Except as otherwise permitted herein, receiving party covenants and agrees that it will not, directly or indirectly, disclose any Confidential Information to any third party, except with disclosing party's prior written consent, and shall not make use of

Confidential Information for its own purposes or the benefit of any person or entity other than disclosing party.

3. Producer agrees not to use any Confidential Information to purchase, sell, make any short sale of, loan, grant any option for the purchase of, or otherwise transfer or dispose of any shares of AmTrust Financial Services, Inc. ("AFSI") common stock (or other securities, warrants or other forms of convertible securities outstanding or other rights to acquire such securities). Producer acknowledges that (i) a purpose of this provision is so that Producer and AmTrust will be in compliance with Regulation FD promulgated by the Securities and Exchange Commission ("SEC") and other applicable securities laws, and (ii) if Producer does not comply with the provisions of this Article XV, AFSI may be deemed by such action to be in violation of such laws and regulations, which could have a material negative impact on the business of AmTrust and AFSI.

B. Nonpublic Personal Information:

1. Producer agrees that during the term of this Agreement, Producer may receive or be given access to information, which may include nonpublic personal information (NPI) as such is defined in applicable state and federal privacy and data security laws and regulations (Privacy & Data Laws) relating to AmTrust's employees, customers, policyholders or claimants.

2. Accordingly, Producer agrees to maintain effective information security policies and procedures that include administrative, technical and physical safeguards designed to a) ensure the security of NPI, b) protect against anticipated threats or hazards to the security or integrity of NPI, c) protect against unauthorized access or use of NPI, and d) provide all NPI to AmTrust, upon its request, or ensure the proper disposal of NPI (Security Procedures). Producer further agrees to immediately notify AmTrust of any actual or potential data breach involving NPI and to appropriately document any and all corrective actions taken by Producer. Producer represents and warrants that it will contractually require its subcontractors to comply with Privacy & Data Laws and to maintain Security Procedures.

3. Producer agrees to indemnify and hold AmTrust, its directors, officers, employees and representatives harmless against any and all loss, damage and expenses, including reasonable attorney's fees, cost of investigation and defense, for any data breach resulting from an act or omission of Producer or of Producer's subcontractors.

C. Intellectual Property

AmTrust will provide Producer access to certain proprietary systems developed by AmTrust, including without limitation, the ANA system, PremProg and NOAH Claims system (collectively, the "AmTrust IP"). Producer acknowledges and agrees that the AmTrust IP, including without limitation program code, specifications, logic, design, ideas, techniques, know-how and procedures contained therein and all related documentation are confidential intellectual property exclusively owned by AmTrust. This Agreement does not grant and shall not be construed to grant any license or right to use the AmTrust IP except as expressly authorized in writing by AmTrust. Producer and its employees shall not disclose AmTrust IP or any part thereof to any third party, including affiliates, except as expressly authorized by AmTrust. Producer shall not (a) use or access the AmTrust IP for any purpose other than performing its duties under this Agreement; or (b) modify, enhance, reverse engineer, delink, disassemble or decompile any of the AmTrust IP or part thereof.

D. Records

1. Producer shall have in place prior to the commencement of any activity under this Agreement a disaster recovery plan, designed to protect all Records required to be maintained under this Agreement from any catastrophe, disaster, or unforeseen occurrence that could damage such Records.

2. Producer shall implement a comprehensive written information security program including provision of adequate security in the interface between AmTrust and Producer.

3.  At AmTrust's request, Producer shall be obligated to provide copies of such disaster recovery plan and/or comprehensive written information security program.

E.  In the event Producer violates any provisions set forth in this Article XV., AmTrust maintains the right to claim damages or seek any available legal or equitable remedies, including an injunction to prevent continued or further violations of this Article XV.

F.  The provisions of this Article XV shall survive the termination of this Agreement.

4.  Article XVI. Intellectual Property, is be deleted in its entirety and replaced with the following:

## XVI. Compliance

A.  Producer warrants and represents that it shall abide by the requirements of the insurance laws and regulations of the states in which it will operate on behalf of AmTrust, and shall maintain all licenses necessary to transact the business described in a Program. In addition, Producer shall in all other respects act in full compliance with applicable legal requirements, including but not limited to laws governing consumer disclosures and privacy, remuneration disclosures, U.S. Treasury Department's Office of Foreign Assets Control (OFAC) regulations and other laws and regulations

B.  Producer warrants and represents that it (nor any of its officers, directors, stockholders, employees or agents) has not offered, paid, promised to pay, or authorized the payment of any money, or anything of value to (a) any foreign official, or (b) any person, while knowing, or having reason to know, that all or a portion of such money or thing of value will be offered or given for any of prohibited purposes under the anti-corruption laws. Producer and everyone retained by Producer covenant that it will not violate, nor cause AmTrust to violate any applicable anti-corruption laws in connection with its business dealings with AmTrust in any country. Producer agrees that should it learn of or have reason to know of any activities in connection with the representation of AmTrust which may constitute a violation of the Foreign Corrupt Practices Act (FCPA), the UK Bribery Act or applicable local country anti-corruption laws, it will immediately advise AmTrust.

Except as set forth above, the provisions of the Managing Producer Agreement shall remain unchanged.

In Witness Whereof, the parties have caused this Amendment No. 1, effective on the date set forth above, to be executed by duly authorized representatives:

AmTrust North America, Inc., on behalf of
Wesco Insurance Company

_____
(signature)

Name: Christopher J. Bellis

Date: 9/21/2012

KF&B, Inc. dba
KF&B Program Managers Insurance Services

_____
(signature)

Name: Michael C Howery EVP

Date: 9/19/12



AmTrust Underwriters
An AmTrust Financial Company

ENDORSEMENT
To MANAGING PRODUCER AGREEMENT

NUMBER 1
EFFECTIVE DATE: July 1, 2012

This Endorsement, effective the 1st day of July 2012, is made to the Managing Producer Agreement dated July 1, 2011 by and between AmTrust North America, Inc. on behalf of Wesco Insurance Company (AmTrust); and KF&B, Inc. dba KF&B Program Managers Insurance Services (Producer), as amended and endorsed (MPA).

Whereas, Producer is an appointed agent and serves as an underwriting manager on behalf of AmTrust pursuant to terms and conditions of the MPA;

Now, therefore, intending to be legally bound, in consideration of the mutual covenants of the parties set forth in the MPA and for other good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, it is hereby agreed by and between AmTrust and Producer, that:

Addendum 1 for the **KF&B Limousine and Taxi Program** is hereby amended as follows:

1. Number 2. Program Term shall be amended by adding a new Subsection b. as follows:

   2. Program Term
      b. All policies with effective dates on or between July 1, 2012 and June 30, 2013 (Program Year 2).

2. Number 3. Premium Cap shall be amended by adding a new Subsection b. as follows:

   3. Premium Cap
      b. Your premium cap for Program Year 2 will be $20,000,000.

3. Number 4. Program Commission shall be amended as follows:

   Subsection 4.a Provisional Commission is amended by adding a new Subparagraph 4.a.ii. as follows:

   4. Program Commission
      a. Provisional Commission
         ii. Your provisional commission for Program Year 2 shall be as follows:
            A. Your compensation in total shall be 20.5% of gross written premium and shall be reduced by returns and cancellations. Your right to receive compensation shall at all times be subordinate to our right to offset or apply such compensation against any indebtedness of you to us.
            B. Your compensation applies as follows:
               (1) Retail Commission:            13.5%
               (2) Program Administration        _7.0%_
                                                 20.5%
            Claim Administration Fees will be paid by AmTrust.
            C. Provisional Commission Adjustment:
            As payment in full for the performance of its obligations under this Agreement, Producer shall be entitled to the following compensation:
               (1) As respects Program Year 2, Producer shall be entitled to a provisional commission ("Provisional Commission") of 20.5% of Gross Earned Premium assuming a provisional expected Loss Ratio of 60.0%. AmTrust shall be entitled to, and Producer shall be obligated to pay to AmTrust, a return commission on return premiums at the same rate as such commission is paid to Producer.



AmTrust Underwriters
An AmTrust Financial Company

(2)   The Provisional Commission paid to Producer shall be subject to recalculation and adjustment by AmTrust to arrive at the actual commission payable to Producer ("Actual Commission") depending on the actual Loss Ratio as follows:

(a)   if the actual Loss Ratio is less than 60.0%, the Provisional Commission shall be adjusted upward at a rate of 1/3 to 1, increasing the commission by 1/3 of 1.0% for each 1.0% decrease in the actual Loss Ratio, until a maximum commission rate of 22.50% of Gross Earned Premium at an actual Loss Ratio of 54.0%;

(b)   in the event that the actual Loss Ratio for Program Year 2 shall exceed 60.0%, the difference between the actual Loss Ratio and 60.0% shall be multiplied by the Gross Earned Premium for Program Year 2 and the result shall be carried forward and added to Losses Incurred in the subsequent Program Years for the purpose of Loss Ratio calculation.

The following chart illustrates the commission parameters:

|  | Commission % on GEP | Loss Ratio |
|---|---|---|
| Minimum & Provisional | 20.50% | 60.00% |
| Maximum | 22.50% | 54.00% |

4. Number 6. Policy Issuance System is deleted in its entirety and replaced with the following:

a.   AmTrust Policy Issuance System installed in Producer's Office (AmTrust System):

i.   Producer is required to use the AmTrust System without modification or deviation for the issuance of policies for the KF&B Limousine and Taxi Program.

ii.   Producer's failure to comply with paragraph i., above will be considered a negligent act and Producer's failure to comply with the terms and conditions of this Agreement and may result in our enforcement of all remedies available under this Agreement.

iii.   Producer will be responsible for all costs associated with the implementation of the AmTrust System in Producer's office.

Except as expressly modified herein, the terms and conditions of the Managing Producer Agreement shall remain and continue in full force. All references to the Managing Producer Agreement in any agreement, instrument or writing shall be deemed to refer to the Managing Producer Agreement as amended hereby.

The parties hereto by their duly authorized representatives have executed this Endorsement to be effective on the date first written above.

AmTrust North America, Inc. on behalf of Wesco Insurance Company

_____
(Signature)

Name: Christopher J. Bellis

Date: 9/21/2012

KF&B, Inc.
dba KF&B Program Managers Insurance Services

_____
(Signature)

Name: Michael C Flowery EVP

Date: 9/19/12



AmTrust Underwriters
An AmTrust Financial Company

EXHIBIT A
To Managing Producer Agreement

EFFECTIVE DATE July 1, 2012

This Exhibit A, effective the 1st day of July, 2012 is attached and made part of the Managing Producer Agreement dated July 1, 2011.

Producer:   KF&B, Inc. dba KF&B Program Managers Insurance Services
Insurer:    AmTrust North America, Inc. on behalf of:
            Wesco Insurance Company
            (collectively, AmTrust)

Program:    KF&B Limousine and Taxi Program

Producer is authorized pursuant to the terms and conditions of the Agreement to produce Subject Business on behalf of each insurer listed above, only in the states indicated below, for the lines of business where the insurer is authorized and has approved filings.

| States | CA | GL |
|--------|----|----|
| AK | ✓ | ✓ |
| AL | ✓ | ✓ |
| AR | ✓ | ✓ |
| AZ | ✓ | ✓ |
| CA | ✓ | ✓ |
| CO | ✓ | ✓ |
| CT | ✓ | ✓ |
| DC | ✓ | ✓ |
| DE | ✓ | ✓ |
| FL | ✓ | ✓ |
| GA | ✓ | ✓ |
| HI | | |
| IA | ✓ | ✓ |
| ID | ✓ | ✓ |
| IL | ✓ | ✓ |
| IN | ✓ | ✓ |
| KS | ✓ | ✓ |

| States | CA | GL |
|--------|----|----|
| KY | ✓ | ✓ |
| LA | ✓ | ✓ |
| MA | | |
| MD | ✓ | ✓ |
| ME | ✓ | ✓ |
| MI | ✓ | ✓ |
| MN | ✓ | ✓ |
| MO | ✓ | ✓ |
| MS | ✓ | ✓ |
| MT | ✓ | ✓ |
| NC | ✓ | ✓ |
| ND | ✓ | ✓ |
| NE | ✓ | ✓ |
| NH | ✓ | ✓ |
| NJ | ✓ | ✓ |
| NM | ✓ | ✓ |
| NV | ✓ | ✓ |

| States | CA | GL |
|--------|----|----|
| NY | ✓ | ✓ |
| OH | ✓ | ✓ |
| OK | ✓ | ✓ |
| OR | ✓ | ✓ |
| PA | ✓ | ✓ |
| RI | | |
| SC | ✓ | ✓ |
| SD | ✓ | ✓ |
| TN | ✓ | ✓ |
| TX | ✓ | ✓ |
| UT | ✓ | ✓ |
| VA | ✓ | ✓ |
| VT | ✓ | ✓ |
| WA | ✓ | ✓ |
| WI | ✓ | ✓ |
| WV | ✓ | ✓ |
| WY | ✓ | ✓ |

| Key: | |
|------|------|
| **CA** | Commercial Automobile |
| **GL** | General Liability |
| ✓ | Available |
| | Not Available |

FILED: NEW YORK COUNTY CLERK 06/09/2017 05:36 PM
NYSCEF DOC. NO.

Case 1:17-cv-05340-JPO-GWG   Document 78-1   Filed 09/25/19   Page 32 of 113

INDEX NO. 653186/2017
RECEIVED NYSCEF: 06/09/2017



AmTrust Underwriters
An AmTrust Financial Company

### AMENDMENT 2
### to MANAGING PRODUCER AGREEMENT

This Amendment, effective the 1st day of July, 2013 (Effective Date) is made to the Managing Producer Agreement (MPA) entered into July 1, 2011 by and between AmTrust North America, Inc. on behalf of Wesco Insurance Company (collectively, AmTrust); and KF&B, Inc. dba KF&B Program Managers Insurance Services (Producer), as amended and endorsed (MPA).

Intending to be legally bound, in consideration of the mutual covenants of the parties set forth in the MPA and for other good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, it is hereby agreed by and between AmTrust and Producer that the MPA will be amended as follows:

Whereas, Technology Insurance Company, Inc. (TIC), a New Hampshire domiciled, duly licensed insurance company, is an insurance company affiliate of AmTrust North America, Inc.; and

Whereas, TIC wishes to appoint Producer to serve as an underwriting manager on its behalf, pursuant to the terms and conditions of the MPA; and

Whereas, Producer accepts the appointment to serve as underwriting manager on behalf of TIC, pursuant to the terms and conditions of the MPA.

Now, therefore, intending to be legally bound, in consideration of the mutual covenants of the parties set forth in the MPA and for other good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, it is hereby agreed by and between AmTrust and Producer as follows:

1. The first paragraph of the MPA is amended to include TIC as an AmTrust party to the MPA, and

2. The parties to the MPA acknowledge and agree that upon the Effective Date, forward, the MPA shall be read and construed to include TIC in all references to AmTrust throughout the MPA.

Except as set forth above, the provisions of the MPA shall remain unchanged.

In Witness Whereof, the parties have caused this Amendment, effective on the date set forth above, to be executed by their duly authorized representatives:

AmTrust North America, Inc., on behalf of:
Wesco Insurance Company
Technology Insurance Company, Inc.

(signature)

Name: _Christopher J. Bellis_

Date: _10/7/2013_

KF&B, Inc. dba
KF&B Program Managers Insurance
Services

(signature)

Name: _Michael C. Howery, EVP_

Date: _Oct 7, 2013_



AmTrust Underwriters
An AmTrust Financial Company

ENDORSEMENT
To MANAGING PRODUCER AGREEMENT

NUMBER 2
EFFECTIVE DATE: July 1, 2013

This Endorsement, effective the 1st day of July, 2013, is made to the Managing Producer Agreement dated July 1, 2011 by and between AmTrust North America, Inc. on behalf of Wesco Insurance Company and Technology Insurance Company, Inc. (collectively AmTrust); and KF&B, Inc. dba KF&B Program Managers Insurance Services (Producer), as amended and endorsed (MPA).

Whereas, Producer is an appointed agent and serves as an underwriting manager on behalf of AmTrust pursuant to terms and conditions of the MPA;

Now, therefore, intending to be legally bound, in consideration of the mutual covenants of the parties set forth in the MPA and for other good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, it is hereby agreed by and between AmTrust and Producer, that:

Addendum 1 for the **KF&B Limousine and Taxi Program** is hereby amended as follows:

1. Number 1. Program Name/Subject Business is amended by adding a new Subsection b. as follows:

    b. Effective as of July 1, 2013 forward, for AmTrust's Specialty Program segment:
        i. Producer is appointed as the dedicated program manager for Subject Business except in the states of Oregon and Washington.
        ii. Producer will submit all Subject Business to AmTrust. If AmTrust declines any Subject Business, Producer may place such declined business with a third party carrier.

2. Number 2. Program Term shall be amended by adding a new Subsection c. as follows:

    c. Effective as of July 1, 2013, the Program Term will continue with automatic annual renewals, unless terminated sooner in accordance with the terms of this agreement. Each annual period will be a Program Year, which shall include:
        i. All policies with effective dates on or between July 1, 2013 and June 30, 2014 (Program Year 3).
        ii. All policies with effective dates on and between July 1 and subsequent June 30 (Program Year 4 and later).

3. Number 3. Premium Cap shall be amended by adding a new Subsection c. as follows:

    b. Your premium cap for Program Year 3 and each subsequent Program Year will be $20,000,000.

4. Number 4. Program Commission is amended by adding a new Subparagraphs 4.a.iii. and 4.a.iv. as follows:

    4.a.iii.   Your provisional commission for Program Year 3 shall be as follows:
        A. Your compensation in total shall be 21.5% of gross written premium and shall be reduced by returns and cancellations. Your right to receive compensation shall at all times be subordinate to our right to offset or apply such compensation against any indebtedness of you to us.



AmTrust Underwriters
An AmTrust Financial Company

B. Your compensation applies as follows:
   (1)  Retail Commission:        13.5%
   (2)  Program Administration      8.0%
                                   21.5%

C. Provisional Commission Adjustment:
   As payment in full for the performance of its obligations under this
   Agreement, Producer shall be entitled to the following compensation:
   (1)  As respects Program Year 3, Producer shall be entitled to a provisional
        commission ("Provisional Commission") of 21.5% of Gross Earned
        Premium assuming a provisional expected Loss Ratio of 60.0%.
        AmTrust shall be entitled to, and Producer shall be obligated to pay to
        AmTrust, a return commission on return premiums at the same rate as
        such commission is paid to Producer.
   (2)  The Provisional Commission paid to Producer shall be subject to
        recalculation and adjustment by AmTrust to arrive at the actual
        commission payable to Producer ("Actual Commission") depending on
        the actual Loss Ratio as follows:
        (a)  if the actual Loss Ratio is less than 60.0%, the Provisional
             Commission shall be adjusted upward at a rate of 1/3 to 1,
             increasing the commission by 1/3% for each 1.0% decrease in
             the actual Loss Ratio;
        (b)  in the event that the actual Loss Ratio for Program Year 3 shall
             exceed 60.0%, the difference between the actual Loss Ratio and
             60.0% shall be multiplied by the Gross Earned Premium for
             Program Year 3 and the result shall be carried forward and
             added to Losses Incurred in subsequent Program Years for the
             purpose of Loss Ratio calculation.

The following chart illustrates the commission parameters:

|                        | Commission % on GEP | Loss Ratio |
|------------------------|---------------------|------------|
| Minimum & Provisional  | 21.5%               | 60.0%      |
|                        | +1/3%               | <60.0%     |

4.a.iv.  Your provisional commission for Program Year 4 shall be as follows:
   A. Your compensation in total shall be 22.5% of gross written premium and shall
      be reduced by returns and cancellations.  Your right to receive compensation
      shall at all times be subordinate to our right to offset or apply such
      compensation against any indebtedness of you to us.

   B. Your compensation applies as follows:
      (1)  Retail Commission:        13.5%
      (2)  Program Administration      9.0%
                                      22.5%

   C. Provisional Commission Adjustment:
      As payment in full for the performance of its obligations under this
      Agreement, Producer shall be entitled to the following compensation:
      (1)  As respects Program Year 4, Producer shall be entitled to a provisional
           commission ("Provisional Commission") of 22.5% of Gross Earned
           Premium assuming a provisional expected Loss Ratio of 60.0%.
           AmTrust shall be entitled to, and Producer shall be obligated to pay to
           AmTrust, a return commission on return premiums at the same rate as
           such commission is paid to Producer.



AmTrust Underwriters
An AmTrust Financial Company

(2)  The Provisional Commission paid to Producer shall be subject to recalculation and adjustment by AmTrust to arrive at the actual commission payable to Producer ("Actual Commission") depending on the actual Loss Ratio as follows:

(a)  if the actual Loss Ratio is less than 60.0%, the Provisional Commission shall be adjusted upward at a rate of 1/3 to 1, increasing the commission by 1/3% for each 1.0% decrease in the actual Loss Ratio;

(b)  in the event that the actual Loss Ratio for Program Year 4 shall exceed 60.0%, the difference between the actual Loss Ratio and 60.0% shall be multiplied by the Gross Earned Premium for Program Year 4 and the result shall be carried forward and added to Losses Incurred in subsequent Program Year for the purpose of Loss Ratio calculation.

The following chart illustrates the commission parameters:

|  | Commission % on GEP | Loss Ratio |
|---|---|---|
| Minimum & Provisional | 22.50% | 60.0% |
| Maximum | +1/3% | <60.0% |

Except as expressly modified herein, the terms and conditions of the Managing Producer Agreement shall remain and continue in full force. All references to the Managing Producer Agreement in any agreement, instrument or writing shall be deemed to refer to the Managing Producer Agreement as amended hereby.

The parties hereto by their duly authorized representatives have executed this Endorsement to be effective on the date first written above.

AmTrust North America, Inc. on behalf of:
Wesco Insurance Company Services
Technology Insurance Company, Inc.

(Signature)

Name: Christopher J. Bellis

Date: 10/2/2013

KF&B, Inc. dba
KF&B Program Managers Insurance

(Signature)

Name: Michael C Howery EVP

Date: Oct 2, 2013



AmTrust Underwriters
An AmTrust Financial Company

EXHIBIT A
To Managing Producer Agreement

EFFECTIVE DATE July 1, 2013

This Exhibit A, effective the 1st day of July, 2013 is attached and made part of the Managing Producer Agreement dated July 1, 2011.

Producer: KF&B, Inc. dba KF&B Program Managers Insurance Services
Insurer: AmTrust North America, Inc. on behalf of:
Wesco Insurance Company
Technology Insurance Company, Inc.
(collectively, AmTrust)

Program: KF&B Limousine and Taxi Program

Producer is authorized pursuant to the terms and conditions of the Agreement to produce Subject Business on behalf of each insurer listed above, only in the states indicated below, for the lines of business where the insurer is authorized and has approved filings.

| States | CA | GL |
|--------|----|----|
| AK | ✓ | ✓ |
| AL | ✓ | ✓ |
| AR | ✓ | ✓ |
| AZ | ✓ | ✓ |
| CA | ✓ | ✓ |
| CO | ✓ | ✓ |
| CT* | ✓ | ✓ |
| DC | ✓ | ✓ |
| DE | ✓ | ✓ |
| FL | ✓ | ✓ |
| GA | ✓ | ✓ |
| HI | | |
| IA | ✓ | ✓ |
| ID | ✓ | ✓ |
| IL | ✓ | ✓ |
| IN | ✓ | ✓ |
| KS | ✓ | ✓ |
| KY | ✓ | ✓ |

| States | CA | GL |
|--------|----|----|
| LA | ✓ | ✓ |
| MA | | |
| MD | ✓ | ✓ |
| ME | ✓ | ✓ |
| MI | ✓ | ✓ |
| MN | ✓ | ✓ |
| MO | ✓ | ✓ |
| MS | ✓ | ✓ |
| MT | ✓ | ✓ |
| NC | ✓ | ✓ |
| ND | ✓ | ✓ |
| NE | ✓ | ✓ |
| NH | ✓ | ✓ |
| NJ* | ✓ | ✓ |
| NM | ✓ | ✓ |
| NV | ✓ | ✓ |
| NY | | |
| OH | ✓ | ✓ |

| States | CA | GL |
|--------|----|----|
| OK | ✓ | ✓ |
| OR | ✓ | ✓ |
| PA* | ✓ | ✓ |
| RI | | |
| SC | ✓ | ✓ |
| SD | ✓ | ✓ |
| TN | ✓ | ✓ |
| TX | ✓ | ✓ |
| UT | ✓ | ✓ |
| VA | ✓ | ✓ |
| VT | ✓ | ✓ |
| WA | ✓ | ✓ |
| WI | ✓ | ✓ |
| WV | ✓ | ✓ |
| WY | ✓ | ✓ |

| Key: | |
|------|--|
| CA | Commercial Automobile |
| GL | General Liability |
| ✓ | Available |
|  | Not Available |

*  Excludes risks that have a NYC Taxi & Limousine Commission Medallion

10/3/13

FILED: NEW YORK COUNTY CLERK 06/09/2017 05:36 PM
NYSCEF DOC. NO.

INDEX NO. 653186/2017

RECEIVED NYSCEF: 06/09/2017

Case 1:17-cv-05340-JPO-GWG   Document 78-1   Filed 09/25/19   Page 37 of 113



AmTrust Underwriters
An AmTrust Financial Company

ENDORSEMENT
To MANAGING PRODUCER AGREEMENT

NUMBER 3
EFFECTIVE DATE: July 1, 2014

This Endorsement, effective the 1st day of July, 2014, is made to the Managing Producer Agreement dated July 1, 2011 by and between AmTrust North America, Inc. on behalf of Wesco Insurance Company and Technology Insurance Company, Inc. (collectively AmTrust); and KF&B, Inc. dba KF&B Program Managers Insurance Services (Producer), as amended and endorsed (MPA).

Whereas, Producer is an appointed agent and serves as an underwriting manager on behalf of AmTrust pursuant to terms and conditions of the MPA;

Now, therefore, intending to be legally bound, in consideration of the mutual covenants of the parties set forth in the MPA and for other good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, it is hereby agreed by and between AmTrust and Producer, that:

Addendum 1 for the **KF&B Limousine and Taxi Program** is hereby amended as follows:

Number 3. Premium Cap is amended as follows:

1.  Subsection c. is deleted in its entirety and replaced with the following:

    c.  Your premium cap for Program Year 3 will be $20,000,000.

2.  Subsection d. is added as follows:

    d.  Your premium cap for Program Year 4 and each subsequent Program Year will be $30,000,000.

Except as expressly modified herein, the terms and conditions of the Managing Producer Agreement shall remain and continue in full force. All references to the Managing Producer Agreement in any agreement, instrument or writing shall be deemed to refer to the Managing Producer Agreement as amended hereby.

The parties hereto by their duly authorized representatives have executed this Endorsement to be effective on the date first written above.

AmTrust North America, Inc. on behalf of:
Wesco Insurance Company
Technology Insurance Company, Inc.

(Signature)

Name: Christopher J. Bellis

Date: 5/11/2015

KF&B, Inc. dba
KF&B Program Managers Insurance Services

(Signature)

Name: Michael C Howard

Date: 5/11/2015



AmTrust North America
An AmTrust Financial Company

SENT VIA OVERNIGHT DELIVERY

August 7, 2015

KF&B, Inc dba
KF&B Program Managers Insurance Services
425 West Broadway, Suite 408
Glendale, CA 91204
Attention: Michael Howery

Re:  • Managing Producer Agreement between AmTrust North America, Inc. on
        behalf of Wesco Insurance Company and Technology Insurance Company,
        Inc. (collectively AmTrust); and KF&B Inc. dba KF&B Program Managers
        Insurance Services ("KF&B"), effective July 1, 2011, as amended and
        endorsed (MPA);
     • KF&B Limousine and Taxi Program (Program)

Dear Mr. Howery:

This letter will confirm that upon mutual agreement, KF&B and AmTrust will terminate
the Program and the MPA (Termination), effective as of December 31, 2015.  As a result
of Termination, KF&B's responsibilities and authorities as related to the Program are
modified as follows:

1.  KF&B has no further authority under the MPA to quote, bind or issue any new
    policies for the Program with effective dates on or after August 10, 2015.  All
    outstanding quotes issued on or prior to August 10, 2015 will be honored.

2.  KF&B will have no authority to quote, bind or issue any renewal policies with
    effective dates on or after January 1, 2016.

3.  KF&B will issue statutory notice of non-renewal for all Program policies.
    a.  The non-renewal notices shall state as reason for the non-renewal:
        **"KF&B no longer represents AmTrust North America, Inc. on behalf of
        Wesco Insurance Company and Technology Insurance Company, Inc."**
    b.  KF&B will provide AmTrust with a monthly list of policies which will include:
        Account name; Policy number; Effective date; Expiration date; Date the non-
        renewal notice will be or was issued.
    c.  KF&B will provide AmTrust with copies of each non-renewal notice upon
        issuance.
    d.  The Administrative Services Cooperative, Inc. (Policy#WPP1051635 03)
        account must be non-renewed as of January 1, 2016.

4.  KF&B will cooperate and support AmTrust in the collection and recovery of
    deductible security/collateral for all policies whether in-force or expired.

KF&B, Inc
Michael Howery
August 7, 2015

Page 2 of 2

5. KF&B will obtain an extension of the transition agreement between Acrisure and KF&B, to allow KF&B to continue to operate under the name KF&B Program Managers Insurance Services and its FEIN through December 31, 2015.

6. KF&B will continue to service all in-force policies as required by the MPA.

7. KF&B will continue to administer the collection and receipt of Premiums for all in-force policies as required by the MPA.

8. KF&B will continue to provide coverage verification with respect to claims related to the Program.

9. KF&B will maintain its errors and omissions and fidelity insurance as required by the MPA.

10. KF&B will maintain active producer licenses in all states where in-force policies remain. Once there are no longer any in-force policies, this shall serve as notice that producer appointments will be terminated.

11. KF&B will provide AmTrust with copies of all policies and underwriting files as required by the MPA. The underwriting files will be provided in electronic or PDF format no later than thirty (30) days after the expiration of the last in-force policy or sooner upon AmTrust's request.

There is nothing in this letter that shall relieve KF&B of its obligations under the MPA, including but not limited to, cooperating with and assisting AmTrust in the termination and the orderly run-off of the Program.

If you have any questions regarding the above, please contact me at (860) 571-2124.

Very truly yours,

Christopher J. Bellis
Sr. Vice President
AmTrust Underwriters, Inc.
AmTrust North America, Inc. on behalf of
Wesco Insurance Company and
Technology Insurance Company, Inc.

# Exhibit 2

# KASOWITZ BENSON TORRES LLP

1633 BROADWAY

NEW YORK, NEW YORK 10019

(212) 506-1700

FAX: (212) 506-1800

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

LAUREN TABAKSBLAT
DIRECT DIAL: (212) 506-1982
DIRECT FAX: (212) 835-5008
LTABAKSBLAT@KASOWITZ.COM

July 8, 2019

**Via Electronic Mail**

Hon. J. Paul Oetken
New York District Court, Southern District
United States Courthouse, Court Room 706
40 Foley Square
New York, New York 10007

Re:    *AmTrust North America, Inc. et al. v. KF&B, Inc.*, Index No. 17-cv-05340 (JPO)

Dear Judge Oetken:

Plaintiffs write pursuant to Rule 5.B.1 of Your Honor's Individual Practice and Rules seeking an order precluding defendant KF&B, Inc. ("KF&B") from asserting that it complied with its obligation to maintain underwriting files in compliance with the underwriting guidelines annexed to and incorporated into the Managing Producer Agreement between Plaintiffs and KF&B effective July 1, 2011 (the "MPA"). Plaintiffs also seek an order precluding KF&B from challenging Plaintiffs' forthcoming expert report on the grounds that it failed to consider documents in the underwriting file for a specific policy.

This action arises from KF&B's breach of its contractual and fiduciary obligations to properly manage the KF&B Taxi and Limousine Program (the "Program"). The Complaint alleges that KF&B failed to, among other things, take the most basic steps to underwrite the Program, which has resulted in tens of millions of dollars in damages to Plaintiffs.

As set forth herein, the MPA required KF&B to maintain account-by-account underwriting file throughout the pendency of the Program and for five years following its termination. These underwriting files are quintessential to the parties' claims and defenses in this action, and are necessary to assess the appropriateness of KF&B's management of the Program and whether it complied with its contractual and fiduciary obligations. Accordingly, as detailed below, from the outset of discovery and continuing throughout the past eighteen months, Plaintiffs have diligently pursued discovery of these critical underwriting files, including seeking Court intervention. Counsel for KF&B repeatedly represented that the underwriting files no longer exist as they were allegedly maintained during the pendency of the Program. KF&B's disorganized and random document production is consistent with those repeated representations. Nevertheless, just three days prior to the expiration of the fact-discovery deadline, a corporate representative for KF&B testified that KF&B maintains account-by-account underwriting files for the Program in three separate databases on its system.

K A S O W I T Z   B E N S O N   T O R R E S   LLP

Hon. J. Paul Oetken
July 8, 2019

Plaintiffs will be severely prejudiced if, after months of diligently pursuing the account-by-account underwriting files, including the expenditure of substantial time and resources, KF&B is allowed to rely on the inconsistent, unsubstantiated and unreliable testimony of its corporate representative concerning the existence of those files. Under these circumstances, KF&B should be estopped from asserting that it complied with the requirement to maintain account-specific underwriting files, from asserting that Plaintiffs failed to consider specific documents in those files, and from further confusing the factual record by producing any documents in support of the eleventh-hour testimony.

## FACTUAL BACKGROUND

### A.    The MPA Requires KF&B To Maintain Account-By-Account Underwriting Files.

The MPA obligates KF&B to "maintain…an underwriting file *for each risk written*" in a "complete, accurate and up-to-date" manner for "five (5) years after the termination of the last obligations under [the] Program." *See* Ex. 1, Complaint, Exhibit 1 at §§ X.B, IX (emphasis added). Pursuant to the MPA, each underwriting file must contain, *inter alia*, the policy, correspondence and worksheet of account activity, underwriting and pricing information, rating worksheet, and loss data reports. *Id.* at §§ X.B. The MPA mandates that the underwriting files are Plaintiffs' property and, upon the expiration of the five year period following termination of the MPA, or sooner upon Plaintiffs' request, KF&B is required to send Plaintiffs the original underwriting files. *See id.* at § IX.

The MPA was terminated by letter dated August 7, 2015, effective as of December 31, 2015. *See* Ex. 2. Accordingly, KF&B's obligation to maintain "complete, accurate, and up-to-date" underwriting files for "each risk" does not expire until December 2020.

### B.    KF&B Represents That Account-By-Account Files Do Not Exist.

Plaintiffs have diligently pursued the production of the account-by-account underwriting files. Despite Plaintiffs' multiple attempts to solicit this critical discovery, KF&B's counsel repeatedly represented that the underwriting files no longer exist as they were allegedly kept during the pendency of the Program.

### 1.    May 25, 2018 Discovery Conference

At the May 25, 2018 Discovery Conference, Plaintiffs informed the Court that the documents KF&B had produced as of that date were not organized in a manner that would enable Plaintiffs to determine: (1) if each document was part of an account-specific underwriting file; or (2) if so, from which underwriting file each document originated. Dkt. No. 48 at 18-19. Accordingly, Plaintiffs sought the Court's intervention to ascertain the location of the underwriting files by account as required by the MPA. *Id.* at 19. In response, KF&B advised the Court that the underwriting files were archived and were not organized by account or policy, thus the only way to ascertain the underwriting files was to recreate the files *post hoc* through searches of custodians' e-mails. Dkt. No. 48, at 16-17, 20.

2

# Kasowitz Benson Torres llp

Hon. J. Paul Oetken
July 8, 2019

## 2. Correspondence Regarding Underwriting Files

By letter dated October 5, 2018, Plaintiffs reiterated their request for KF&B to "identify, on an account-by-account basis, the documents that comprise the underwriting file for each account." *See* Ex. 3 (October 5, 2018 Letter at 1). Rather than produce account-by-account underwriting files as required under the MPA, KF&B produced a "key" that KF&B claimed to have used "to pull the data together" to reverse engineer the required underwriting files. *See* Ex. 3 (October 19, 2018 Letter at 3). The "key" consisted of a 495-page PDF of an excel spreadsheet with search terms putatively used to reverse engineer the underwriting files for each account. *Id.* at Appendix 3.[1] Importantly, the "key" failed to include bates numbers – or any other mechanism -- to correlate the hundreds of thousands of pages of documents produced with the account-specific underwriting files. *Id.*

Plaintiffs promptly informed KF&B that the "key" did not allow Plaintiffs to "reverse engineer and create [ ] the file for a given policy." *See* Ex. 3 (November 21, 2018 Letter at 1-2). In response, KF&B represented that the account-by-account underwriting files no longer exist because they "were archived on backup tapes due to change in the internal electronic storage system at KF&B." *See* Ex. 3 (December 26, 2018 Letter at 1-2.)

## 3. KF&B's Responses to Plaintiffs' Second Set of Interrogatories

On May 2, 2019, Plaintiffs served their Second Set of Interrogatories to KF&B seeking, for 33 enumerated accounts, the bates numbers for "all documents contained in or making up the Underwriting Files." *See* Ex. 4 (Plaintiffs' Second Set of Interrogatories to Defendant.) KF&B's sworn objections and responses to Plaintiffs' Second of Interrogatories, dated June 3, 2019, stated: "Plaintiffs are already in possession of the information sought by Plaintiffs' Second Set of Interrogatories, and are able to identify with bates-ranges for such information utilizing search terms within Plaintiffs' own database." *See* Ex. 5 (Defendant's Objections and Responses). KF&B further stated that the "burden of deriving or ascertaining the information [requested] is substantially the same for Plaintiffs as it is for Defendant." *Id.* at 7. Simultaneous with service of their Objections and Responses, KF&B also made a supplemental production "which consist[s] of documents that were not responsive to [] the KF&B custodian limitation . . . or [] the keyword search terms agreed to by the parties[.]" *Id.*

Thus, as of June 3, 2019, KF&B maintained that the account-specific underwriting files could only be identified through targeted searches.

## C. KF&B's Corporate Representative Testified That The Underwriting Files Are Maintained In Organized Folders On KF&B's Systems.

Despite maintaining for eighteen months that account-by-account underwriting files no longer exist, and serving document productions and discovery responses consistent with that position, just three days prior to the June 28, 2019 fact discovery cut-off, on June 25, 2019,

---

[1] An excerpt of the "key" is attached hereto as an appendix to Exhibit 3.

K A S O W I T Z   B E N S O N   T O R R E S   LLP

Hon. J. Paul Oetken
July 8, 2019

Michael Howery, in his capacity a corporate representative for KF&B, testified under-oath that:
(i) KF&B maintains all of the electronic files enumerated in Section IX of the MPA on an
account-by-account basis on its systems (*see* Ex. 6 (June 25, 2019 Transcript of Michael Howery
at 142-45, 157)); (ii) no files were lost in the transition from KF&B's former electronic storage
system (Agent Aid) to its current electronic storage system (Epic) (*id*. at 145); (iii) KF&B's
Agent Aid system is still accessible today (*id*. at 160-61); (iv) for all policies in the Program, any
documents applicable to an underwriting file remain in the underwriting file as of June 25, 2019
(*id*. at 153-55); (v) for certain excess taxi accounts, files "were maintained separately in a folder
on [KF&B's] system server," including the "application, loss runs, rating work sheets,
everything to build that policy up to the binding point" (*id*. at 161-62).  Once bound, any
subsequent files for the excess taxi accounts were uploaded to Agent Aid or Epic.  (*Id*. at 162-
63.)  The folders maintained on KF&B's system server are organized by year and account name,
and "are all accessible."  (*Id*.)

        Plaintiffs immediately called for the production of the underwriting files in their native
form as maintained in Agent Aid and KF&B's system. Ex. 6 at 166-67.  In response, counsel for
KF&B completely abandoned its prior position -- presented during the Discovery Conference,
written correspondence, and sworn interrogatory responses -- that account-by-account
underwriting files as required by the MPA no longer exist and must be reverse engineered, and
for the first time informed Plaintiffs that KF&B did not produce these underwriting files because
the account-by-account underwriting files were not identified through application of the
custodian and search term limitations the parties agreed to for e-mail accounts.  *Id.* at 167.

        However, the parties' correspondence regarding search terms and custodians leaves no
doubt that the limitations did not apply to the account-by-account underwriting files.  *See, e.g.*,
Ex. 3 (December 20, 2017 Letter at 3 (listing the "custodians who would appear likely to possess
*relevant emails and other communications*[.]" (emphasis added)); Ex. 3 (January 30, 2018 Letter
at 1-2 (requesting KF&B produce account-specific files, and separately addressing proposed
custodians and terms *for KF&B to run over the custodial email documents*); Ex. 3 (February 23,
2018 at 1-2 (memorializing KF&B's agreement to produce underwriting files for specific
accounts and separately memorializing discussions concerning "search terms" for "custodial
email documents.").  Nor could custodial accounts or search terms properly capture the
underwriting files required under the MPA, as Mr. Howery explicitly testified that these files are
not maintained by a particular custodian, but rather are maintained in Agent Aid or on KF&B's
server.  KF&B's after the fact explanation is inconsistent with its conduct and judicial
representations, and amounts to an admission that KF&B has been misleading Plaintiffs, as well
as the Court, throughout the 18-month fact discovery period.  KF&B's misrepresentations are
particularly egregious in light of Plaintiffs' diligent and repeated efforts to solicit the production
of the account-by-account underwriting files.

**ARGUMENT**

        Fed. R. Civ. P. 34(b)(2)(E)(i) mandates that "[a] party must produce documents as they
are kept in the usual course of business or must organize and label them to correspond to the

# Kasowitz Benson Torres llp

Hon. J. Paul Oetken
July 8, 2019

categories in the request[.]"  *Century Jets Aviation LLC v. Alchemist Jet Air LLC*, 2011 WL 724734, at *3–4 (S.D.N.Y. Feb. 8, 2011).  "A party choosing to produce documents as maintained in the ordinary course of business 'bears the burden of demonstrating that the documents made available were in fact produced consistent with that mandate.'"  *S.E.C. v. Collins & Aikman Corp.*, 256 F.R.D. 403, 409 (S.D.N.Y. 2009) (citations omitted).  Put simply, the producing party is obligated to organize its production such that "sufficient context" is provided to "enable the [P]laintiffs to efficiently locate the specific information related to their requests*."  Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 109–10 (S.D.N.Y. 2013) (citing *Schrom v. Guardian Life Insurance Co. of America*, 2012 WL 28138, at *6 (S.D.N.Y. Jan. 5, 2012)).

On the eve of the fact discovery cut-off, KF&B's corporate representative testified that account-by-account underwriting files for the Program are maintained in an organized, searchable manner in one of three locations:  Agent Aid, Epic, and folders on the KF&B server.  *See* Ex. 6.  KF&B's eleventh-hour sworn testimony is not only inconsistent with representations made by its counsel to this Court and Plaintiffs at conferences and in written correspondence and sworn interrogatory responses, it is also inconsistent with its production of thousands of pages of documents lacking any meaningful context or other information which would permit Plaintiffs to ascertain the contents of the underwriting files maintained for each account or whether or not a document is part of that underwriting file.

At trial, Plaintiffs intend to introduce evidence proving KF&B breached its contractual and fiduciary obligations to Plaintiffs by failing to comply with its underwriting obligations.  Plaintiffs will rely, *inter alia*, on expert testimony as to various deficiencies in KF&B's underwriting process, including the failure to maintain account-by-account underwriting files as required under the MPA.  Because KF&B has failed to produce full, complete copies of the underwriting files as maintained in the usual course of business, KF&B should be precluded from asserting that it maintained account-by-account specific policies, or otherwise rebutting Plaintiffs' experts' contentions that the underwriting files lacked required documentation in violation of the MPA.  *See Rojo v. Deutsche Bank*, 2009 WL 3790191 (S.D.N.Y. Oct. 30, 2009) (precluding witness from testifying regarding unproduced documents, where testimony would prejudice opposing party, and which adversary could not have known about absent full document production); *see also Richmond v. Gen. Nutrition Centers Inc.*, 2012 WL 762307, at *5 (S.D.N.Y. Mar. 9, 2012) (precluding argument and evidence not produced during discovery where the failure to disclose was not substantially justified or harmless).[2]

---

[2]     Plaintiffs would be severely prejudiced if KF&B were allowed to produce native underwriting files at this juncture.  In the event that the Court is inclined to allow KF&B to rely on the account-by-account files, Plaintiffs respectfully request a 60-day extension of the discovery deadline so that Plaintiffs' have sufficient time to review those files, as well as, the opportunity to re-depose KF&B's corporate representative concerning the files.  Plaintiffs also request that the Court grant Plaintiffs' reasonable fees incurred to compel the underwriting files and the unsuccessful efforts to try to reverse engineer the account-by-account underwriting files.  *See Schiller v. City of New York*, No. 04-cv-7921, 2007 WL 735010, at *4 (S.D.N.Y. Mar. 12, 2007) (requiring defendants to bear the "costs of the inefficiencies caused by the late disclosure" of relevant discovery).

# Kasowitz Benson Torres llp

Hon. J. Paul Oetken
July 8, 2019

Respectfully submitted,

*/s/ Lauren Tabaksblat*

Lauren Tabaksblat

cc:  All Counsel of Record (via e-mail)

6

# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 17-CV-05340 (JPO)

- - - - - - - - - - - - - - - - - - - - - - x
AMTRUST NORTH AMERICA, INC., WESCO
INSURANCE COMPANY, and TECHNOLOGY
INSURANCE COMPANY, INC.,

          Plaintiffs/Counter Claim Defendants,

     - against -

KF & B, INC. d/b/a KF & B PROGRAM
MANAGERS INSURANCE SERVICES,

          Defendants/Counter Claim Plaintiffs.


- - - - - - - - - - - - - - - - - - - - - - x

                    June 25, 2019
                    10:00 a.m.


     VIDEO RECORDED DEPOSITION of MICHAEL HOWERY, a

30(b)(6) Witness for the Defendants herein, taken by the

Plaintiffs/Counter Claim Defendants, held at the offices

of Kasowitz Benson & Torres, LLP, 1633 Broadway, New York,

New York, before Sara K. Killian, a Professional Court

Reporter and Notary Public of the State of New York.

Job No. CS3425820

```
 1    A P P E A R A N C E S :

 2

 3    KASOWITZ BENSON TORRES, LLP
      Attorneys for Plaintiffs/Counter Claim Defendants
 4    1633 Broadway
      New York, New York  10019
 5
      BY: JORDAN BELTZ, ESQ.
 6        LAUREN TABAKSBLAT, ESQ.

 7

 8    CLAUSEN MILLER, P.C.
      Attorneys for Defendants/Counter Claim Plaintiffs
 9    28 Liberty Street
      New York, New York  10005
10
      BY: JACOB ZISSU, ESQ.
11

12

13

14    ALSO PRESENT:

15        CHRIS HANLON, Veritext Videographer

16

17

18

19

20

21

22

23

24

25
```

1                    STIPULATIONS

2

3          IT IS HEREBY STIPULATED AND AGREED by and

4     among counsel for the respective parties hereto,

5     that the sealing and certification of the within

6     deposition shall be and the same are hereby

7     waived;

8

9          IT IS FURTHER STIPULATED AND AGREED all

10    objections except as to form of the

11    question, shall be reserved to the time

12    of the trial;

13

14         IT IS FURTHER STIPULATED AND AGREED that

15    the within deposition may be signed before any

16    Notary Public with the same force and effect as

17    if signed and sworn to before the Court.

18

19                    *      *      *

20

21

22

23

24

25

1    specifically with regard to topic number six?

2         A.       Not other than previously discussed.

3         Q.       Did you review any documents to

4    specifically prepare for topic number six?

5         A.       Nothing other than previously

6    discussed.

7         Q.       Okay.

8                  Have you had a chance to review

9    Section 9 of the MPA?

10        A.       Yes.

11        Q.       Was KF & B aware of its obligations

12   under Section 9 during the pendency of the

13   program?

14                 MR. ZISSU:  Objection as to form.

15        A.       Yes, KF & B is responsible for its

16   maintenance of books and records.

17        Q.       I can direct your attention to the

18   second paragraph of Section 9, the paragraph

19   beginning with "All records shall be

20   maintained ..."

21                 Four lines up from the bottom,

22   there's a sentence that says "The records shall be

23   maintained for each program for a period of five

24   years after termination of the last obligations

25   under a program."

Page 143

```
 1                    What is KF & B's understanding as to
 2      what its obligation was pursuant to that
 3      provision?
 4                    MR. ZISSU:  Objection as to form.
 5                    Document speaks for itself.
 6           A.       Yes.  Are you asking me to restate
 7      what you just said?
 8           Q.       Not necessarily restate it.
 9                    But what was KF & B's understanding
10      as to what was required of it pursuant to that
11      sentence?
12                    MR. ZISSU:  Objection as to form.
13                    Document speaks for itself.
14           A.       To continue to maintain our records
15      for a period of at least five years after
16      termination or the last obligation under the
17      program.
18           Q.       Okay.
19                    And that includes original records?
20                    MR. ZISSU:  Objection as to form.
21           A.       Our records are all on a -- once
22      again, I stated this before -- we're on a
23      paperless system.  So an original record, for
24      example, the application, that information comes
25      into us either at some point by fax or e-mail, so
```

Page 144

1     if a -- in the early days, a facsimile paper comes

2     out, that paper is then scanned into an electronic

3     format and attached to our agency management

4     system.

5          Q.      You testified earlier that AmTrust

6     preferred paper copies of records on this account.

7                  MR. ZISSU:  Objection as to form.

8                  Incomplete characterization of his

9          prior testimony.

10         A.      When AmTrust originally came in to do

11    audits, they preferred to look at paper files,

12    yes.  They knew, however, that we had -- our

13    system was paperless.  So at all times, they also

14    had access to our paperless system.

15                 As the years went on, then they were

16    fine just coming in with laptops and attaching and

17    looking at our system, but early on, they wanted

18    to see the paper file.

19                 MR. ZISSU:  Counsel, can you stop

20         clicking your pen during the witness's

21         answer?  It's very distracting.

22                 MR. BELTZ:  I'm sorry.

23         A.      So we maintained paper files for the

24    AmTrust auditor's use.

25         Q.      Does KF & B still have those paper

1      files in its possession?

2           A.      No, we do not.

3           Q.      Does KF & B still have all of the

4      electronic files that are covered under Section 9

5      of the MPA in its possession?

6           A.      Yes, we do.

7           Q.      Were any of those electronic files

8      lost in the transition from Agent Aid to Epic?

9           A.      No, nothing was lost from the

10     transition to -- from Agent Aid to Epic.  Only

11     active files were transferred to Epic, so we still

12     maintain the Agent Aid system to archive the files

13     that were no longer active.

14          Q.      So even today, the Agent Aid system

15     is still in use for the purpose of maintaining the

16     archived files?

17          A.      The Agent Aid system is still there

18     to house the archived electronic files.

19          Q.      And KF & B also transferred over the

20     way that it maintained e-mails at some point; is

21     that correct?

22          A.      Yes.  As discussed earlier, there was

23     a change in our e-mail servers.

24          Q.      Were any electronic documents lost in

25     the transition between the two e-mail servers?

```
 1    are still there.
 2         Q.      Is it possible for a KF & B
 3    underwriter to go into Agent Aid and type in a
 4    policy number and pull up the underwriting file
 5    for that bound policy?
 6                 MR. ZISSU:  Objection as to form.
 7         A.      You're saying is it possible to go
 8    into agency and pull up and view the underwriting
 9    file?
10         Q.      On an account-by-account basis, yes.
11                 MR. ZISSU:  Objection as to form.
12         A.      Yes, it's possible.
13         Q.      The same answer would apply to Epic?
14                 MR. ZISSU:  Objection as to form.
15                 Outside the scope.
16         A.      Yes.  Each policy has its own file --
17    if you will, electronic file -- that you can go in
18    and review.
19         Q.      So if somebody were to provide either
20    you or another KF & B employee with a policy
21    number, somebody could just log on to either Agent
22    Aid or Epic and pull up the underwriting file for
23    that policy?
24                 MR. ZISSU:  Objection as to form.
25                 Mischaracterizes prior testimony.
```

1       A.      There are specific rights as to who

2    can see how much information.  So for example, a

3    very basic level clerical person can only view

4    certain documents.  Underwriters are able to view

5    everything in that file.  Management has totally

6    separate reports that are outside of the

7    individual accounts.

8                So yes, underwriters, management can

9    go into an individual file and view the attached

10   documents.

11      Q.      And those attached documents, in

12   KF & B's mind, would be the complete underwriting

13   file?

14                MR. ZISSU:  Objection as to form.

15                Mischaracterizes prior testimony.  No

16         foundational basis.

17                We keep talking about "this

18         underwriting file."

19                Are you defining it the same way that

20         he's defining it?

21                MR. BELTZ:  We've been talking for 15

22         minutes.  Of course I am.

23      A.      I'll just state one more time the

24   only items that are outside of the agency

25   management system could be e-mails and those are

1     stored on our e-mail server and they're separate

2     from the account.

3               So you would have to go into the

4     e-mail system and search by that policy number or

5     that named insured to pull those documents.

6          Q.     Understood.

7               To the extent that an application

8     would be part of the underwriting file, you could

9     go and type in an account number or policy number

10    and pull up that application, correct?

11              MR. ZISSU:  Objection as to form.

12              Mischaracterizes prior testimony.

13              He talked about different legacy

14         systems earlier and what's accurate, what's

15         on tape, what's been archived.

16              You're talking about it like today he

17         can pull up those systems.

18              MR. BELTZ:  Okay.  I was attempting

19         to streamline this, but we can do it this way

20         if you want.

21         Q.     For the legacy accounts that are

22    still archived in Agent Aid -- okay? -- could you

23    go into Agent Aid -- you being Mike Howery or any

24    other senior executive at KF & B -- type in a

25    policy number and find the application on Agent

1    Aid?

2              MR. ZISSU:  Today?

3              MR. BELTZ:  Today.

4         A.      Yes, I can go in the agent system --

5    Agent Aid system today and pull up a policy from

6    2011 and see the underwriting information attached

7    to the file.

8         Q.      Okay.

9                 Same question with regard to the

10   driver schedule.

11        A.      If the driver schedule is an

12   applicable piece -- for example, on limousine --

13   yes, I could go in and see the driver schedule.

14        Q.      Vehicle schedule?

15        A.      Once again, yes.  If that's an

16   applicable piece of the underwriting guideline and

17   I say that because there are taxi accounts that

18   don't have a driver schedule.  So yes, they --

19   yes, if that's an applicable part of the file is

20   in the underwriting system, in the Agent Aid

21   system.

22        Q.      Other than some e-mails that may be

23   stored somewhere else, the complete underwriting

24   file for archived accounts in Agent Aid is still

25   accessible today?

1           MR. ZISSU:  Objection as to form.

2      A.      Yes, the Agent Aid system is still

3    available today.

4      Q.      And those are searchable by policy

5    number?

6      A.      Yes.  In Agent Aid, you can search by

7    policy number.

8      Q.      Are any accounts that were written as

9    part of the AmTrust program in the Epic system or

10   is everything archived in the Agent Aid system?

11     A.      I'm not sure I can answer that.  I

12   don't know the exact date that the Epic system

13   took over.  If there were -- if there were

14   policies that were still in force when the switch

15   was made, then that information would have been

16   moved to the Epic system.

17     Q.      And if there are policies that were

18   written in the AmTrust program that are currently

19   housed in the Epic agency management system, would

20   those underwriting files still be accessible to

21   you today by policy number?

22           MR. ZISSU:  Objection as to form.

23     A.      Yes.  If an AmTrust policy was in the

24   Epic system, you would still have the -- let's

25   call it the last policy would be in the Epic

1    system, the prior policies would be in the Agent

2    Aid system.

3            The only exception to all of this are

4    the excess taxis.  The excess taxis were massively

5    large typically massively large data files.  So

6    those, for example, could have hundreds, if not

7    thousand pages of loss runs.  So those were

8    maintained separately in a folder on our system

9    server.  So all of the application, loss runs,

10   rating work sheets, everything to build that

11   policy up to the binding point is stored in those

12   folders.

13           Once a policy is bound, now a policy

14   would get attached to Agent Aid and the service

15   and any subsequent endorsements -- servicing,

16   invoicing, certificates of insurance -- would have

17   been in the agency management system.  But the

18   underwriting process up to the binding point is

19   stored in separate sub folders that we maintain.

20       Q.      And how were those sub folders

21   organized?  Are they organized by account name,

22   policy name or something else?

23       A.      They're organized by year and account

24   name.

25       Q.      And are those folders on your server

Page 163

1     still accessible today?

2          A.      Yes, those folders are all

3     accessible.

4          Q.      If I'm understanding you correctly,

5     the underwriting file for an excess taxi account

6     may be split in part between these folders on your

7     server and then either an Agent Aid or Epic; is

8     that correct?

9                  MR. ZISSU:  Objection as to form.

10         A.      Yes, that's correct.  An excess taxi

11    policy would have a file that I maintained during

12    the underwriting process up to the point of

13    issuance and then once it was issued, the actual

14    policy itself would go on to whatever applicable

15    agency management system we were using --

16    typically, Agent Aid -- and then all the policy

17    service from that point on would be attached to

18    the Agent Aid file.

19         Q.      That's because the data files were

20    simply too large to migrate into the Agent Aid

21    system?

22                 MR. ZISSU:  Objection as to form.

23         A.      Yes, in part they were and

24    secondarily, I'm not one who is going to sit there

25    and spend countless hours doing clerical work, so

Page 274

```
 1
 2                    CERTIFICATION
 3            I, SARA K. KILLIAN, a Court
 4       Reporter and Notary Public of the State
 5       of New York, do hereby certify that
 6       MICHAEL HOWERY, the witness whose
 7       examination under oath is hereinbefore set
 8       forth, was duly sworn, and that such deposition
 9       is a true record of the testimony given
10       by such witness.
11            I FURTHER CERTIFY that I am not
12       related to any of the parties to this
13       action by blood or marriage, and that
14       I am in no way interested in the
15       outcome of this matter.
16            IN WITNESS WHEREOF, I have hereunto
17       set my hand this 25th day of June, 2019.
18
19
20            <%4268,Signature%>
21            SARA K. KILLIAN
22       Notary Public of the State of New York
23
24
25
```

Exhibit 4

J7NHAMTC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

AMTRUST NORTH AMERICA, et al.,

                    Plaintiffs,

          v.                          17 Civ. 5340 (JPO)

KF&B, INC.,
                                      Conference

                    Defendant.

------------------------------x
                                      New York, N.Y.
                                      July 23, 2019
                                      11:49 a.m.

Before:

                    HON. J. PAUL OETKEN,

                                      District Judge

                         APPEARANCES

KASOWITZ BENSON TORRES LLP
     Attorneys for Plaintiffs
BY:  LAUREN TABAKSBLAT
     RACHEL M. JACOBSON

CLAUSEN MILLER LLP
     Attorneys for Defendant
BY:  SERENA A. SKALA
     JACOB ZISSU

J7NHAMTC

1          (Case called)

2          THE DEPUTY CLERK:  Starting with the plaintiff,

3     counsel, please state your name for the record.

4          MS. TABAKSBLAT:  Lauren Tabaksblat on behalf of

5     plaintiffs.

6          MS. JACOBSON:  Rachel Jacobsen on behalf of

7     plaintiffs.

8          THE COURT:  Defendants?

9          MS. SKALA:  Serena Skala from Clausen Miller on behalf

10    of defendants.

11         MR. ZISSU:  Jacob Zissu, Clausen Miller, for the

12    defendants.

13         THE COURT:  You can all be seated.  You can remain

14    seated.  If you could just pull a mic, microphone, close to you

15    so I can hear you and the court reporter can hear you.

16         This is a conference I scheduled essentially intended

17    to be a status conference following the close of fact discovery

18    in this case, and I've extended the deadline for fact discovery

19    at least once.  I addressed a couple of discovery issues in an

20    order on April 25 and scheduled this conference which I then

21    had to extend by a week, and in that order I had set the fact

22    discovery deadline to June 28.  In the meantime, I did refer a

23    discovery dispute to Magistrate Judge Gorenstein who resolved

24    it in an order dated June 11.  Then following the close of fact

25    discovery, or the deadline for fact discovery, I received a

J7NHAMTC

1   letter from plaintiffs' counsel dated July 8 and defendant's

2   response dated July 15, which I assume is what the parties are

3   interested in addressing first.

4          The letter from plaintiffs' counsel argues that KF&B

5   should be estopped from asserting that it complied with the

6   requirement to maintain account-specific underwriting files,

7   from asserting that plaintiffs failed to consider specific

8   documents in those files, and from further confusing the

9   factual record by producing any document in support of the

10   eleventh-hour testimony.  In response, defendant's counsel

11   argues this is a premature motion in limine, and they're

12   mischaracterizing the state of the discovery kerfuffle.

13          Did I get that right, more or less?

14          MS. TABAKSBLAT:  Yes, your Honor.

15          THE COURT:  Any update?  Have you resolved it?

16          MS. TABAKSBLAT:  No, your Honor.

17          THE COURT:  So, as I understand it, the question is

18   whether the complaint of plaintiffs is that these documents in

19   defendant's filed, in underwriting files, which were in entered

20   in an account-specific manner were not produced in that way.

21   So isn't the solution just to get whatever they have, they say

22   they now have, in native format, and then you'll have what you

23   have?  Have you all produced what came out that they said they

24   hadn't gotten before?  Has there been any additional production

25   in response to this?

J7NHAMTC

1          MS. TABAKSBLAT:  No, your Honor.  If I could just

2    address the issue quickly.

3          THE COURT:  Yes.

4          MS. TABAKSBLAT:  So the MPA, which governs the

5    agreement --

6          THE COURT:  Would you pull the mic closer, please.

7          MS. TABAKSBLAT:  Sure.  The MPA, which governs the

8    agreements between the parties, requires that KF&B keep

9    account-specific underwriting files for each policy that was

10   written.

11         THE COURT:  This is not a discovery issue.  You're

12   saying it's now been establish that they don't do that?

13         MS. TABAKSBLAT:  So there's an inconsistency in the

14   record with respect to what's been produced and what's been

15   represented in connection with discovery and what the corporate

16   representative for KF&B testified to two days before the close

17   of fact discovery.  The reason this is significant is because,

18   to the extent that the files exist in the manner in which they

19   were required to be maintained under the MPA, we believe that

20   we're entitled to those files.  And the reason this is so time

21   sensitive is because these are crucial to our expert report

22   which is going to be due -- I believe the parties agreed to an

23   initial disclosure date of August 13.

24         THE COURT:  Why didn't you produce them in that manner

25   as required by the MPA, and if you didn't but can, why don't

J7NHAMTC

1    you do it now?

2            MS. SKALA:  So a few things, your Honor.  The first is

3    that the underwriting files as defined by the MPA encompass

4    several different areas of documents as they were maintained by

5    KF&B.  The testimony that was given by KF&B's 30(b)(6) witness

6    was that he can log into one of these places and, using a

7    search similar to how you would do something on Google, type in

8    the policy number for an account and pull up in a list the

9    account-specific documents that are contained in this database.

10           We did produce all but 42 of those documents.  There

11   were over 50,000, and we did produce all but 42 which we have

12   since produced.

13           THE COURT:  You've now produced the other 42?

14           MS. SKALA:  Correct.

15           THE COURT:   OK.

16           MS. SKALA:  However, those documents on that system,

17   which we refer to as Agent 8, is not the totality of documents

18   that consist of the underwriting files as defined by the

19   agreement between the parties.  Those documents also exist and

20   are maintained in KF&B's office, but a lot of them are on the

21   email servers.  As discussed last year before your Honor in

22   May, those documents are about three terabytes of data.  So we

23   agreed with counsel to end -- it was so ordered by this Court

24   to limit the search of those email documents by key words and

25   accounts -- I'm sorry, not accounts, by key words and email

1    custodians.  We have fully complied with that order.

2            The reason that this is so complicated is because

3    plaintiffs until last week had refused to identify which of the

4    1,500 accounts they were seeking complete underwriting files

5    for.  Had they done that, we could have definitely narrowed our

6    search for documents by those account names and probably done

7    a -- we could have limited it by account names, and we weren't

8    given that option until the close of fact discovery.

9            I just want to address one additional thing, which is

10   plaintiffs focused on the fact that Mr. Howery was deposed as a

11   30(b)(6) three days before the close of fact discovery.  But,

12   in fact, Mr. Howery was in New York on April 24 providing

13   individual testimony and was schedule to be deposed the next

14   day, April 25, in the 30(b)(6) capacity.  And at 4:30 p.m.,

15   after we received your Honor's order extending discovery,

16   plaintiffs unilaterally canceled that deposition.  So any

17   complaints that they might have that he was produced three days

18   before the end of fact discovery is theirs.

19            THE COURT:  That's because I extended the fact

20   discovery.

21            MS. SKALA:  Correct.

22            THE COURT:  So either way, it was at the end of fact

23   discovery.

24            MS. SKALA:  Correct, but had it been done on April 25

25   when originally scheduled and they had this issue then, we

1    could have had to months for us to resolve this.  And any

2    complaints that now they're foreclosed because discovery is

3    closed is not KF&B's doing.

4              THE COURT:  So, look, what if we add a couple more

5    months?  What would you want in terms of discovery?

6              MS. TABAKSBLAT:  Sure, your Honor.  So the issue is

7    that under the MPA, the underwriting file is a defined term.

8    To the extent counsel's suggesting that all but 43 of the

9    documents that exist in Agent 8 have been produced, that very

10   well may be the case.  The issue is that there's no way for us

11   to identify which documents were part of each underwriting

12   file.  So the reason that the MPA required these files to be

13   kept in an account-by-account basis was because it was

14   significant and important and integral to determining the

15   appropriate pricing, the renewal, and so in order to assess and

16   to prove -- the burden of proof is on the plaintiffs -- that

17   KF&B breached their contractual and fiduciary obligations to

18   underwriting these accounts, we need to understand what the

19   universe of that -- of the underwriting file for each account

20   is.

21             THE COURT:  How many of the accounts are you focused

22   on?

23             MS. TABAKSBLAT:  I believe 33.  To the extent counsel

24   suggests we didn't -- initially, we've been addressing the

25   issue of the underwriting files date back to May 2018.

1    THE COURT:  How much of your complaint -- I know the

2    general contours of what the lawsuit is about in terms of what

3    you allege they did wrong under the agreement.  How much of it

4    focuses on the failure to keep separately the underwriting

5    files and how much of it is what was in the underwriting files

6    or something else?

7    MS. TABAKSBLAT:  It's essentially one in the same

8    because to the extent that they failed to keep underwriting

9    files, we would allege that is completely inhibiting their

10   ability to properly underwrite and renew each account each

11   year.

12   THE COURT:  Why can't you guys produce what was in the

13   33 underwriting files?

14   MS. SKALA:  It's not that we can't, your Honor.  It's

15   just that the first time that they identified these 33 accounts

16   and requested the -- the first time they identified which

17   accounts form the basis of their damages was last week.

18   THE COURT:  OK.

19   MS. TABAKSBLAT:  Your Honor, that's incorrect.

20   THE COURT:  I don't care.

21   MS. TABAKSBLAT:  Just to make sure the record's clear,

22   we served interrogatories.  We've been asking about these

23   underwriting files for years and have been told they don't

24   exist.  We then -- we served document requests, we sent

25   correspondence about it, we raised it to the Court, and then we

1   served interrogatory responses, I believe it was either the

2   first week in May or the last week in April, that specifically

3   address these 33 accounts, and then we got the same response,

4   that they don't exist and we can't give them to you.

5          THE COURT:  OK.  Why don't you just produce them.

6   I'll move things by a month, even though I said I never would,

7   because you guys keep fighting about everything and someone's

8   lying and I don't know who is, what's going on.  But what if

9   you just produce them in the form of what is in the 33

10   underwriting files consistent with what was said in the

11   30(b)(6) deposition?  Can you do that?

12          MS. SKALA:  We should be able to, your Honor, yes.

13          THE COURT:  OK.  Can I move everything back by

14   30 days?

15          MS. TABAKSBLAT:  I think -- look, we're the plaintiff.

16   We want a trial date, but I think we need more than that, just

17   because I don't know how long it's going to take them to

18   produce the documents, and then obviously our expert has spent

19   months reviewing this.  And one other point I'd like to make to

20   your Honor is our client has expended a tremendous amount of

21   money and resources to try to run searches and identify every

22   document for a particular account that could potentially be

23   part of an underwriting file, and our experts have spent an

24   enormous amount of time doing that as well.  So we'd reserve

25   our rights to move for an appropriate sanction.

1          THE COURT:  For an appropriate sanction?  OK.  I mean,

2     not addressing the sanction, if you want to move for sanctions,

3     I'll address it if I have to.  But if the sanction is in the

4     form of we want some of our attorney's fees, you should confer

5     about it first.  Who knows, maybe you'll reach an agreement on

6     that, but if you have to bring it to me, that's a separate

7     track.

8          MS. TABAKSBLAT:  Understood.

9          THE COURT:  Rather than granting the relief you

10    request in your letter, which is essentially like a motion in

11    limine, I would rather decide the case on the facts and have a

12    fulsome process, even if it means another extension, which I

13    don't want to grant, but I will.

14         So if I extend everything 45 days or 60 days, would

15    that be enough?

16         MS. TABAKSBLAT:  Could your Honor set interim

17    deadlines for how long KF&B would have to produce these

18    documents so we can understand how long it will take -- how

19    long we'll have to review them?

20         THE COURT:  Do you know at this point how long it

21    would take to produce what I've described?

22         MS. SKALA:  No, because, as I said earlier and we've

23    been saying for over a year, the underwriting files are

24    maintained in three different areas.  They already have the

25    Agent 8 documents for the 33 accounts that they've identified.

J7NHAMTC

1    We will have to go back, expand the email portion of the search

2    beyond the ten agreed-upon email custodians, as well as beyond

3    the keyword searches that we previously applied.  So I don't

4    know how long it would take.

5            THE COURT:  You think you can do it in a way that

6    produces what was in the underwriting files for the 33?

7            MS. SKALA:  Yes.  Now that they've narrowed it down,

8    I'm cautiously optimistic that we're going to be able to do

9    that, but we're going to be employing many of the same --

10   "tactics" is the wrong word, but we have to use search terms as

11   well and we have to search by account name and we have to

12   search by policy number because, like I said, the underwriting

13   files are kept in these -- they're complete; they're just in

14   three different areas.

15           THE COURT:  How about 60 days?

16           MS. SKALA:  I think that that would probably make the

17   most sense so we don't have to come back.

18           THE COURT:  All right.

19           MS. TABAKSBLAT:  Sure, that's fine.  Obviously, to the

20   extent it takes longer than anticipated for them to produce the

21   documents, we'll reserve our right to come back to the Court so

22   we have adequate time.

23           THE COURT:  OK.

24           MS. TABAKSBLAT:  Your Honor, can I just clarify that

25   what they will be turning over to us is either a packet of

J7NHAMTC

```
 1    documents or a list of Bates numbers that comprise the

 2    underwriting account which will be aggregated from all the

 3    different sources that defense counsel just described?

 4            MS. SKALA:  I know that we can easily do that from

 5    Agent 8 pursuant to the third-party vendor who's hosting our

 6    documents online.  With respect to documents that have not

 7    already been produced we can find, we can definitely do that.

 8    With respect to documents that have already been produced, I

 9    would suggest that counsel employ the same methods that we do

10    in organizing and figuring out what document goes where.  Just

11    do a keyword search.  But we will endeavor to provide them with

12    that.

13            THE COURT:  I think even the ones they've already

14    produced you're going to need to --

15            MS. SKALA:  Identify.

16            THE COURT:  -- at least by Bates number identify what

17    is in one through thirty-three of the underwriting files.

18            MS. SKALA:  OK.

19            THE COURT:  So now I'm extending fact discovery again

20    for 60 days from now.  Then I guess what I'm doing is extending

21    the -- what was the last date for expert disclosures?

22            MS. TABAKSBLAT:  September 25, 2019.

23            THE COURT:  September?

24            MS. TABAKSBLAT:  25.

25            THE COURT:  So should we move that back by 60 days?
```

1              MS. TABAKSBLAT:  That works for plaintiffs.

2              MS. SKALA:  If we may.

3              THE COURT:  All right.  We'll do that.  Would you just

4      submit a proposed order with the dates.  Just call it a revised

5      scheduling order with the dates, and I'll sign that.

6              Then there's another thing I wanted to talk about, but

7      are there any other dates before we get to that?  Are there any

8      other dates we need to talk about?

9              MS. TABAKSBLAT:  There's one other issue, your Honor.

10     Defendants served a fifth request for production on the last

11     day of fact discovery as extended by your Honor.  So it was

12     served on June 28, 2019.  Plaintiffs' position is these

13     requests are improper.  The discovery requests address

14     plaintiffs' acquisition of Tower and ARI Mutual, which were the

15     subject of defendant's counterclaim.  Both of these accounts

16     were set forth in the counterclaim.  They've known about this

17     since the commencement of this action, and we see no reason why

18     the document requests were served on the eve of the deadline of

19     fact discovery and would require plaintiffs to produce

20     documents following the close of fact discovery.

21             THE COURT:  Do you want to respond?

22             MS. SKALA:  Yes.  Two things, your Honor:  Their

23     30(b)(6) witness could not elaborate on the acquisition of

24     those two companies, which was what precipitated our discovery

25     demands, and their 30(b)(6) wasn't produced until late in June

J7NHAMTC

1    as well.  And with all due respect, they can't really have it

2    both ways.  If we're extending fact discovery, then fact

3    discovery has been extended, and our position is they should

4    respond.

5              MS. TABAKSBLAT:  Your Honor, we disagree.  I mean,

6    there's two -- you can get document discovery and you can get

7    expert testimony.  They could have asked for the documents.

8    They knew about that.  They didn't ask for that.  And a

9    30(b)(6) is not a basis --

10             THE COURT:  I'm not going to require plaintiff to

11   respond to that request given that it was submitted on the last

12   day.  I'm extending this for 60 days solely for the matters

13   we've discussed about the underwriting file.

14             The other thing I wanted to address is I realize, in

15   looking through the docket, that no party has demanded a jury

16   trial.  Am I right?

17             MS. SKALA:  That's correct.

18             MS. TABAKSBLAT:  Yes, your Honor.  The MPA has a jury

19   waiver.

20             THE COURT:  So we can skip summary judgment, I

21   believe.  When we have a case like this with a bench trial, my

22   view is it makes no sense to go through the whole summary

23   judgment process where you have all these deposition

24   designations and you present all this stuff to me, and then it

25   takes me six months to go through it and decide whether there's

1    any genuine dispute of material fact rather than just going

2    straight to the bench trial where I actually look at the same

3    stuff.  We can do direct testimony by declaration or affidavit,

4    and if we need to do cross, we can.  I'll look at the same

5    expert's stuff, and then we just have a bench trial.

6              Does that make sense?

7              MS. TABAKSBLAT:  Yes, your Honor.

8              MS. SKALA:  The only issue that we would have with

9    that, your Honor, is that we still sort of don't know what

10   their specific complaints are even with these 33 accounts

11   because their 30(b)(6) witness reserved everything for their

12   expert.  So to the extent there are issues that are ripe for

13   adjudication, without having to waste everyone's time,

14   including your Honor's time at trial, I think that the parties

15   should be given an opportunity to brief some of those issues

16   and get rid of them on motion for summary judgment if possible.

17             THE COURT:  What do you think of that?

18             MS. TABAKSBLAT:  I agree with your Honor that we can

19   just proceed to trial, but to the extent they want to raise

20   specific issues, then I guess we could address that at that

21   time.

22             THE COURT:  How long would a trial be, do you think,

23   assuming that direct was by affidavit?

24             MS. SKALA:  At least three weeks.

25             MS. TABAKSBLAT:  I was going to say five to

1    seven days.  Maybe closer to five.

2              THE COURT:  What kind of issues do you think you can

3    narrow by having summary judgment briefing?

4              MR. ZISSU:  Certainly --

5              THE COURT:  Let me ask you this a slightly different

6    way.  Is this a case where it's basically -- are there really

7    factual disputes in this case or is it basically a case about

8    the interpretation of specific language in the MPA or both?

9              MR. ZISSU:  There's a combination of both, but it

10   depends on the issue.  And part of this is because plaintiffs'

11   original complaint kind of threw a lot of things at the wall to

12   see what would stick, and what's borne out in discovery is that

13   a lot of these things have no factual support or basis.  And

14   what their 30(b)(6) essentially did was say, oh, don't worry,

15   our expert will come up with all the facts you need so that we

16   can proceed to trial.  We still don't have any idea what the

17   actual allegations are here, but we do know a couple things.

18   One of those things is that the deductible collateral agreement

19   that they included as an exhibit to their complaint is a false

20   exhibit.  It's something that was never provided to KF&B as a

21   contractual document, and their own witnesses admitted it, the

22   30(b)(6), and they also have admitted that they don't have a

23   foundational witness for that document in response to our

24   request for admission.

25              The second thing has to do with black cars.  As we

J7NHAMTC

understand it, only one of the 33 accounts is actually a black

car.  This was the heart of their complaint, if you recall,

your Honor, and it turns out it's a very small amount of their

now-alleged $45 million in damages.  There's one claim for

approximately $300,000.  These are very small things that can

be disposed of quite easily.

        There's also the issue of -- you'll recall the

allegations that plaintiffs made last year that pricing was

something that KF&B controlled, but it turns out from all the

deposition testimony that KF&B had parameters that were

actually set by AmTrust's own actuaries and that AmTrust's own

actuaries had been relying not only on a model that was not

provided to them by KF&B, they were using an ISO model, they

were regulated by the states and limited by the states by their

own filings, AmTrust's own filings, with the state regulatory

authorities as how much they could charge.  On top of that,

when it came time, say, on an annual basis, for revising those

models, AmTrust's own actuaries were not looking at the actual

loss data to correct their pricing.  So all allegations as to

this $45 million loss really boiled down to an issue of

pricing that AmTrust itself is solely responsible for and that

KF&B has no functioning.

        So the underwriting, whether something deviated from

the underwriting manual, whether it was a risky risk, as

they've said, that's really a side issue.  The bulk of this

J7NHAMTC

1    case comes down to damages which were solely within AmTrust's

2    pricing model.

3              THE COURT:   Do you want to respond to any of that?

4              MS. TABAKSBLAT:  Sure.

5              THE COURT:  You don't have to if you don't want to.

6              MS. TABAKSBLAT:  I think counsel essentially just laid

7    for you all the questions of fact.  I don't think anything he

8    just described deals with a matter of law that's appropriate

9    for resolution on summary judgment.  Obviously, to the extent

10   he claims that there's no questions of fact with respect to the

11   deductible guidelines, we disagree.  I believe there's a

12   question of fact as to which deductible guidelines governed.

13   However, even to the extent that we accept counsel's position

14   as true and a prior version of the deductible guidelines does

15   govern this case, we still believe there are breaches of those

16   guidelines.

17             We also disagree with the idea that all the fault lays

18   with AmTrust with respect to pricing and the algorithm.  We

19   obviously brought in an MPA for the specific purpose of

20   underwriting this account, and the record reflects that they

21   breached their underwriting guidelines as well as their

22   fiduciary duties.

23             THE COURT:  Have you talked about a mediation, a

24   private mediation?  Seems like, after the expert reports, that

25   would be a great idea.  You're going to spend all this money

J7NHAMTC

1    with summary judgment and then trial, but, obviously, the

2    answer's going to be somewhere in the middle.  Have you thought

3    about that?

4            MS. TABAKSBLAT:  We've had settlement -- we've had

5    very preliminary settlement discussions.  I agree with your

6    Honor that the appropriate time to discuss more developed

7    settlement discussions will be after the expert reports are

8    exchanged.

9            THE COURT:  You all agree?

10           MS. SKALA:  Yes.

11           THE COURT:  I'm moving the expert deadline, -- you're

12   going to give me an order -- from September to November.  When

13   will that be?  I think I'll just set a conference where we can

14   figure out next steps after that period has run.  So we'll set

15   either a briefing schedule for summary judgment or motions in

16   limine and bench trial or maybe both.

17           When would be a good time?  Beginning of December come

18   back?

19           MS. TABAKSBLAT:  Yes, your Honor.

20           THE COURT:  How is Friday, December 6?

21           MS. SKALA:  Went to look for my phone, and I don't

22   have it.  That sounds fine, your Honor.

23           THE COURT:  Is that good for you?

24           MS. TABAKSBLAT:  Yes.

25           THE COURT:  Let's have a status conference/scheduling

J7NHAMTC

1    conference December 6 at 11:00 a.m.  All right.

2              MS. TABAKSBLAT:  Thank you.

3              THE COURT:  Anything else?

4              MS. SKALA:  No, your Honor.  Thank you.

5              MS. TABAKSBLAT:  No.

6              THE COURT:  Thanks, everybody.  We're adjourned.

7              (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 5

| | |
|---|---|
| **From:** | Serena A. Skala <SSkala@clausen.com> |
| **Sent:** | Monday, August 5, 2019 3:14 PM |
| **To:** | Rachel M. Jacobson; Lauren Tabaksblat; Christian T. Becker; Jordan Beltz |
| **Cc:** | Jacob R. Zissu; John P. De Filippis; Tyler Jay Lory |
| **Subject:** | AmTrust v. KF&B |
| **Attachments:** | 5 Star Flash.xlsx; AAA Full Transportation Systems.xlsx; Administrative Services Cooperative(ASC).xlsx; Ajay Transportation.xlsx; Bay Area Metro.xlsx; Beverly Hills Transport.xlsx; Cabco.xlsx |

**\*\*EXTERNAL EMAIL\*\***

Counsel:

Pursuant to our agreement, enclosed please find spreadsheets of the already produced documents pertaining to the Underwriting Files for 5 Star Flash, AAA Full Transportation Systems, ASC, Ajay Transportation, Bay Area Metro, LLC, Beverly Hills Transit Coop., Inc. and Cabco Yellow, Inc.

We will continue to provide you with spreadsheets on a rolling basis.  If you have any question, please let us know. Thanks.

**Serena A. Skala | Partner**
Clausen Miller P.C. | 28 Liberty Street, 39th Floor | New York, New York 10005
212.805.3948 | vCard | bio

 

**Clausen Miller P.C.** Illinois • New York • California • New Jersey • Indiana • Wisconsin • Connecticut • Florida
**Clausen Miller International** London • Paris • Rome • Brussels

This electronic mail and any attachments are privileged and confidential and may be protected by the attorney-client privilege or attorney work product doctrine. It is intended solely for the use of the addressee identified above. If you are not the intended recipient, any use, disclosure, copying, or distribution of this electronic mail is unauthorized. If you have received this electronic mail in error, please notify the sender immediately by calling 212.805.3900 and delete it from your computer. Thank you.

| From: | Serena A. Skala <SSkala@clausen.com> |
|---|---|
| Sent: | Wednesday, August 7, 2019 4:07 PM |
| To: | Rachel M. Jacobson; Lauren Tabaksblat; Christian T. Becker; Jordan Beltz |
| Cc: | Jacob R. Zissu; John P. De Filippis; Tyler Jay Lory |
| Subject: | RE: AmTrust v. KF&B |
| Attachments: | City Service.xlsx; Derrick Payne.xlsx; Exclusive 1.xlsx; GTS II Transportation.xlsx; Gulf Coast.xlsx; Hollywoodland Tours.xlsx; Indianapolis Yellow Cab.xlsx; Irving Holdings.xlsx; ITOA.xlsx; Jesus R. Maria.xlsx |

**\*\*EXTERNAL EMAIL\*\***

Rachel,

In furtherance of our e-mail from Monday, enclosed please find spreadsheets of the already produced documents pertaining to the Underwriting Files for City Service, Derrick Payne, Exclusive 1, GTS II Transportation, Gulf Coast, Hollywood land Tours, Indianapolis Yellow, Irving Holdings, ITOA and Jesus R. Maria.

We will continue to provide you with spreadsheets on a rolling basis.  If you have any questions, please let us know. Thanks.

**Serena A. Skala | Partner**
Clausen Miller P.C. | 28 Liberty Street, 39th Floor | New York, New York 10005
212.805.3948 | vCard | bio

---

**From:** Serena A. Skala
**Sent:** Monday, August 5, 2019 3:14 PM
**To:** 'Rachel M. Jacobson' <RJacobson@kasowitz.com>; Lauren Tabaksblat <LTabaksblat@kasowitz.com>; Christian T. Becker <CBecker@kasowitz.com>; Jordan Beltz <JBeltz@kasowitz.com>
**Cc:** Jacob R. Zissu <jzissu@clausen.com>; John P. De Filippis <jdefilippis@clausen.com>; Tyler Jay Lory <tlory@clausen.com>
**Subject:** AmTrust v. KF&B

Counsel:

Pursuant to our agreement, enclosed please find spreadsheets of the already produced documents pertaining to the Underwriting Files for 5 Star Flash, AAA Full Transportation Systems, ASC, Ajay Transportation, Bay Area Metro, LLC, Beverly Hills Transit Coop., Inc. and Cabco Yellow, Inc.

We will continue to provide you with spreadsheets on a rolling basis.  If you have any question, please let us know. Thanks.

**Serena A. Skala | Partner**
Clausen Miller P.C. | 28 Liberty Street, 39th Floor | New York, New York 10005
212.805.3948 | vCard | bio

 

**Clausen Miller P.C.** Illinois • New York • California • New Jersey • Indiana • Wisconsin • Connecticut • Florida
**Clausen Miller International** London • Paris • Rome • Brussels

This electronic mail and any attachments are privileged and confidential and may be protected by the attorney-client privilege or attorney work product doctrine. It is intended solely for the use of the addressee identified above. If you are not the intended recipient, any use, disclosure, copying, or distribution of this electronic mail is unauthorized. If you have received this electronic mail in error, please notify the sender immediately by calling 212.805.3900 and delete it from your computer. Thank you.

| | |
|---|---|
| **From:** | Serena A. Skala <SSkala@clausen.com> |
| **Sent:** | Thursday, August 8, 2019 4:25 PM |
| **To:** | Rachel M. Jacobson; Lauren Tabaksblat; Christian T. Becker; Jordan Beltz |
| **Cc:** | Jacob R. Zissu; John P. De Filippis; Tyler Jay Lory |
| **Subject:** | RE: AmTrust v. KF&B |
| **Attachments:** | 5 Star Flash(Revised).xlsx; AAA Full Transportation Systems (Revised).xlsx; Administrative Services Cooperative(ASC)(Revised).xlsx; Juan S Taratula.xlsx; KS Express.xlsx; LA Checker.xlsx; LA Tours.xlsx; Luxor Cabs.xlsx; Mikhail Babayan.xlsx; MKBS.xlsx; Pleasantville Village.xlsx |

**\*\*EXTERNAL EMAIL\*\***

Rachel,

In furtherance of our e-mails from earlier this week, enclosed please find spreadsheets of the already produced documents pertaining to the Underwriting Files for Juan S Tartula, KS Express, LA Checker, LA Tours, Luxor Cabs, Mikhail Babayan, MKBS and Pleasantville Village.

We have also enclosed revised spreadsheets for 5 Star Flash, AAA and ASC – these are filtered to reflect documents with a File Loc of "C:\Taxi Files\Quotes (…)" only.  Only documents with this File Location were updated in the revised spreadsheets.  Please note that these revised spreadsheets still only contain references documents that have already been produced and do not reflect any documents that may be in our later supplemental production.

We will continue to provide you with spreadsheets on a rolling basis.  If you have any questions, please let us know. Thanks.

**Serena A. Skala | Partner**
Clausen Miller P.C. | 28 Liberty Street, 39th Floor | New York, New York 10005
212.805.3948 | vCard | bio

---

**From:** Serena A. Skala
**Sent:** Wednesday, August 7, 2019 4:07 PM
**To:** 'Rachel M. Jacobson' <RJacobson@kasowitz.com>; 'Lauren Tabaksblat' <LTabaksblat@kasowitz.com>; 'Christian T. Becker' <CBecker@kasowitz.com>; 'Jordan Beltz' <JBeltz@kasowitz.com>
**Cc:** Jacob R. Zissu <jzissu@clausen.com>; John P. De Filippis <jdefilippis@clausen.com>; Tyler Jay Lory <tlory@clausen.com>
**Subject:** RE: AmTrust v. KF&B

Rachel,

In furtherance of our e-mail from Monday, enclosed please find spreadsheets of the already produced documents pertaining to the Underwriting Files for City Service, Derrick Payne, Exclusive 1, GTS II Transportation, Gulf Coast, Hollywood land Tours, Indianapolis Yellow, Irving Holdings, ITOA and Jesus R. Maria.

We will continue to provide you with spreadsheets on a rolling basis.  If you have any questions, please let us know. Thanks.

**Serena A. Skala | Partner**
Clausen Miller P.C. | 28 Liberty Street, 39th Floor | New York, New York 10005
212.805.3948 | vCard | bio

**From:** Serena A. Skala
**Sent:** Monday, August 5, 2019 3:14 PM
**To:** 'Rachel M. Jacobson' <RJacobson@kasowitz.com>; Lauren Tabaksblat <LTabaksblat@kasowitz.com>; Christian T. Becker <CBecker@kasowitz.com>; Jordan Beltz <JBeltz@kasowitz.com>
**Cc:** Jacob R. Zissu <jzissu@clausen.com>; John P. De Filippis <jdefilippis@clausen.com>; Tyler Jay Lory <tlory@clausen.com>
**Subject:** AmTrust v. KF&B

Counsel:

Pursuant to our agreement, enclosed please find spreadsheets of the already produced documents pertaining to the Underwriting Files for 5 Star Flash, AAA Full Transportation Systems, ASC, Ajay Transportation, Bay Area Metro, LLC, Beverly Hills Transit Coop., Inc. and Cabco Yellow, Inc.

We will continue to provide you with spreadsheets on a rolling basis.  If you have any question, please let us know. Thanks.


**Serena A. Skala | Partner**
Clausen Miller P.C. | 28 Liberty Street, 39th Floor | New York, New York 10005
212.805.3948 | vCard | bio

 

**Clausen Miller P.C.** Illinois • New York • California • New Jersey • Indiana • Wisconsin • Connecticut • Florida
**Clausen Miller International** London • Paris • Rome • Brussels

This electronic mail and any attachments are privileged and confidential and may be protected by the attorney-client privilege or attorney work product doctrine. It is intended solely for the use of the addressee identified above. If you are not the intended recipient, any use, disclosure, copying, or distribution of this electronic mail is unauthorized. If you have received this electronic mail in error, please notify the sender immediately by calling 212.805.3900 and delete it from your computer. Thank you.

| From: | Serena A. Skala <securetransfer@clausen.com> |
|---|---|
| Sent: | Monday, September 2, 2019 3:13 PM |
| To: | Rachel Jacobson Teitler; Jordan Beltz; Lauren Tabaksblat; Christian T. Becker; tlory@clausen.com; jdefilippis@clausen.com; jzissu@clausen.com; adifusco@clausen.com; Adam Klein |
| Subject: | AmTrust v. KF&B - Jesus R. Maria, West Florida Limousine and LA Tours Productions |

**\*\*EXTERNAL EMAIL\*\***

Counsel:

Enclosed please find our supplemental production of documents pertaining to
the Underwriting Files for Jesus R. Maria, West Florida Limousine and LA Tours.  We have
also enclosed updated spreadsheets of the documents produced by KF&B which comprise the Underwriting File
for these accounts.  These spreadsheets supersede the prior spreadsheets sent regarding these accounts.

As you know, the testimony in this matter has
established that the Underwriting Files were maintained by KF&B in three
locations:  Agent Aid, on the KF&B server and in e-mail.  Each document listed in the attached spreadsheet
contains a reference to its
bates-range, its File Name and its File Location (File Loc), the latter of which corresponds to one of the
aforementioned three locations.  The
documents which were maintained on the KF&B server can be identified by a File Location that begins with
"C:\."  The documents stored in e-mails and
on Agent Aid documents are so identified.

As
previously stated, we have attempted to
accommodate your concerns, e.g. the category of  Miscellaneous
Program/Underwriting Documents includes documents encompassed by the MPA's
(X.B.VI.) definition of "underwriting file" and which have been maintained by
KF&B, but which apply to more than one account or the program in
general.

Thank you.

**Files attached to this message**

| Filename | Size | Checksum (SHA256) |
|---|---|---|
| Jesus R Maria (Updated).xlsx | 31 KB | 1d047f965e078a3dcbefa4aafae05e91759d8fe66ac8f14fb4736d12e21368e2 |

| Filename | Size | Checksum (SHA256) |
|---|---|---|
| LA Tours (Updated).xlsx | 51.2 KB | 7b7b6a10bf76c54b524e2a48296c93b135879b44c03a7cf41197e805a27f17b1 |
| West Florida Limo (Updated).xlsx | 31.8 KB | e7c1acf8b2ffeaf7d59b664d6f0c1de64d81f442d8eae54cc4ab0c087aa9ad2b |
| VOL_030.zip | 4.65 MB | d34ad5b054ecc2984cf4829e8f3a811a3d26ba2686dade07bcdb7de998a04569 |
| VOL_032.zip | 24.6 MB | 55a41dbe9dd732d96b1a6923cc0d013d642fdee2660d7c86fa6a5b4de00e3a61 |
| VOL_033.zip | 6.01 MB | d444b2ca6678f1aeefdb71b8c010ef6b3b19224b698d9d38be7851747dbb3d56 |

Please click on the following link to download the attachments:
https://securetransfer.clausen.com/message/vCPMQiPG9yhEN1dJbkY7Zz

This email or download link can not be forwarded to anyone else.

The attachments are available until: **Wednesday, 2 October.**

Message ID: vCPMQiPG9yhEN1dJbkY7Zz

Download Files

---

**Clausen Miller P.C. Secure File Transfer: https://securetransfer.clausen.com**

This electronic mail and any attachments are PRIVILEGED & CONFIDENTIAL and may be protected by the ATTORNEY-CLIENT PRIVILEGE. It is intended solely for the use of the addressee identified above. If you are not the intended recipient, any use, disclosure, copying, or distribution of this electronic mail is UNAUTHORIZED. If you have received this electronic mail in error, please notify the sender immediately by calling (312) 855.1010 and delete it from your computer. Thank you.

# Exhibit 6

| | |
|---|---|
| **From:** | Serena A. Skala <securetransfer@clausen.com> |
| **Sent:** | Monday, August 19, 2019 5:35 PM |
| **To:** | Rachel M. Jacobson; Christian T. Becker; Jordan Beltz; Lauren Tabaksblat |
| **Cc:** | jzissu@clausen.com; tlory@clausen.com; jdefilippis@clausen.com |
| **Subject:** | AmTrust v. KF&B - Derrick Payne and Pleasantville Village Accounts |

**\*\*EXTERNAL EMAIL\*\***

Counsel:

Enclosed please find our supplemental production of
documents pertaining to the Underwriting Files for Derrick Payne and Pleasantville Village.  We have
also enclosed updated spreadsheets of the documents produced by KF&B
which comprise the Underwriting Files for Derrick Payne and Pleasantville Village.  These spreadsheets
supersede the prior spreadsheets sent regarding these accounts.

As you know, the testimony in this matter has established
that the Underwriting Files were maintained by KF&B in three
locations:  Agent Aid, on the KF&B server and in e-mail.  Each
document listed in the attached spreadsheets contain a reference to its
bates-range, its File Name and its File Location (File Loc), the latter of
which corresponds to one of the aforementioned three locations.  The
documents which were maintained on the KF&B server can be identified by a
File Location that begins with "C:\."  The documents stored in e-mails and on Agent Aid documents
are so identified.

Thank you.

**Files attached to this message**

| Filename | Size | Checksum (SHA256) |
|---|---|---|
| Derrick Payne (Updated).xlsx | 35.7 KB | b630fc9a0ee6f1af0a760f34dbb6873b6027eb88c40df37d1678a00a7d1f9cd1 |
| Pleasantville Village (Updated).xlsx | 20.6 KB | 95e05e3824e1fc6a3587928043a9f78d244cf88c1978b42a29e9fc22da235c7c |
| VOL_019.zip | 14.4 MB | 3bfe66b52aeb8c9a46cf8048c940d7826a8ba37d1262fae3d3b1c3b9a6329de1 |
| VOL_020.zip | 11.4 MB | 48d92fe1d91dc0552f23204baccf2554525a8f8b1832230f6e0f142ff81e5bb9 |
| VOL_021.zip | 1.24 MB | dac3cb65e09197ccd71a28ba72e72784e1118a42f186c409b2f93aa6df3db238 |

Please click on the following link to download the attachments:
https://securetransfer.clausen.com/message/lrAQ1HvFHJPzQRYJY6pAgU

This email or download link can not be forwarded to anyone else.

The attachments are available until: **Wednesday, 18 September.**

Message ID: lrAQ1HvFHJPzQRYJY6pAgU

Download Files

Clausen Miller P.C. Secure File Transfer: https://securetransfer.clausen.com

This electronic mail and any attachments are PRIVILEGED & CONFIDENTIAL and may be protected by the ATTORNEY-CLIENT PRIVILEGE. It is intended solely for the use of the addressee identified above. If you are not the intended recipient, any use, disclosure, copying, or distribution of this electronic mail is UNAUTHORIZED. If you have received this electronic mail in error, please notify the sender immediately by calling (312) 855.1010 and delete it from your computer. Thank you.

| | |
|---|---|
| **From:** | Serena A. Skala <securetransfer@clausen.com> |
| **Sent:** | Wednesday, August 21, 2019 3:43 PM |
| **To:** | Rachel M. Jacobson; Christian T. Becker; Lauren Tabaksblat; Jordan Beltz; jzissu@clausen.com; jdefilippis@clausen.com; tlory@clausen.com |
| **Subject:** | AmTrust v. KF&B - GTS II, Transportation and Hollywoodland Tours |

**\*\*EXTERNAL EMAIL\*\***

Counsel:

Enclosed please find our
supplemental production pertaining to GTS II Transportation and Hollywoodland
Tours.  As with Monday's supplemental production, we have enclosed
updated spreadsheets pertaining to these accounts that supersede the
spreadsheets previously provided for these accounts.

As to your August 8 email, we
disagree with the positions taken therein.  KF&B is – and has been -
producing the documents it maintained in good faith and in full compliance with the Court's
order. We have attempted to accommodate your concerns, e.g. the category of Miscellaneous
Program/Underwriting Documents includes documents encompassed by the MPA's (X.B.VI.)
definition of "underwriting file" and which have been maintained by KF&B,
but which apply to more than one account or the program in general.

Thank you.

Serena Skala

**Files attached to this message**

| Filename | Size | Checksum (SHA256) |
|---|---|---|
| VOL_023.zip | 29.5 MB | 9d5ba4af634ab691fcd9b25f37c92467bb6e96d3f28910c778da74fb35649b84 |

1

| Filename | Size | Checksum (SHA256) |
|---|---|---|
| VOL_024.zip | 4.4 MB | 524c053270f72007f0bac17c59d484652afad188e6cc808a4898acb5a5a2bab0 |
| GTS II Transportation (Updated).xlsx | 43.6 KB | 40d5e79d02c16ee32227338bc7e9c6e816ef23b27c8ff8c585677596f5f8de3b |
| Hollywoodland (Updated).xlsx | 28.5 KB | dfd117e8bc1a61c445edf7051351b7b2c530f5be6e0cee46d28a7cd7be63d840 |

Please click on the following link to download the attachments:
https://securetransfer.clausen.com/message/mgsI8yHyGb9Llv44qGRBKz

This email or download link can not be forwarded to anyone else.

The attachments are available until: **Friday, 20 September.**

Message ID: mgsI8yHyGb9Llv44qGRBKz

Download Files

---

**Clausen Miller P.C. Secure File Transfer: https://securetransfer.clausen.com**

This electronic mail and any attachments are PRIVILEGED & CONFIDENTIAL and may be protected by the ATTORNEY-CLIENT PRIVILEGE. It is intended solely for the use of the addressee identified above. If you are not the intended recipient, any use, disclosure, copying, or distribution of this electronic mail is UNAUTHORIZED. If you have received this electronic mail in error, please notify the sender immediately by calling (312) 855.1010 and delete it from your computer. Thank you.

| | |
|---|---|
| **From:** | Serena A. Skala <securetransfer@clausen.com> |
| **Sent:** | Monday, August 26, 2019 11:57 AM |
| **To:** | Rachel M. Jacobson; Jordan Beltz; Christian T. Becker; Lauren Tabaksblat |
| **Cc:** | jzissu@clausen.com; jdefilippis@clausen.com; tlory@clausen.com |
| **Subject:** | AmTrust v. KF&B - Supplemental Production Beverly Hills Transit |

**\*\*EXTERNAL EMAIL\*\***

Counsel:

Enclosed please find our
supplemental production of documents pertaining to the Underwriting File for Beverly
Hills Transit.  We have
also enclosed an updated spreadsheet of the documents produced by KF&B which
comprise the Underwriting File for Beverly Hills Transit.  This
spreadsheet
supersedes the prior spreadsheet sent regarding this account.


As you know, the testimony in
this matter has established that the Underwriting Files were maintained by
KF&B in three
locations:  Agent Aid, on the KF&B server and in e-mail.  Each document
listed in the attached spreadsheet contains a reference to its
bates-range, its File Name and its File Location (File Loc), the latter of which
corresponds to one of the aforementioned three locations.  The
documents which were maintained on the KF&B server can be identified by a File
Location that begins with "C:\."  The documents stored in e-mails and
on Agent Aid documents are so identified.    As
previously stated, we have attempted to accommodate
your concerns, e.g. the category of  Miscellaneous Program/Underwriting
Documents includes documents encompassed by the MPA's (X.B.VI.) definition
of "underwriting file" and which have been maintained by KF&B, but which
apply to more than one account or the program in general.

Thank you.


**Files attached to this message**

| Filename | Size | Checksum (SHA256) |
|---|---|---|
| Beverly Hills Transit (Updated).xlsx | 136 KB | 0950a629587d30c7394afac5920e6ee115920b0bae37d8919b487d14fddca75c |
| VOL_022.zip | 164 MB | 75e85a90f25c91dba3d1aaa49fe47e6c25cc964e699fb3ace32f6b0a01abc827 |
| VOL_028.zip | 18.9 KB | 8c2df6d580c5bf861372218a1825621cf88d4d87554b2a4bd77d4232bca54ca2 |

Please click on the following link to download the attachments:
https://securetransfer.clausen.com/message/b2Z4vAor6YCLJni8byXZnD

This email or download link can not be forwarded to anyone else.

The attachments are available until: **Wednesday, 25 September.**

Message ID: b2Z4vAor6YCLJni8byXZnD

Download Files

**Clausen Miller P.C. Secure File Transfer:** https://securetransfer.clausen.com

This electronic mail and any attachments are PRIVILEGED & CONFIDENTIAL and may be protected by the ATTORNEY-CLIENT PRIVILEGE. It is intended solely for the use of the addressee identified above. If you are not the intended recipient, any use, disclosure, copying, or distribution of this electronic mail is UNAUTHORIZED. If you have received this electronic mail in error, please notify the sender immediately by calling (312) 855.1010 and delete it from your computer. Thank you.

| | A | B | C | D |
|---|---|---|---|---|
| 1 | ProdBeg | ProdEnd | FileName | FileLoc |
| 2 | KFB_00187561 | KFB_00187567 | WPP1068267-01_Corresponden_1-12-2015_282535.001 | Agent Aid |
| 3 | KFB_00613372 | KFB_00613642 | KFBA440_Pol-Underw_10-18-2011_208586.001 | Agent Aid |
| 4 | KFB_00915138 | KFB_00915160 | WPP1068267-00_Certificates_2-7-2013_241992.001 | Agent Aid |
| 5 | KFB_00915161 | KFB_00915161 | WPP1068267-00_Claims_2-25-2013_242664.001 | Agent Aid |
| 6 | KFB_00915162 | KFB_00915163 | WPP1068267-00_Claims_3-26-2013_244085.001 | Agent Aid |
| 7 | KFB_00915164 | KFB_00915164 | WPP1068267-00_Claims_6-11-2013_247665.001 | Agent Aid |
| 8 | KFB_00915165 | KFB_00915165 | WPP1068267-00_Claims_6-3-2013_247333.001 | Agent Aid |
| 9 | KFB_00915166 | KFB_00915173 | WPP1068267-00_Corresponden_10-1-2013_252821.001 | Agent Aid |
| 10 | KFB_00915174 | KFB_00915175 | WPP1068267-00_Corresponden_11-4-2013_254661.001 | Agent Aid |
| 11 | KFB_00915176 | KFB_00915181 | WPP1068267-00_Corresponden_12-3-2013_256139.001 | Agent Aid |
| 12 | KFB_00915182 | KFB_00915189 | WPP1068267-00_Corresponden_1-6-2014_257697.001 | Agent Aid |
| 13 | KFB_00915190 | KFB_00915190 | WPP1068267-00_Corresponden_2-26-2013_242709.001 | Agent Aid |
| 14 | KFB_00915191 | KFB_00915194 | WPP1068267-00_Corresponden_2-3-2014_259111.001 | Agent Aid |
| 15 | KFB_00915195 | KFB_00915199 | WPP1068267-00_Corresponden_3-1-2013_242886.001 | Agent Aid |
| 16 | KFB_00915200 | KFB_00915200 | WPP1068267-00_Corresponden_3-18-2013_243699.001 | Agent Aid |
| 17 | KFB_00915201 | KFB_00915212 | WPP1068267-00_Corresponden_4-1-2013_244380.001 | Agent Aid |
| 18 | KFB_00915213 | KFB_00915222 | WPP1068267-00_Corresponden_5-1-2013_245617.001 | Agent Aid |
| 19 | KFB_00915223 | KFB_00915223 | WPP1068267-00_Corresponden_5-17-2013_246544.001 | Agent Aid |
| 20 | KFB_00915224 | KFB_00915224 | WPP1068267-00_Corresponden_5-29-2013_247088.001 | Agent Aid |
| 21 | KFB_00915225 | KFB_00915238 | WPP1068267-00_Corresponden_6-10-2013_247571.001 | Agent Aid |
| 22 | KFB_00915239 | KFB_00915244 | WPP1068267-00_Corresponden_6-3-2013_247314.001 | Agent Aid |
| 23 | KFB_00915245 | KFB_00915250 | WPP1068267-00_Corresponden_7-11-2013_249032.001 | Agent Aid |
| 24 | KFB_00915251 | KFB_00915252 | WPP1068267-00_Corresponden_7-22-2013_249411.001 | Agent Aid |
| 25 | KFB_00915252 | KFB_00915268 | WPP1068267-00_Corresponden_7-31-2013_249762.001 | Agent Aid |
| 26 | KFB_00915269 | KFB_00915269 | WPP1068267-00_Corresponden_8-12-2013_250274.001 | Agent Aid |
| 27 | KFB_00915270 | KFB_00915270 | WPP1068267-00_Corresponden_8-26-2013_250855.001 | Agent Aid |
| 28 | KFB_00915271 | KFB_00915271 | WPP1068267-00_Corresponden_9-19-2013_252013.001 | Agent Aid |
| 29 | KFB_00915272 | KFB_00915276 | WPP1068267-00_Corresponden_9-4-2013_251280.001 | Agent Aid |
| 30 | KFB_00915277 | KFB_00915557 | WPP1068267-00_Pol-Underw_11-5-2012_237589.001 | Agent Aid |
| 31 | KFB_00915558 | KFB_00915627 | WPP1068267-00_Pol-Underw_2-5-2013_241871.001 | Agent Aid |
| 32 | KFB_00915628 | KFB_00915628 | WPP1068267-00_Pol-Underw_2-5-2013_241874.001 | Agent Aid |
| 33 | KFB_00915629 | KFB_00915634 | WPP1068267-00_Pol-Underw_3-18-2013_243665.001 | Agent Aid |
| 34 | KFB_00915635 | KFB_00915663 | WPP1068267-00_SignedDocs_3-18-2013_243631.001 | Agent Aid |
| 35 | KFB_00915664 | KFB_00915665 | WPP1068267-01_Claims_11-13-2015_309456.001 | Agent Aid |
| 36 | KFB_00915666 | KFB_00915672 | WPP1068267-01_Corresponden_10-2-2014_275375.001 | Agent Aid |
| 37 | KFB_00915673 | KFB_00915673 | WPP1068267-01_Corresponden_10-24-2014_277067.001 | Agent Aid |
| 38 | KFB_00915674 | KFB_00915677 | WPP1068267-01_Corresponden_11-17-2014_278845.001 | Agent Aid |
| 39 | KFB_00915678 | KFB_00915678 | WPP1068267-01_Corresponden_12-2-2014_279656.001 | Agent Aid |
| 40 | KFB_00915679 | KFB_00915680 | WPP1068267-01_Corresponden_12-3-2014_279714.001 | Agent Aid |

| | A | B | C | D |
|---|---|---|---|---|
| 763 | KFB_00313862 | KFB_00313863 | FW: Beverly Hills Taxi.msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 764 | KFB_00314062 | KFB_00314062 | RE: Beverly Hills - Taxi policy number request.msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 765 | KFB_00314077 | KFB_00314078 | FW: Beverly hills.msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 766 | KFB_00314237 | KFB_00314238 | RE: Beverly hills.msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 767 | KFB_00314241 | KFB_00314241 | Beverly Hills 350 CSL 012413.xls | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 768 | KFB_00314242 | KFB_00314242 | Beverly Hills split limit 012413.xls | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 769 | KFB_00314280 | KFB_00314282 | RE: Beverly Hills - Taxi policy number request.msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 770 | KFB_00314283 | KFB_00314285 | RE: Beverly Hills - Taxi policy number request.msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 771 | KFB_00314286 | KFB_00314286 | Beverly Hills----WPP1068267 00 .msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 772 | KFB_00314287 | KFB_00314402 | beverly67.pdf | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 773 | KFB_00314403 | KFB_00314403 | IL12011185 (Split Limits) 312299.doc | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 774 | KFB_00314404 | KFB_00314404 | CA99270187 (Split Limits) 312299.doc | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 775 | KFB_00314516 | KFB_00314517 | RE: Ticket 30921 RE: Beverly Hills----WPP1068267 00 .msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 776 | KFB_00314518 | KFB_00314635 | beverly67.pdf | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 777 | KFB_00314636 | KFB_00314637 | RE: Beverly Hills Taxi.msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 778 | KFB_00314638 | KFB_00314642 | Claims Agreement - AmTrust Addendum No 12 - Beverly Hills Transit Coop.pdf | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 779 | KFB_00314705 | KFB_00314706 | RE: Beverly Hills.msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 780 | KFB_00314707 | KFB_00314707 | First Dollar Ltr 2012.doc | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 781 | KFB_00314985 | KFB_00314986 | Beverly Hills Transit.msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 782 | KFB_00314987 | KFB_00314988 | RE: Beverly Hills Transit.msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 783 | KFB_00319028 | KFB_00319029 | FW: Beveryhills Taxi Payments.msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 784 | KFB_00319030 | KFB_00319030 | Beverly Hills Binder.pdf | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 785 | KFB_00319031 | KFB_00319031 | Invoice and Payments Report.xlsx | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 786 | KFB_00319032 | KFB_00319034 | FW: Beveryhills Taxi Payments.msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 787 | KFB_00319035 | KFB_00319035 | Beverly Hills Binder.pdf | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 788 | KFB_00319036 | KFB_00319036 | Invoice and Payments Report.xlsx | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 789 | KFB_00319037 | KFB_00319038 | (No subject/filename).msg | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 790 | KFB_00319039 | KFB_00319039 | State Volume.xls | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 791 | KFB_00319100 | KFB_00319100 | Beverly Hills Transit Coop Inc. Policy WPP106826700 & WPP106826800 Weekly Report 04/22/2013 to | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 792 | KFB_00319101 | KFB_00319101 | 13 RPT cau kf&b rpt week of 042213 to 043013.xls | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 793 | KFB_00319131 | KFB_00319131 | Beverly Hills transit Coop,inc. Policy WPP106826700 & WPP106826800 Weekly Report 05/01/13 to | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 794 | KFB_00319132 | KFB_00319132 | 13 RPT cau kf&b rpt week of 050113 to 050513.xls | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 795 | KFB_00319408 | KFB_00319408 | Beverly Hills transit Coop,inc. Policy WPP106826700 & WPP106826800 Weekly Report 05/20/13 to | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 796 | KFB_00319409 | KFB_00319409 | 13 RPT cau kf&b rpt week of 052013 to 052613.xls | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 797 | KFB_00319845 | KFB_00319845 | Beverly Hills transit Coop,inc. Policy WPP106826700 & WPP106826800 Weekly Report 05/27/13 to | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 798 | KFB_00319846 | KFB_00319846 | 13 RPT cau kf&b rpt week of 052713 to 053113.xls | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 799 | KFB_00319921 | KFB_00319921 | Beverly Hills transit Coop,inc. Policy WPP106826700 & WPP106826800 Weekly Report 06/03/13 to | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 800 | KFB_00320393 | KFB_00320393 | Beverly Hills Transit Coop Inc. Policy WPP106826700 & WPP106826800 Weekly Report 06/17/2013 to | E-Mail - Mailbox - Mike Howery\Deleted Items\ |
| 801 | KFB_00320517 | KFB_00320517 | Beverly Hills Transit Coop Inc. Policy WPP106826700 & WPP106826800 Weekly Report 06/24/2013 to | E-Mail - Mailbox - Mike Howery\Deleted Items\ |

| | |
|---|---|
| **From:** | Serena A. Skala <securetransfer@clausen.com> |
| **Sent:** | Wednesday, August 28, 2019 9:43 AM |
| **To:** | Rachel Jacobson Teitler; Jordan Beltz; Christian T. Becker; Lauren Tabaksblat; tlory@clausen.com; jdefilippis@clausen.com; jzissu@clausen.com |
| **Subject:** | AmTrust v. KF&B - Ajay Transportation and Exclusive One Supplemental Productions |

**\*\*EXTERNAL EMAIL\*\***

Counsel:

Enclosed please find our supplemental production of documents pertaining to the Underwriting Files for Exclusive One and Ajay Transportation.  We have also enclosed an updated spreadsheets of the documents produced by KF&B
which comprise the Underwriting File for these accounts.  These

spreadsheets supersede the prior spreadsheets sent regarding these accounts.

As you know, the testimony in this matter has established that the Underwriting Files were maintained by KF&B in three locations:  Agent Aid, on the KF&B server and in e-mail.  Each
document listed in the attached spreadsheet contains a reference to its bates-range, its File Name and its File Location (File Loc), the latter of
which corresponds to one of the aforementioned three locations.  The documents which were maintained on the KF&B server can be identified by a
File Location that begins with "C:\."  The documents stored in e-mails and on Agent Aid documents are so identified.   As previously stated, we have attempted to accommodate your concerns, e.g. the category of  Miscellaneous Program/Underwriting Documents includes documents encompassed by the MPA's (X.B.VI.) definition of "underwriting file" and which have been maintained by KF&B, but which apply to more than one account or the program in general.

Thank you.

**Files attached to this message**

| Filename | Size | Checksum (SHA256) |
|---|---|---|
| VOL_026.zip | 15.7 MB | `1c62ade4afeb638abf72955ad998c49d42177bb759a4d12f61fb8c84b49c66af` |

| Filename | Size | Checksum (SHA256) |
|---|---|---|
| VOL_027.zip | 24.4 MB | e265447f2a1ff82b837175f848030c2cdb365f4ecb79457c70179fffb6006aad |
| Ajay Transportation (Updated).xlsx | 62.3 KB | 733d747a26fd2d1bdef28681e0c2aab5bdef17233331338a4d5eae1fa7d30f2a |
| Exclusive One (Updated).xlsx | 33.6 KB | 07ee7dbdfc367bc8af33bad91a3e72f8c1266a686da64237d9a400d183cd924d |

Please click on the following link to download the attachments:
https://securetransfer.clausen.com/message/rsBTiCvl74S67XZk8aYft6

This email or download link can not be forwarded to anyone else.

The attachments are available until: **Friday, 27 September.**

Message ID: rsBTiCvl74S67XZk8aYft6

Download Files

---

**Clausen Miller P.C. Secure File Transfer: https://securetransfer.clausen.com**

This electronic mail and any attachments are PRIVILEGED & CONFIDENTIAL and may be protected by the ATTORNEY-CLIENT PRIVILEGE. It is intended solely for the use of the addressee identified above. If you are not the intended recipient, any use, disclosure, copying, or distribution of this electronic mail is UNAUTHORIZED. If you have received this electronic mail in error, please notify the sender immediately by calling (312) 855.1010 and delete it from your computer. Thank you.

| From: | Serena A. Skala <securetransfer@clausen.com> |
|---|---|
| Sent: | Monday, September 2, 2019 3:13 PM |
| To: | Rachel Jacobson Teitler; Jordan Beltz; Lauren Tabaksblat; Christian T. Becker; tlory@clausen.com; jdefilippis@clausen.com; jzissu@clausen.com; adifusco@clausen.com; Adam Klein |
| Subject: | AmTrust v. KF&B - Jesus R. Maria, West Florida Limousine and LA Tours Productions |

**\*\*EXTERNAL EMAIL\*\***

Counsel:

Enclosed please find our supplemental production of documents pertaining to
the Underwriting Files for Jesus R. Maria, West Florida Limousine and LA Tours.  We have
also enclosed updated spreadsheets of the documents produced by KF&B which comprise the Underwriting File
for these accounts.  These spreadsheets supersede the prior spreadsheets sent regarding these accounts.

As you know, the testimony in this matter has
established that the Underwriting Files were maintained by KF&B in three
locations:  Agent Aid, on the KF&B server and in e-mail.  Each document listed in the attached spreadsheet
contains a reference to its
bates-range, its File Name and its File Location (File Loc), the latter of which corresponds to one of the
aforementioned three locations.  The
documents which were maintained on the KF&B server can be identified by a File Location that begins with
"C:\."  The documents stored in e-mails and
on Agent Aid documents are so identified.

As
previously stated, we have attempted to
accommodate your concerns, e.g. the category of  Miscellaneous
Program/Underwriting Documents includes documents encompassed by the MPA's
(X.B.VI.) definition of "underwriting file" and which have been maintained by
KF&B, but which apply to more than one account or the program in
general.

Thank you.

**Files attached to this message**

| Filename | Size | Checksum (SHA256) |
|---|---|---|
| Jesus R Maria (Updated).xlsx | 31 KB | 1d047f965e078a3dcbefa4aafae05e91759d8fe66ac8f14fb4736d12e21368e2 |

| Filename | Size | Checksum (SHA256) |
|----------|------|-------------------|
| LA Tours (Updated).xlsx | 51.2 KB | 7b7b6a10bf76c54b524e2a48296c93b135879b44c03a7cf41197e805a27f17b1 |
| West Florida Limo (Updated).xlsx | 31.8 KB | e7c1acf8b2ffeaf7d59b664d6f0c1de64d81f442d8eae54cc4ab0c087aa9ad2b |
| VOL_030.zip | 4.65 MB | d34ad5b054ecc2984cf4829e8f3a811a3d26ba2686dade07bcdb7de998a04569 |
| VOL_032.zip | 24.6 MB | 55a41dbe9dd732d96b1a6923cc0d013d642fdee2660d7c86fa6a5b4de00e3a61 |
| VOL_033.zip | 6.01 MB | d444b2ca6678f1aeefdb71b8c010ef6b3b19224b698d9d38be7851747dbb3d56 |

Please click on the following link to download the attachments:
https://securetransfer.clausen.com/message/vCPMQiPG9yhEN1dJbkY7Zz

This email or download link can not be forwarded to anyone else.

The attachments are available until: **Wednesday, 2 October.**

Message ID: vCPMQiPG9yhEN1dJbkY7Zz

Download Files

Clausen Miller P.C. Secure File Transfer: https://securetransfer.clausen.com

This electronic mail and any attachments are PRIVILEGED & CONFIDENTIAL and may be protected by the ATTORNEY-CLIENT PRIVILEGE. It is intended solely for the use of the addressee identified above. If you are not the intended recipient, any use, disclosure, copying, or distribution of this electronic mail is UNAUTHORIZED. If you have received this electronic mail in error, please notify the sender immediately by calling (312) 855.1010 and delete it from your computer. Thank you.

| | |
|---|---|
| **From:** | Serena A. Skala <securetransfer@clausen.com> |
| **Sent:** | Wednesday, September 4, 2019 2:04 PM |
| **To:** | Rachel Jacobson Teitler; Christian T. Becker; Jordan Beltz; Lauren Tabaksblat; Adam Klein; adifusco@clausen.com; jdefilippis@clausen.com; jzissu@clausen.com; tlory@clausen.com |
| **Subject:** | AmTrust v. KF&B - Juan Taratuta and KS Express |

**\*\*EXTERNAL EMAIL\*\***

Good afternoon,

Enclosed please find our supplemental productions for KS Express and Juan S. Taratuta.   We have also enclosed an updated spreadsheets of the documents produced by KF&B which comprise the Underwriting File for these accounts.  These spreadsheets supersede the prior spreadsheets sent regarding these accounts.

Thank you.

 - Serena Skala

**Files attached to this message**

| Filename | Size | Checksum (SHA256) |
|---|---|---|
| VOL_034.zip | 31.1 MB | d6cea649f7425b9aa391a85903c32b88bf22475f09fe4b9e108a1ade1792ee82 |
| VOL_035.zip | 2.92 MB | 5aa8e4fad29a3729b1b691a1a8dd8345517df45e5672edffb5fa86fbe8f74954 |
| Juan S Taratuta (Updated).xlsx | 30 KB | 4c4c41bd6b7da7cf0e4c4af0154c1b0a5847f285c410d8764e8dc7bd3885e95d |
| KS Express (Updated).xlsx | 30.6 KB | ffaece008d6d3f65a7db3d2921d09d0fa37c849483baa51d283d6804e9c39ae4 |

Please click on the following link to download the attachments:
https://securetransfer.clausen.com/message/XeJlfG26STx97AUHRSal84

This email or download link can not be forwarded to anyone else.

The attachments are available until: **Friday, 4 October.**

Message ID: XeJlfG26STx97AUHRSal84

[ Download Files ]

This electronic mail and any attachments are PRIVILEGED & CONFIDENTIAL and may be protected by the ATTORNEY-CLIENT PRIVILEGE. It is intended solely for the use of the addressee identified above. If you are not the intended recipient, any use, disclosure, copying, or distribution of this electronic mail is UNAUTHORIZED. If you have received this electronic mail in error, please notify the sender immediately by calling (312) 855.1010 and delete it from your computer. Thank you.

# Exhibit 7



**AmTrust Underwriters**
An AmTrust Financial Company

## Audit Report
## KF&B Limousine & Taxi Program

**Department Conducting Audit:**
Underwriting

**Account Name:**
KF&B Limousine & Taxi Program

**Program Administrator:**
KF&B, Inc. dba KF&B Managers Insurance

**Claims Administrator:**
North American Risk Services (NARS)

**Loss Control Administrator:**

Cal West Inspection and Audit Services (LIMO Business Only(

**Program Term:**
7/1/2012 to 6/30/2013

**Audit Date:**
3/19/2013

**Prepared By:**
Jerrell Fort

**Auditors:**
Jerrell Fort
Walter Lasley

| **Primary Client Contacts:** | **Business Segment:** |
|---|---|
| Michael Howery, Executive VP<br>Larry Kalior, President<br>Ron Geller, VP<br>Eric Whiteside, VP, Operation<br>Karla Sotelo, Underwriter | Insurance Products |

| **Lines of Business:** | **Carrier:** |
|---|---|
| Automobile Liability & APD | **Wesco Insurance Company**<br>Technology Insurance Company |

## Executive Summary

### Program Structure/History

KF&B was formed in 1933 as a wholesale in Glendale, California. It is recognized as the oldest continuously operating insurance wholesaler in the state of California. KF&B concentrates on transportation business across the U.S. and operates as an underwriting manager utilizing approximately 85 agents nationwide. In 1992, the principals of Transportation Insurance Brokers, Inc. (TIB), the largest independently owned retail broker to the public transportation industry, purchased KF&B.

KF&B's home office is located in Glendale, Ca, with a branch office in Orlando, Florida.
Both offices have local underwriting staffs. There are 17 employees and the company is licensed in 16 states.

In 2011, KF&B and AmTrust entered into an agreement to write KF&B's Limousine Operators and Taxi Program, previously written by Praetorian Insurance Company. The program is a countrywide program offered in states where both AmTrust and KF&B are licensed. The limousine portion of the program is written on a ground up, guaranteed cost basis (no auto liability deductible or SIR), targeting owner operators of small fleet limousine businesses. The taxi portion of the program is limited to large taxi fleet operators who are willing to accept a deductible or SIR retention of $25,000 or more and willing to provide cash collateral to fund the retaining layer claim loss fund.

The lead underwriter for the limo business is Karla Sotelo who works in the Glendale, Ca., branch. The lead underwriter for the taxi business is Mike Howery who works in the Orlando, FL branch.

KF&B has the ability to quote, issue and endorse policies using our AmTrust CPP system, coordinate regulatory filings and issue cancellation notices when necessary. The KF&B underwriters noted above, handle the risk selection reviews, quoting and binding authorization within program parameters. Any special exceptions, unusual risks, or risks otherwise outside KF&B's underwriting authority require referral to AmTrust Underwriters for approval.

KF&B uses the 3i-Infotech (Corban) / Agent-Aid system. Agent-Aid is KF&B's paperless underwriting system. The audit team made request for remote access to the paperless system that will allow AmTrust the ability to review the underwriting files on future underwriting audits in order to review files either remotely or on-site.

## Review Summary

This review was the second on-site underwriting review conducted by AmTrust since program inception 2011. Unfortunately, the proceeding underwriter did not complete a report, therefore, the audit team conducted this review as an initial audit review for the program.

The audit confirmed that KF&B maintains good knowledge of the limousine and taxi industry, promote reasonable risk selection and generally adhered to the current underwriting guidelines in effect.

## Strengths

- Transportation oriented Program Administrator, knowledge of target markets
- Limited production sources
- Management involvement in the underwriting decision process
- Adherence to Current Underwriting Guidelines
- Adequate underwriting information obtained to determine risk exposures and quality
- Adequate risk selection and pricing

## Areas Needing Strengthening

- Improve file documentation of the underwriter's analysis that supports the underwriting decision to accept the risk and quantify the quality of the risk.

CONFIDENTIAL

**Status of Prior Recommendations**

| Count | Priority | Prior Recommendations | Due Date | Status |
|-------|----------|----------------------|----------|--------|
| 1 | Select... | None | | Closed |

*** *Please include a comment if there are no prior recommendations and indicate "Closed" as the status*

## Recommendations

| Count | Priority | Recommendations | Due Date | Status |
|-------|----------|----------------|----------|--------|
| 1 | High | Expand the underwriting file documentation of the underwriter's analysis by adding a risk summary document to KF&B's Limo pricing and loss experience model and include the recently developed Underwriter Risk Evaluation Form in every taxi file. These documents should assist with allowing the reviewer to quickly see the account characteristics and the underwriter's risk assessment thoughts on the account. | 4/30/2013 | Open |
| 2 | High | Filing is required to charge $350 inspection /loss control fee on Limo risks in state of California. AUI compliance will research to determine if any other state require filing for inspection/loss control. | 4/30/2013 | Open |
| 3 | High | The KF&B offers split limits as required by taxi regulatory authorities in some jurisdictions.  Currently, AmTrust does not have split limit filing available. AUI to initiate filing for split limit in states where KF&B writes taxi business. | 4/30/2013 | Open |

*** *Please include a comment if there are no recommendations and indicate "Closed" as the status*

| # of Open Recommendations | # of Closed Recommendations | # of Overdue Recommendations | Total # of Recommendations | As of |
|---------------------------|------------------------------|------------------------------|----------------------------|-------|
| 3 | 1 | 0 | 4 | 4/12/2013 |

## Review Highlights

### Overall Comments

Normally, underwriting business auto involves examining several different areas. Some important ones are the named insured, operations, management, vehicle information, driver information including obtaining MVRs for review, loss control and financial information, loss history, tailoring coverage and deductibles.  We would expect to see evidence of these items addressed in the underwriting file. Ironically, this program's underwriting guidelines and criteria, established by my predecessor for the two business segments KF&B writes for AmTrust is atypical from the normal underwriting considerations when evaluating business auto risks.  With the exception of seeing financial information in the files, most if not all of the above elements were generally seen in the underwriting files on the smaller limo segment. However, on the taxi segment, there was no driver MVRs, financial information, or loss control reports in the files to review.

The taxi underwriting files generally consisted of Acord application, KF&B's pricing and loss rating model,

ANA00006389

quote proposal is binding. The underwriter's explanation as to why MVRs are not required for review before a quote is released is because the taxi segment is an excess program for a homogeneous taxi risk, with the operations, management, and controls reflected primarily through their pricing approach; KF&B believes the current practice of not requiring MVRs for review prior to binding nor providing onsite loss control inspections is acceptable. Once written, most taxi accounts receive visits two to four times annually by the Claims TPA, North American Risk Services (NARS). After the claims implementation process is completed by NARS and the claims loss fund is establish, NARS will schedule a follow up visit to analyzes loss performance of the account. Unfortunately, the underwriting files did not contain documentation of the follow up visit or discussions held with the taxi insured.

Unlike the limo policies, where KF&B is providing first dollar exposure and concerns about MVR's, ages of vehicle, maintenance, etc., are important issues and concerns, the taxi program is strictly an excess product and KF&B do not believe obtaining MVR or financial information is necessary to underwrite excess taxi business. KF&B contends that since the taxi risks are taking at minimum the first $25k of exposure (some at $100k), the taxi company is already has a vested interest in these items.

**Organization**

Larry Kalior, Chairman and President of KF&B. Owner of KF&B and parent company Transportation Insurance Brokers, the retail arm of the organization. Larry founded TIB in 1981.

Ron Geller, Vice President of KF&B, joined TIB in 1983. Previously, Ron was in the marketing department of the Transit Casualty Company. He is currently Executive Vice President of TIB and is directly involved with the day-to-day operations of TIB.

Mike Howery, Executive Vice President. Mike joined KF&B in 1996, and is responsible for overseeing all facets of program administration including product development, price monitoring, loss control, compliance, and company relations. Mike handles the all taxi business.

Eric Whiteside, Vice President of Operations, joined KF&B in 2012. Eric is responsible for overseeing underwriting, production, and customer service.

Larry Vigor, Senior Underwriter, returned to KF&B in 2000 after a 10-year absence. KF&B was originally purchased from Larry Vigor who had run the company for more than 20 years.

Marni Sawicki, Vice President of Marketing, joined KF&B in 2009. Marni is responsible for all aspects of marketing, advertising and agency relations.

Ron Schwarz, Vice President for WC. Ron joined TIB in 1988 as Director of Sales and joined KF&B in 1993. Ron supervises Workers' Compensation Programs for the company.

Karla Sotelo, Underwriter. Karla is the lead underwriter for the limo business placed with AmTrust.

**Underwriting**

KF&B underwrites Automobile Liability and General Liability issuing the coverage's providing standard ISO coverage's. Owned Automobile Liability limits up to $1,500,000 per accident with coverage written using typical ISO symbols #7 in most cases. Hired and Non – Owned coverage is available at the same aforementioned limits. APD is also available to be offered written using a symbol #7 with deductible ranges from $500 to maximum deductible allowed by ISO. None of the taxi accounts reviewed had APD coverage.

ACORD application are used on the taxi business and program specific application is used on limo business. Applications are required on all files, new and renewal. All files reviewed contained applications signed by the at least the insured and in many cases by the agent. Vehicle schedule, driver schedule and 3 to 5 years of prior carrier loss runs are required with each submission. Motor vehicle records are required only for the limo business. Financials are required on all accounts in excess of 40 vehicles. On site loss control inspections is required on all limo accounts. No such requirement for loss control inspections on taxi business.

KF&B underwriting files are maintained on their paperless Corbin system. AUI has requested to have remote view only access to KF&Bs paperless system.

**File Review**

Eighteen active accounts were reviewed, consisting of 24 policies with a total premium of $6,345, 697. This represented approximately 58% of the in-force book at the time of the audit.

The review found that the quality and amount of risk information was reasonably acceptable for the underwriter to perform risk assessment and analysis. ACORD applications were noted in file for all taxi accounts reviewed. The limo program uses a program specific application or ACORD application. Applications were noted in all limo files reviewed. The applications appeared to be complete and signed by the insured. UM/UIM election and/or reject applications were also in the files. Submission information routinely included historical loss runs data, driver's lists, vehicle lists, garaging location and with the exception of MVRS being in the taxi risks, MVRs were noted in all the limo files.

KF&B uses their pricing and loss rating model to price and quote business. Their model summarizes the loss run information, trend and applies loss development factors to the losses then develops a needed premium/rate for the account. KF&B will then rate the risk in our CPP system that uses ISO loss costs, AmTrust filed LCMs and available state experience and schedule rating plans to develop a premium to quote the insured. Quote proposals with the terms and conditions were noted in the files as well as a binder. Policies were in file for each file reviewed issued timely and with the appropriate forms and endorsements.

On the taxi accounts where a minimum deductible of $25,000 or greater is applied, the quote proposal and binder terms clearly indicated that a signed collateral agreement is required, noted the claim fund amount due and collateral adjustment terms, if necessary.

No financial information from the insured was noted in any of the files reviewed.

Out of the 20 policies reviewed, five were identified as being NI (Needs Improvement). None was considered UA (Unacceptable risks). The primary reason for the 5 accounts being graded below average was because referral not sent to AUI because of loss ratio criteria or missing financial information or lack of documentation of the loss exposures, hazards and control.

Overall, the audit confirmed reasonable quality of business, acceptable information gathering and underwriting analysis was performed on the business written by KF&B. An audit score of 85.5 was the result of this review which is considered average for this review.

**Individual File Comments**

CONFIDENTIAL
ANA00006391

Files scored lower than 85 are specifically being returned to the underwriter of KF&B for comments. The tally worksheet, attached to this report should be reviewed for audit comments on all files reviewed during this audit. The following accounts were rated **NI (Needs Improvement)** and our audit comments are shown as the basis for each file score.

Overall scoring of the file graded as follows: 90 to 100 - Above Average =**AA;** 80 to 89 - Average = **A;** 70 to 79 – Needs Improvement = **NI;** 0 to 69 – Unacceptable = **UA**

*Frank Antepara dba FAMA Limosine – WPP1051655 01* – File graded **NI.** The account has poor experience and should be non renewed. The risk is considered substandard and underwriting analysis justifying renewal was not evident in the file.

## Summary and Service

The review confirmed that KF&B actively underwrites and manages its taxi and limo programs. KF&B's underwriting process appears to provide a framework that facilitates the pursuit of good risk selection and proper pricing. The recommendations of the audit are directed at raising the performance of an acceptable operation.

It is recommended that the next audit be conducted next year first quarter 2014.

## Rating

<u>Satisfactory with Minor Issues</u>

## Description

Satisfactory Internal and/or Management controls noted. Minor improvements required.

ANA00006392